**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff Darrell E. Cline*
*and Plaintiffs Troy Kehoe, Alfonzo Woods,*
*Osiel Herrera Martinez and Diane Van Alstyne*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
|  | Master File No. 1:21-cv-01920-NGG-TAM |
| IN RE 3D SYSTEMS SECURITIES LITIGATION, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
|  | JURY TRIAL DEMANDED |
|  | CLASS ACTION |

Lead Plaintiff Darrell E. Cline ("Lead Plaintiff") together with Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez, and Diane Van Alstyne ("Named Plaintiffs") (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

3D Systems Corp. ("3DSC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities that purchased the publicly-traded common stock of 3DSC from May 6, 2020, to March 5, 2021 (the "Class Period"). Excluded from the class are the individual defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or any excluded persons have or had a controlling interest. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, defendant 3DSC, one of the oldest in the industry, sold 3D printers, materials used for 3D printing, printer software, and on-demand printing services. First-comer status only took the Company so far: as new technologies and competitors entered the market, the Company acquired many of them, to still be perceived as a leading player on the cutting edge of industry advances. Alas, this strategy proved both hollow and costly.

3.      By 2015, its multi-year spending spree, encompassing dozens of purchases and culminating in the introduction of a dizzying 39 new products in a single year, left 3DSC a completely disorganized and unwieldy roll-up company. When the market began to see through the rosy picture painted by management, the behind-the-scenes chaos plaguing 3DSC's global operations caught up with 3DSC and its share price declined 75% from its high of more than $96

2

per share in late 2013 to less than $23 by early May 2015. Not only were the Company and several members of its senior management sued for securities fraud, but both the CEO and the second class-period CFO – who had only served for six months – abruptly stepped down.

4.      When the dust cleared in early 2016, the Company could not file its Annual Report on Form 10-K for 2015 on time because "additional time, resources and effort are required to complete work related to a goodwill and intangible asset impairment charge". When the work was finally completed, the combined charges were a staggering $537.2 million.

5.      At the beginning of the Class Period in May 2020, defendant Vyomesh Joshi ("CEO Joshi"), a seasoned industry professional who had once led Hewlett Packard's imaging and printing division, had been at the helm of the Company for four years. During his tenure, CEO Joshi's stated goal was to focus upon improving product quality and providing end-to-end vertical solutions for customers in aerospace, automotive, healthcare, and durable goods. Internally, to slash costs and to address the severe operational deficiencies, inefficiencies and redundancies, and quality control issues exposed in the earlier lawsuit, the Company focused upon supply chain, IT, and infrastructure improvements,  as well as a business realignment. During this period, product lines were discontinued and resources were reallocated to innovations, particularly in healthcare and metal printing.

6.       When CEO Joshi announced he was leaving the Company in early 2020, the turnaround was not complete: Since 2016, revenues had been essentially flat and net losses, although stabilized, continued unabated. Nevertheless, during the fourth quarter ("Q4") 2019 earnings call, CEO Joshi was proud to have done what was necessary to set the Company up for future success. Specifically, he indicated that he had "worked with the team to improve our product portfolio, business processes, cost structure and culture . . . I feel confident now that we have the

right products in place with the right team to execute our growth strategy." In the press release announcing financial results for Q4 and for all of 2019 ("FY 2019"), CEO Joshi favorably assessed his years at 3DSC: "We have built a foundation on which to scale and grow and we are structuring the company to be lean and profitable."

7.      Because the Company previously grew revenues through a reckless acquisition strategy that failed to build an operational infrastructure, ultimately resulting in the $537.2 million write-off, one critical metric on which the market was focused was 3DSC's gross profit margin – the percentage of revenue not offset by the costs of goods sold. Organic revenue growth and long-term success in the high-tech, 3D-printing industry still followed the low-tech "razor/razor-blade" model: increase the installed base of lower-margin printer customers and reap profits from ongoing sales of high-margin materials. Apart from quarters in which there were write-offs for discontinued products and projects, for much of CEO Joshi's early tenure, the Company's gross profit margin was in the 45% to 50% range.

8.      Starting in Q4 2018, and continuing through much of 2019, this metric fell below 45%. Although revenues declined 8.5%, cost of goods sold remained stubbornly high, causing gross profits to fall by almost 14.3%. As a result, 3DSC's FY 2019 gross profit margin significantly fell -- from 47.2% in 2018 to just 44.2%. As the market perceived that inefficiencies and quality control problems persisted, 3DSC's stock price, which had risen from $9 to more than $20 during the first half of 2018, as revenues increased with new product introductions, fell back down to $10 by the time the Company's financial results were announced for FY 2019.

9.      To present the Company as having finally turned the corner towards operational functionality, foretelling a return to profitability, 3DSC's management disingenuously reported the Company's financial results, delaying the disclosure of information that would ultimately

4

reveal that the Company was still plagued with the problems stemming from the Company's too rapid expansion years earlier. When the impact of COVID-19 threatened to expose this, management accelerated its cost-cutting campaign, cutting hundreds of jobs in a matter of months. One impact of the rapid contraction was that the already skeletal accounting and audit staff was stretched too thin, and its functions outsourced to third parties.

10.     As set forth herein, this toxic mixture, which gutted 3DSC's accounting functions during the Class Period, resulted in the Company intentionally or recklessly failing to properly apply Generally Accepted Accounting Principles ("GAAP") such that 3DSC's Class Period financial results for the first three quarters of 2020 were materially misstated:

a.     In 2017, 3DSC entered into an agreement with a United Therapeutics subsidiary with the goal of 3D printing a human lung for organ replacement surgery. (Additional biotechnology agreements were signed in 2019 and 2020.) Although the United Therapeutics contract was subject to the revenue recognition and disclosure requirements of GAAP Topic 606 (Revenue from Contracts with Customers) and Topic 808 (Collaborative Arrangements), 3DSC complied with neither. Even after additional authority on the subject was adopted – making abundantly clear both standards applied – 3DSC failed to disclose the adoption of the additional pronouncement, as required, and admittedly failed to timely apply the standard starting January 1, 2020, causing its quarterly financial reporting in 2020 to be materially false. By improperly accounting for payments under the United Therapeutics contract as funded R&D that reduced 3DSC's R&D expense line, Defendants were able to appear more successful in both cutting operating costs and improving 3DSC's gross profit margins;

5

b.  Goodwill, *i.e.*, the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination, must be reviewed on an annual basis to determine whether this asset is impaired and, if so, how much it must be written down. In accordance with GAAP, the occurrence of one or more "triggering events," enumerated in seven categories, would also require a quantitative impairment analysis to be conducted in the quarter in which the event(s) occurred. In Q2 2020, when the worst effects of the pandemic were being felt both around the globe and by 3DSC, triggering events for 3DSC had occurred in six of the seven categories, yet the Company affirmatively misrepresented that not a single such factor was present. On November 5, 2020, following a quarter in which both macroeconomic conditions and 3DSC's performance had *improved* – such that it was less likely a triggering event was present – 3DSC reported that in Q3 2020 it tested goodwill for potential impairment and recorded a $48.3 million write-down. Not coincidentally, this belated impairment charge announcement came two days *after* 3DSC trumpeted a $65 million sale of "non-core" assets which provided much-needed liquidity, a transaction which first required 3DSC's secured lender to agree to lift a cap on annual asset sales. Had a triggering event been found to be present in Q2 2020, and a large impairment write-down taken at that time, that could have jeopardized the lender agreeing to lift the annual asset-sale cap. Taking the impairment charge in Q2 2020 would have also endangered the Company's ability to sell stock via an "at-the-market" equity offering announced on August 5, 2020 – pursuant to which the Company raised approximately $25 million;

6

c. When evidence exists that the net realizable value of inventory is lower than its cost, a loss must be taken in that quarter. 3DSC was forced to discontinue sales of its high-end metal printers for more than a year because their powder management units were defective, causing quality control problems. Rather than write off those units in inventory that were defective and rendered obsolete in Q1 2020, when 3DSC qualified an improved unit for use in printers starting in April 2020, in violation of GAAP, 3DSC kept those products in inventory until Q2 2021. By improperly failing to timely write off this inventory, 3DSC overstated is gross margins.

11. The following summary shows the financial statement impact of 3DSCs's failure to: (1) record a $48.3 million goodwill impairment charge in Q2 2020, (2) record a $1.1 million inventory write down on each quarter in 2020 during which its ending inventory was overstated, and (3) correctly account for revenue earned from the collaboration agreement with United Therapeutics during each of the first three quarters of 2020.

**3D SYSTEMS CORPORATION**
**Financial Statement Misstatements Summary**

| (in thousands, except per share amounts) | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2020 | | Jun 30, 2020 | | Sep 30, 2020 | | Dec 31, 2020 | |
| Goodwill | | | | | | | | |
| As reported | $ | 218,200 | $ | 221,500 | $ | 179,600 | $ | 161,765 |
| Impairment | | - | | (48,300) | | - | | - |
| Adjusted | | 218,200 | | 173,200 | | 179,600 | | 161,765 |
| *Overstated %* | | *0.0%* | | *27.9%* | | *0.0%* | | *0.0%* |
| | | | | | | | | |
| Inventory | | | | | | | | |
| As reported | $ | 113,240 | $ | 125,077 | $ | 126,882 | $ | 116,667 |
| Write-down | | (1,100) | | (1,100) | | (1,100) | | (1,100) |
| Adjusted | | 112,140 | | 123,977 | | 125,782 | | 115,567 |
| *Overstated %* | | *1.0%* | | *0.9%* | | *0.9%* | | *1.0%* |
| | | | | | | | | |
| Gross Profit Margin | | | | | | | | |
| As reported | | 42.4% | | 31.4% | | 43.4% | | 42.0% |
| Cooperation agreement acctg. | | -0.3% | | -0.2% | | -0.3% | | 0.0% |
| Inventory write-down | | -0.8% | | -1.0% | | -0.8% | | -0.6% |
| Adjusted | | 41.3% | | 30.2% | | 42.2% | | 41.3% |
| *Overstated* | | *1.1%* | | *1.2%* | | *1.1%* | | *0.6%* |
| | | | | | | | | |
| Income (loss) from Operations | | | | | | | | |
| As reported | $ | (18,218) | $ | (33,872) | $ | (67,604) | $ | 731 |
| Goodwill impairment | | - | | (48,300) | | - | | - |
| Inventory write-down | | (1,100) | | (1,100) | | (1,100) | | (1,100) |
| Adjusted | $ | (19,318) | $ | (83,272) | $ | (68,704) | $ | (369) |
| *Understated loss $* | $ | *1,100* | $ | *49,400* | $ | *1,100* | $ | *1,100* |
| *Understated loss %* | | *6.0%* | | *145.8%* | | *1.6%* | | *Income to Loss* |
| | | | | | | | | |
| Net Loss | | | | | | | | |
| As reported | $ | (18,924) | $ | (37,951) | $ | (72,889) | $ | (19,830) |
| Goodwill impairment | | - | | (48,300) | | - | | - |
| Inventory write-down | | (1,002) | | (1,144) | | (1,145) | | (1,147) |
| Adjusted | $ | (19,926) | $ | (87,395) | $ | (74,034) | $ | (20,977) |
| *Understated loss $* | $ | *1,002* | $ | *49,444* | $ | *1,145* | $ | *1,147* |
| *Understated loss %* | | *5.3%* | | *130.3%* | | *1.6%* | | *5.8%* |
| | | | | | | | | |
| Diluted loss per share | | | | | | | | |
| As reported | $ | (0.17) | $ | (0.33) | $ | (0.61) | $ | (0.16) |
| Goodwill impairment | | - | | (0.42) | | - | | - |
| Inventory write-down | | (0.01) | | (0.01) | | (0.01) | | (0.01) |
| Adjusted* | $ | (0.17) | $ | (0.76) | $ | (0.62) | $ | (0.17) |
| *Understated loss $* | $ | *-* | $ | *0.43* | $ | *0.01* | $ | *0.01* |
| *Understated loss %* | | *0.0%* | | *130.3%* | | *1.6%* | | *6.3%* |

\* - sub-total may not foot due to rounding.

12.     The Company reported a spate of good news during the first two months of 2021 – achieving impressive revenue gains in Q4 2020, meeting new management's goal of $60 million in cost cutting by year-end, closing the sale of two subtractive software businesses for $65 million, paying off its secured long-term debt, and announcing a breakthrough in bioprinting of the human lung. In response, 3DSC's share price soared from $10.47 before these announcements to $42.23 in late January.

13.     Several weeks later, the Company reported that it would have to delay the filing of its 2020 Form 10-K and its Q4 2020 earnings call by five days, respectively, until after the close of the markets on March 1, 2021, and the morning of March 2, 2021. Although the Company indicated that it discovered deficiencies in its internal controls over financial reporting, investors were reassured that "there have been no misstatements identified in prior year financial statements as a result of these deficiencies." 3DSC also reaffirmed the preliminary results announced in early January 2021.

14.     On March 1, 2021, 3DSC's closing stock price was $38.79. The Company did not file its 2020 Form 10-K after the markets closed. On the morning of March 2, 2021, the Company instead filed a Form NT 10-K indicating that it could not file its annual report without further analysis of the presentation cash flows associated with the Cimatron and GibbsCAM divestiture.

15.     During the Company's March 2, 2021, earnings call, which began at 8:30 a.m., management expressed confidence in long-term double-digit organic revenue growth, and an improvement in gross margins to back over 50%, but refused to give short-term guidance or to explain which non-core assets it planned to sell to deliver a final $20 million in run rate reduction it promised by the end of 2021 to improve margins.  The figures the Company did report revealed that despite assuring investors that its internal control problems did not affect the accuracy of

financial reporting, in fact 3DSC was required to "re-evaluate its accounting methodology" for regenerative medicine agreements, specifically payments on the human lung bioprinting contract with United Therapeutics.  The Company also missed consensus estimates of adjusted earnings per share and admitted it had earlier misclassified Q4 2020 healthcare sector revenue as industrial sector revenue. When management provided disappointing adjusted gross margin guidance for 2021 – in the range of only 40 – 44%, the midpoint of which, 42%, was lower than the adjusted gross profit margin of 42.6% reported for an abysmal 2020 – investors correctly perceived that additional negative surprises lay ahead. In fact, the belated inventory write-down for "unsellable" DMP powder management units and a DMP Factory 500 printer occurred in Q2 2021.

16.     Upon hearing this news, the market recognized that after nearly five years of improving supply chain efficiency, reducing its array or products, building IT infrastructure, and standardizing operations, reorganizing into two vertical units with a singular focus on additive printing, and slashing headcount to "resize" 3DSC – by 148 employees in 2019 and 477 employees in 2020, the Company's operational woes were not in the rearview mirror. By the close of the market, 3DSC's share price had plunged from $38.79 to $31.17, on the heaviest trading volume in nearly a month.

17.     The downward slide continued through March 5, 2021, when the Form 10-K was finally filed in the last half-hour of the week's final trading session, with 3DSC's share price closing at $24.75. For the week, 3DSC's share price declined $14.04, an almost 36.2% drop.

18.     The 2020 Form 10-K – the third delayed Form 10-K filing in five years – disclosed internal control problems relating to "non-standard contracts and non-standard contract terms" and "the review of internally prepared reports and analyses utilized in the financial closing process." Partially attributing the deficiencies to "employee turnover, resulting in a temporary shortage of

personnel with appropriate knowledge or skills to perform an effective review during our financial statement close process," the Company's remediation plan called for the hiring and training of new accounting staff. In conjunction with this disclosure, the Company revealed that it belatedly adopted proper GAAP for payments on the United Therapeutics contract, under which the Company was paid approximately $6.9 million in 2020, and revised its reported revenues and gross profit figures for the first three quarters of 2020 accordingly. These disclosures further contradicted CEO Joshi's assessment that by the beginning of the Class Period his team had "stabilized the company and strengthened the foundation on which to scale and grow. On March 8, 2021, the Company's shares shed another $1.88, to close at $22.87.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

21.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23.     Darrell E. Cline, appointed by the Court as Lead Plaintiff, purchased 3DSC's common stock during the Class Period at artificially-inflated prices and suffered economic damages when the true facts about the Company became known and the artificial inflation was removed from the price of the Company's stock. Lead Plaintiff Cline's certification was previously filed with the Court (Dkt. No. 26-2) and is incorporated by reference.

24.     As set forth in certifications attached hereto, Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez, and Diane Van Alstyne ("Named Plaintiffs") also purchased 3DSC's common stock during the Class Period at artificially-inflated prices and suffered economic damages when the true facts about the Company became known and the artificial inflation was removed from the price of the Company's stock.

25.     Defendant 3D Systems Corporation provides comprehensive 3D printing and digital manufacturing solutions, including, during the Class Period, 3D printers for plastics and metals, materials, software, on-demand manufacturing services, and digital design tools. 3D Systems is headquartered at 333 Three D Systems Circle, Rock Hill, SC 29730. 3D Systems common stock traded on the New York Stock Exchange ("NYSE") under ticker symbol "DDD" during the Class Period.

26.     Defendant Vyomesh I. Joshi ("Joshi") was the President and Chief Executive Officer ("CEO") of 3DSC for part of the Class Period. He served as CEO from April 4, 2016, until May 25, 2020. CEO Joshi also served as a member of 3DSC's Board of Directors during the Class Period. According to 3DSC's 2017 proxy statement: "From 2001 to 2012, [Joshi] was Executive Vice President of Hewlett-Packard's (HP) Imaging and Printing Group, following two decades of research, engineering and management in HP's imaging and printing systems businesses … Mr.

Joshi brings to [3DSC's] Board extensive executive management, corporate strategy and international operational experience.

27.     Defendant Todd A. Booth ("Booth") was the Chief Financial Officer ("CFO") of 3DSC for part of the Class Period. He served as an Executive Vice President and Chief Financial Officer, and Principal Financial and Accounting Officer, from September 3, 2019, until May 14, 2020. A direct report to CEO Joshi, CFO Booth also led the Company's Finance, Strategy and Corporate Development operations. CFO Booth joined the Company following the retirement of the prior CFO, John McMullen, an HP colleague of CEO Joshi who served for three years. According to the August 19, 2019, press release announcing his hiring, CFO Booth not only came with 25 years of "progressive financial leadership" but also "diverse industry experience." CEO Joshi noted: "Todd's experience leading complex transformations and large-scale efficiency improvements will be invaluable as we seize the opportunity ahead of us."

28.     Defendant Dr. Jeffrey A. Graves ("Graves"), the Company's current President and CEO, has served in this position from May 26, 2020. Graves also serves on the Board of Directors. According to 3DSC's most recent proxy statement, having served as CEO of two companies prior to his tenure at 3DSC, Graves brings to the Board  "extensive executive management, corporate strategy, and international operational experience …. Additionally, Dr. Graves has significant knowledge of the Company and the competitive environment in which it operates." Graves holds a bachelor's and a master's degree, in addition to a Ph.D., in metallurgical engineering.

29.     Defendant Wayne Pensky ("Pensky") was the interim CFO of 3DSC for part of the Class Period. He served as interim CFO and Principal Financial and Accounting Officer from May 19, 2020, to September 13, 2020. Prior to nearly a quarter century of service at Hexcel Corporation, from which he retired as CFO in 2017, Pensky was a partner in public accounting firm Arthur

Andersen & Co. CFO Pensky came to 3DSC because he was a colleague of CFO Graves, who has long served on the Board of Directors of Hexcel.

30.     Defendant Jagtar Narula ("Narula"), the Company's current CFO and an Executive Vice President, has served in this position from September 14, 2020. According to the press release announcing his appointment, Narula, a direct report to CEO Graves, was hired to "lead the company's Finance organization, including all finance operations and investor relations.  With a strong technical foundation and extensive experience in investment strategy, [Narula] will play a central role in capital deployment for growth and margin expansion."

31.     Defendants Joshi, Booth, Graves, Pensky and Narula are sometimes referred to herein as the "Individual Defendants."

32.     During their Class Period tenures as either CEO or CFO of 3DSC, each of the Individual Defendants:

   (a)     directly participated in the management of the Company;

   (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

   (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

   (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

14

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

33.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

34.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

35.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### 1986-2015: From Industry Pioneer to Roll-Up Company

36.     3DSC was founded 35 years ago by Charles Hull, who created and obtained the first patent for a 3D printer. Although 3DSC was a dominant player in the nascent field, along with competitor Stratasys, whose founder also held an early patent, following the expiration of the Stratasys fused-deposition-modeling patent in 2009, the field was opened wide, and the price of a 3D printer dropped to the point of affordability for home use. Around this time, Makerbot (later acquired by Stratasys) entered the market, selling DIY kits for building one's own 3D printer and introducing the Thingverse library of shareable digital files that can be downloaded to build objects for a 3D printer. Soon thereafter, new technologies rapidly entered the market, several on the strength of Kickstarter campaigns.

37.     In the face of explosive growth of both technologies and competitors, over a decade ago, the Company began to rapidly expand by acquiring dozens of companies, enabling it to increase not only the number and variety of its product offerings but also its geographic footprint. In addition to locations in a dozen states, by the end of 2014, the Company and its subsidiaries also had offices and/or facilities in Mexico, Brazil, Belgium, France, Israel, Italy, the Netherlands, Switzerland, the United Kingdom, and South Korea.

38.     As revenues initially increased, the Company's stock price soared, reaching more than $96 per share in late 2013. The following year, the truth about Company's failure to integrate its numerous acquisitions, causing a breakdown of 3DSC's ability to manufacture and ship its broad array of products, slowly began to come to light. By the spring of 2015, the company withdrew its revenue guidance. In August 2015, long-time serving CEO Avi Reichental understatedly acknowledged that the Company's rapid expansion "permitted certain operating inefficiencies." Specifically, a lawsuit later settled by 3DSC alleged that during the 2013-2015 period the Company was rife with such "inefficiencies", including extremely poor inventory control, a failure to scale up manufacturing of direct metal and consumer printers to meet demand, and premature shipments of untested products at quarter's end to demonstrate revenue growth. The Company's operational dysfunction led to inventory write-downs, lost revenues, and quality control issues.

39.     By the time Reichental stepped down in late October 2015, the Company's shares were trading below $11.  For 2015, the Company could not file its Annual Report on Form 10-K on time because "additional time, resources and effort are required to complete work related to a goodwill and intangible asset impairment charge". When the work was finally completed, the combined charges were a staggering $537.2 million.

**2016-2020: Efforts to Right the Ship**

40.     To integrate the disparate elements of the business into a unified, functioning company, 3D brought in an experienced industry executive who had led Hewlett Packard's ("HP's") printing division.  In the press release heralding the arrival of CEO Joshi in April 2016, the Company described him as "a transformational and highly engaged leader with significant experience in developing and managing a broad product portfolio, all while driving operational excellence." The Company went on to tout both the breadth and scope of his success: "While leading HP's $26 billion printing business, [Joshi] was responsible for doubling the printing business operating profits during an 11-year period."  CEO Joshi's ability to profitably manage and operate 3DSC's far-flung businesses was of critical importance to the Company and its shareholders following a year where the Company not only no longer reported a profit but had suffered an astounding loss of $5.85 per share.

41.     Delivering 3DSC's Q1 2016 results shortly after his arrival, CEO Joshi announced that having spent a month listening to customers, partners and employees, his focus would be on "improving quality, reliability and supply chain." He added: "The next phase for us is to develop a strategy to drive profitable growth with operational excellence and an appropriate cost structure."

42.     To drive growth and operational excellence, the Company took concrete steps to reduce the size of its portfolio so that it could return to profitability by focusing its resources more effectively. Earlier in the decade, 3DSC had introduced a line of desk-top printers, the Cube series, for home and office use. In December 2015, 3DSC announced that it was discontinuing the sale of the entry-level printer. In the fall of 2016, CEO Joshi announced 3DSC was completely exiting the consumer printer market – ceasing production of the more advanced Cube models – to focus on "next-generation capabilities" in metal printing and Figure 4 printers used in healthcare.

43.     With respect to reducing expenses, throughout 2016, the Company succeeded in improving upon its overall cost structure, with declines in both operating expenses and cost of goods sold. In fact, even with a $33 million reduction in revenue and having recorded a $10.7 million in inventory reserve charge – associated with its exit from sales of **CubePro, CubeJet, and the ProX 400 and termination of a new technology, named "Project Atlas"** – gross profit increased by more than $17.9 million (6%) with a margin of 48.9%. Excluding the $10.7 million charge taken in Q3, 3DSC's gross profit margin was at or greater than 50% in every quarter. Per share losses for the year were cut drastically, to $(0.35), with positive earnings generation in Q4 2016.

44.     Even though healthcare applications, materials and software sales were strong throughout 2016, the core of the Company's business, 3D printer sales, were not: The year-over-year ("YOY") decline was 13%, excluding the discontinued lines, and 21% overall.

45.     In early 2017, management continued to drive down costs and even used some of the savings to reduce printer pricing. Nevertheless, YOY printer revenues continued to decline over the course of the year; the best quarter was Q4, when revenues remained essentially flat. In addition to generally increasing the installed base of 3DSC's printers, CEO Joshi's goal was to transition the customer mix from those using 3DSC's products for low-volume prototype printing to customers using the Company's products for high-volume, production printing.

46.     During the FY 2017 earnings call, one reason CEO Joshi projected optimism that 2018 would be a "corner turn" year for 3DSC was anticipation of the introduction of "disruptive new products to drive customer shift to 3D production." During 2018, the Company successfully introduced and began shipping new printers to be used in a wide range of customer settings. Overall revenues increased 6%, with printing revenues and/or growth in the number of printers shipped achieved in every quarter. Because of rising printer sales, supply-chain efficiencies, and

18

other cost reduction measures, even though there were costs associated with ramping up and marketing the new products, gross profit margins were in the 45-50% range for every quarter, and 47.2% for the full year.

47.     Just as it appeared that 3D had indeed turned a corner towards profitability, the Company suffered two self-inflicted wounds that would greatly impact both revenues and gross profit margins not only for Q1 2019 – which came in at an anemic 43.2% – but for all of 2019. First, just months after their introduction in the fall of 2018, sales of 3DSC's high-end metal DMP Factory printers were suspended indefinitely because of quality control problems with the printers' powder management unit that was discovered when customers ramped up production. During the Q1 2019 earnings call, management not only reported that the problem contributed to a loss of $8 million in metal printer revenue in Q1 2019, due to an inability to fill customer orders, but explained that sales would not resume until the second half of the year while the Company worked on a solution to the problem. To a lesser extent, Q1 2019 margins were squeezed by an "under absorption" of production overhead in its factories due to both lower production and product mix – a problem that was likely to persist until the end of the year. With these strong headwinds, the Company issued gross margin guidance of only the "mid-40s for the balance of the year."

48.     During the remainder of 2019, revenues remained weak. For the year, 3DSC reported an 8.5% decline in revenues, to $629.1 million. Even worse, given the mix of products sold – with the high-end DMP Factory metal printers *out* of that mix – gross profits fell more than $46.3 million, causing the annual gross profit margin to drop precipitously, from 47.2% in 2018 to only 44.2% in 2019. But a brighter future was finally on the horizon. Not only was Q4 2019 the strongest quarter of the year, but factory metal printer sales were set to resume in 2020.

49.     During the Q3 2019 earnings call, CEO Joshi announced that a solution to the

19

powder management unit problem had been found and that once the units were "completely qualified" they would ship in April 2020. He confirmed this in the Q4 and FY 2019 earnings release: "Now in 2020 we believe we have the right products and solutions, including our planned shipment of factory metals printers in the second quarter, to accelerate the adoption of additive manufacturing technology and drive profitable revenue growth." Commenting upon his departure from the Company on a call with analysts that day, CEO Joshi stated: "I joined 3D Systems four years ago and have worked with the team to improve our product portfolio, business processes, cost structure and culture … . I feel confident now that we have the right products in place with the right team to execute our growth strategy."

50.     During the February 26, 2020, call, CFO Booth provided annual gross profit margin guidance in the "mid-40s." As this was the same guidance that had been given for 2019, a year in which this important metric had declined 3% (to 44.2%), an analyst asked if that meant 44-46%. CEO Joshi agreed.  However, as set forth below, with continuing operating inefficiencies and the impact of the pandemic just beginning to be felt, the Company could not achieve these results. Consequently, throughout the Class Period 3DSC and the Individual Defendants knowingly and/or recklessly misrepresented the Company's true financial results and business prospects to the detriment of class members.

### 2020: Operational Deficiencies Persisted and Worsened

51.     In his efforts to integrate the Company's business and systems to drive seamless execution, CEO Joshi focused on both personnel and systems by: (1) installing top managers he knew and trusted and (2) investing in the standardization and automation of 3DSC's operations.

52.     With respect to the former, soon after CEO Joshi took the reins, John McMullen, a former colleague who served as CFO of the HP division Joshi had led, joined 3DSC as its CFO on

20

July 1, 2016.  By mid-2017, a majority of 3DSC's executives were transplants to the Company.

As CEO Joshi explained at two technology conferences, held on June 5th and 6th, 2017:

> The last part is the execution. When I joined the company, our quality reliability, we had issues. We were not really the execution engine. So I hired 9 managers and leaders that I knew that -- who could really help the company to take into the execution. So we have 5 leaders who are from 3D Systems and my staff and 9 from outside, in total, 15 of us that can really augment that leadership team in making that transition that I'm talking about. So the supply chain, CFO, marketing manager, region managers, for example, Doug, Reinhard, John, Chris, Jim, Eric, our IT manager also. And they're all the managers I worked with at HP. So I know that they really built with me a multi-billion-dollar business for Hewlett-Packard. I think that's the team that we can take into the execution because my belief when the technology portfolio is there, it's all about now execution. (Stifel June 5, 2017)

> So when I think about, when I joined the company last April and looked at it, the portfolio of the company. And I felt that this is a great technology portfolio but operationally, we were very weak. So what I did was, basically, hired 9 executives from my network that I knew that I can really count on, to make this thing really accelerate the growth that I was talking about . . . As I said, I got 9 executives from my network. They're all down in what key position that I have, from supply chain to CFO to regional leads to marketing to CIO, all these are all the executives that I had worked with when I was at HP. (Bank of America/Merrill Lynch June 6, 2017)

53.     CEO Joshi was quite blunt about the dysfunctional mess he had inherited and how long it would take him to turn it around:

> So the operating framework that I have in mind is, really, the first part is the cost structure because if you do the right execution, the way I think about the path is revenue minus operating process . . . IT, because you never had any processes. Most of the processes were manual. My view is standardizing and automating. And investing into [IT] is also very important. (Stifel June 5, 2017)

> " . . . [W]here we're investing is in IT because most of the acquisitions that we made, they were not really fully integrated. So a lot of manual processes that I want to convert and standardize and automate them. And by doing that *in late '18*, we'll have an opportunity to take even cost further out because once you standardize and automate processes you can take even cost out, especially, on the OpEx side. (BofA/Merrill Lynch June 6, 2017) (Emphasis supplied.)

54.     CEO Joshi's personnel and organizational moves grew the Company's headcount significantly. From a total of 2,445 full- and part-time employees in 2016, 3DSC ended 2017 with

21

2,666 employees, and a $4.4 million increase in Selling, General and Administrative ("SG&A") expenses. As explained by a former VP of Finance who was employed by 3DSC from early 2016 until the fall of 2020 in 3DSC's San Diego office, who reported directly to SVP Radhika Krishnan, and was responsible, *inter alia*, for financial reporting, budgeting, forecasting, growth and revenue plans, Confidential Witness ("CW") 1, CEO Joshi believed in "matrix management," a form of organizational structure in which employees report to multiple managers, not just one, with employees in different functional divisions distributed into product/project teams to work with colleagues from other divisions. Apparently, this structure made 3DSC top-heavy. When CEO Graves embarked on his quest to cut 20% of 3DSC's jobs, as CW1 further explained, many direct reports to the CEO were cut out in a first wave, with deeper cuts among VPs following those.

55.     Even before 3DSC cut hundreds of jobs in the second half of 2020, 3DSC's top executives were already engaged in a plan to reduce SG&A headcount. Both CFO McMullen and CFO Booth commented on the Company's progress, in the Q3 2018 and Q3 2019 earnings calls, respectively. From 2,666 employees at the end of 2017, 3DSC reduced its headcount by 194, to 2,472 by the end of 2019.

56.     Focused on creating and implementing business and operational process improvements to improve the Company's top-line performance, CW1 ultimately reported to the CFO and was aware of troubles in the accounting department. During CW1's tenure at 3DSC, audit function ran on a skeleton crew. Below the Director of Audit, staffing was inadequate which led to internal control deficiencies in which controllers for the Americas were left on their own. CW1 believed that the performance of the accounting department was directly impacted by the deep personnel cuts in 2020.

57.     A new problem that developed when CEO Joshi took control of the Company was friction in the accounting department. According to CW1, the relationship between the auditors, BDO, and management was fraught with difficulties, in part attributable to ongoing animosities between the old regime and the HP personnel subsequently brought in to run the company.  HP personnel were viewed suspiciously by BDO and other members of the old management team. The appointment of a new Global Controller in 2018, Tom Lewis, only exacerbated the differences between the two factions. CW1 believed Lewis was very strong technically and, with the assistance of Director of Corporate Accounting, Rachel Chapman, he began cleaning up accounting processes. Alas, Tom Lewis stepped down just as CFO Booth was coming aboard, and departing CFO McMullen's choice of replacement, Dan Morse, was not qualified for the job and his one-year tenure, from mid-2019 until mid-2020, was "a fiasco". Having been stuck performing the technical work Morse could not, CFO Booth left 3DSC in May 2020 after only eight months.

58.     Another ex-employee revealed the rapid deterioration of the Company's accounting department during 2020.  A former Credit and Collections Department Manager and Manager of Global Credit Services, who worked in the Rock Hill, South Carolina headquarters from mid-2014 until the fall of 2020, and reported to Treasurer and VP John Nyvaper, CW2, not only stated that there were "wholesale" cuts to the accounting staff during 2020, with many accounting managers leaving or being laid off, but that BDO was assuming internal accounting functions as 3DSC's accounting managers left.  Additionally, CW2 noted that BDO was reviewing the Company's ongoing debt situation. (In fact, following a $21 million cash burn in Q1 2020, one analyst indicated that it was possible for 3DSC to violate loan covenants in its long-term secured credit agreement as early as Q2 2020.) According to CW2, there also appeared to be turnover in the BDO staff.

59.     With respect to automating and streamlining the Company's operating systems, the task revealed itself to be bigger than CEO Joshi initially anticipated.  CW1 confirmed that because the company had grown through a series of unintegrated acquisitions, 3DSC had a very complex accounting structure that led to great difficulty closing at the end of quarters.  In particular, the third month of every quarter was "frenzied", relying on a series of manual processes that were simply inadequate. By comparison, CW1 noted that HP, a company with $26 billion in annual revenues, could close its books in four days while 3DSC, a company with $600 million in annual revenues could not. Because it took "forever" to close the books, the CEO and CFO were anxious every quarter: 3DSC is publicly traded company yet its CEO and CFO were on pins and needles waiting for the information needed for the filing of external reports and financial statements. Added to the lack of integrated accounting processes and systems, also in the last month of the quarter, the sales force was scrambling to meet sales targets by, among other things, offering discounts to customers. This negatively impacted sales in the early months of the next quarter. Because of these issues, CW1's assessment was that 3DSC was a "hard business to steer."

60.     CW1 indicated that because he was very experienced, Global Controller Jim Hopeck was able to navigate the manual processes needed to close a company whose merged businesses were on different accounting systems. However, at the close of 2017, BDO changed the manner of booking warranty revenue. Lots of scrambling ensued, the 2017 Form 10-K was filed late, and both Hopeck and Assistant Global Controller Tom Busch were let go in April 2018. Although CEO Joshi increased capital expenditures to build up IT and infrastructure – boasting during the Q4 2018 earnings call that 3DSC implemented a major Oracle ERP system upgrade in mid-2018 to "drive longer-term operational efficiencies, better automation of processes, and data

analytics" – by "late '18," CEO Joshi's target date for process standardization, this had not yet happened.

61.     Then-CFO John McMullen stated, in November 2018, during the Q3 2018 earnings call: "We are very pleased with the progress we are making as we are executing on our plans to align resources with key priorities, reduce overhead costs and leverage our IT infrastructure investments." Yet, by the Q1 2019 earnings call, in May 2019, CEO Joshi bluntly admitted: " . . . our actions in investments in go-to market, [in] IT and compliance are not completed . . ." Events that took place starting just a few months later disrupted any progress that had been made.

62.     A former Global Inventory Accountant who was employed in 3DSC's Rock Hill, headquarters for three years (2017-2020), who reported to Assistant Corporate Controller Tom Busch and to Mary Okey, Manager of Global Cost Accounting following Busch's 2018 departure, CW3, was hired to create an accounting process that could be audited. Prior to CW3's arrival at 3DSC, cost accounting had been haphazard – necessitating cost updates 20-30 times a day – an *ad hoc* process that prevented accurate calculation and made it difficult to match revenues with the cost of goods sold. One example was the challenge presented to CW3 with respect to booking costs associated with the powder management delivery system. Annually, CW3 was charged with updating the percentages of the initial cost of the powder attributed to raw material, to services and to the printer itself. This type of challenge, created by 3DSC's fragmented accounting culture, necessitated the rebooking of the proper percentages.  As did CW1, CW3 believed the change of corporate controllers in 2018 unfortunately exacerbated these difficulties.

63.     When CW3 arrived, the Company's existing Enterprise Resource Planning system – used to manage 3DSC's daily business activities, such as accounting, procurement, project management, risk management, compliance, and supply chain operations – could not account well

without basic accounting standards. CW3 was tasked with updating and standardizing cost accounting standards with respect to, for example, new material purchase costs, to accurately calculate purchase price variances and material yield variances. Without these standards it was very difficult to match revenues with the costs of goods sold. Once CW3 began to create auditable standards, a project that would take a financial analyst four days to accomplish could be done in three hours. CW3 created month-end and annual reports to be distributed to company management, including calculations of warranty reserves, obsolete inventory, and reviews and validations of price quotes.

64.     According to CW3, a series of rapid and chaotic management changes, and an exodus of accounting and finance personnel at all levels, started in the fall of 2019. Senior executives who left the Company included VP of Finance Brooke Davis, Controller Tom Lewis, and Director of Corporate Accounting Rachel Chapman. Daniel Morse, who took over as Global Controller with only a supply-chain background, also left, in mid-2020. CW1 indicated that interim CFO Pensky let Morse go.

65.     According to CW3, when 3DSC expanded its relationship with Sanmina, a provider of integrated manufacturing services, to include plastic printing platforms in addition to the manufacture of Figure 4 printers – a move heralded by CEO Joshi in the Q4 2019 earnings call as providing 3DSC with a variable cost model, while ensuring world-class manufacturing proficiency – it was not just the manufacture of printers that was outsourced, but in-house accounting functions as well.  Soon after CW3 left the Company, deep cuts to staffing occurred, including a large group from the fixed asset accounting team.

66.     Although former CEO Joshi credited his team for stabilizing the Company and building a strong foundation that integrated 3DSC's vast operations, in reality, as can be gleaned

from the assessments of these former employees, operating stability had not yet been achieved by the fall of 2019, when high-level finance and accounting staff began an exodus from the Company; matters worsened in 2020 when the accounting department was hollowed out and in-house accounting functions were rapidly outsourced.   Whether intentionally or with deliberate recklessness, even though the accounting and audit functions were gutted to achieve $60 million in cost savings by the end of 2020 – a measure on which top management's performance bonus would be based – management certified in each of the first three quarters of 2020 that the design and operation of 3DSC's disclosure controls and procedures were effective.

**Relevant Accounting Principles the Company Failed to Follow**

67.      During the Class Period, knowing that 3DSC had not yet fully-integrated its complex manual systems and that senior-level turnover in accounting and finance had been ongoing *for two years*, defendants decided to drastically reduce the size of the already embattled, thinly-stretched, accounting and audit staff and to outsource its work to third parties. This reckless conduct resulted in a failure to report the company's financial results in compliance with Generally Accepted Accounting Principles, as required by law.

68.      Generally Accepted Accounting Principles ("GAAP") constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements. Although the SEC has the statutory authority to establish GAAP for public companies, it has delegated that authority to a private-sector entity known as the Financial Accounting Standards Board ("the FASB").

69.     SEC Rules and interpretive releases, as well as the FASB's Accounting Standards Codification ("ASC") and Accounting Standards Updates ("ASU") together represent sources of authoritative GAAP for SEC registrants. *See* ASC 105-10-05-1.

70.     SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1) ("Reg. S-X") unambiguously provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. With certain exceptions laid out in 17 C.F.R. § 210.10-01(a), Regulation S-X also requires that interim financial statements must also comply with GAAP. Most important, interim reports must contain sufficient disclosure to make the interim financial information presented not misleading. Publicly traded companies such as 3DSC must include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  15 U.S.C. §78*l* and 78m.

<u>Impairment of Goodwill Under GAAP</u>

71.     ASC 350-20, the GAAP provision which addresses accounting and financial reporting for goodwill, defines "goodwill" as "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized."   Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination.  ASC 805-30-30-1.

72.     Goodwill is not amortized over time but is instead periodically tested for impairment at the reporting unit level.  ASC 350-20-35-1.  "Impairment," as it relates to goodwill, is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value."  ASC 350-20-35-2.  3DSC's reporting units were consistent with its operating regions.  Following the 2015 goodwill write-offs, by the start of the Class Period, 80%

of 3DSC's remaining goodwill was concentrated in the Europe and Middle East ("EMEA") region, with the balance of goodwill in the Asia Pacific ("APAC") region.

73.     Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28. 3DSC conducts its annual impairment tests as of November 30th. However, GAAP also requires that the "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-30.

74.     A goodwill impairment test consists of a qualitative and a quantitative assessment. A company has the option to first perform (or bypass) a qualitative assessment of goodwill to determine whether it is necessary to perform the quantitative goodwill impairment test.  ASC 350-20-35-35–3B. Generally, the factors considered in a qualitative analysis are the same as the events and circumstances that could trigger an interim impairment test under ASC 350-20-35-3C(a)-(g).

75.     If, after assessing the totality of events or circumstances, an entity determines that it is more likely than not that the fair value of a reporting unit is greater than its carrying amount, quantitative impairment tests are unnecessary. ASC 350-20-35-3D. However, if the likelihood is greater than 50% that the fair value of the reporting unit is less than its carrying value, quantitative impairment tests are needed to identify and measure goodwill impairment.  ASC 350-20-35-3E.

76.     In January 2017, the FASB issued ASU 2017-04 to simplify the quantitative test for goodwill impairment. Under the standard applicable during the Class Period, the quantitative impairment test compares the fair value of an entire reporting unit with its carrying amount, including goodwill.  ASC 350-20-35-4.  If the carrying amount exceeds the fair value of the

reporting unit, then goodwill is considered impaired and an impairment loss is recognized in an amount equal to that excess, up to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-6 and ASC 350-20-35-8.

77.   The FASB adopted the new standard "to reduce the cost and complexity of evaluating goodwill for impairment." ASU 2017-4 at 2-3. The new standard permits companies to identify impairment more readily without having to hire expensive valuations experts to assign hypothetical purchase price allocations to all the assets and liabilities of a reporting unit, as was required under the old standard.

Inventory Charges

78.   As set forth in its 2020 Form 10-K, 3DSC employs the first-in, first-out ("FIFO") inventory cost method. GAAP requires companies using FIFO to present their inventory at the lower of cost or net realizable value on their financial statements. ASC 330-10-35-1B. Net realizable value is defined as the "estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation." ASC 330-10-20.

79.   ASC 330-10-35-1B  provides: "When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings ***in the period in which it occurs***. That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes." (Emphasis supplied.)

80.   Depending on the composition of inventory, cost adjustments could be applied to individual items, categories of inventory, or components of each major category. ASC 330-10-35 -8 through -11.  Inventory valuation adjustments are recorded by establishing a reserve against the cost of the inventory to reduce its carrying value. GAAP requires companies to disclose

"substantial and unusual losses that result from the subsequent measurement of inventory … in the financial statements." ASC 330-10-50-2.

<u>Revenue Recognition in Contracts with Customers</u>

81.     In May 2014, the FASB issued a new pronouncement, ASU 2014-19: "*Revenue From Contracts With Customers* (Topic 606)" ("Topic 606"), which was effective for 3DSC on January 1, 2018. The core principle of this new revenue recognition standard is that "an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." ASC 606-10-05-3. ASC 606-10-25-1 provides that revenue should be recognized when all the following criteria are met:

a.  The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b.  The entity can identify each party's rights regarding the goods or services to be transferred.

c.  The entity can identify the payment terms for the goods or services to be transferred.

d.  The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e.  It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer.

82.     3DSC's Form 10-Q for Q1 2018, disclosed the adoption of the new standard, and as required, its Form 10-K for FY 2018 added the following expanded disclosures about its adoption of ASU 2014-9 pertaining to revenue recognition:

> The Company enters into contracts that can include various combinations of products and services, which are generally capable of being distinct and accounted for as separate performance obligations. Many of its contracts with customers include multiple performance obligations. ***For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price ("SSP")***. Judgment is required to determine the SSP for each distinct

31

performance obligation in a contract . . . ***In instances where SSP is not directly observable, such as when the product or service is not sold separately, the Company determines the SSP using information that may include market conditions and other observable inputs***. (Emphasis supplied).

83.     In April 2017, the Company's outside auditor, BDO, issued an analysis of Topic 606 entitled "When it Comes Time to New Revenue Recognition Model, ASC 606, It's Time to Play Ball!". In it, BDO discussed key considerations with respect to multi-year arrangements in the biotechnology field:

> **What Life Sciences Entities Need to Know**
> For life sciences companies, adopting ASC 606 could be more complicated than other industries due to the nature and structure of various arrangements. Thus, each company should conduct an in-depth analysis of the related agreements.
>                                    ***
> **Research and Development Arrangements**
> Arrangements are often complex, involving multiple deliverables and various types of consideration and often spanning several years. The analysis of whether a party to an arrangement is a customer (as defined in ASC 606) is important when evaluating whether "reimbursements" or "funded R&D" should be accounted for as revenue from contracts with customers. ***In answering this question, entities should determine whether the reimbursement relates to goods or services that are an output of the company's ordinary activities. If the company's ordinary activities are performing research and development, then it is likely that the relationship between the company and the counterparty is a vendor-customer relationship, and the consideration could be recognized as revenue.***
>
> **Collaboration Agreements**
> ***These agreements (including historical agreements) need to be thoroughly re-evaluated as elements of the arrangements could be subject to ASC 606***. Additionally, entities will need to consider the applicability of ASC 808, *Collaborative Arrangements.* (Emphasis supplied).

84.     ASC Topic 808, "Collaborative Arrangements", referenced in BDO's guidance, establishes reporting requirements for transactions between participants in a collaborative arrangement. ASC 808-10-10-1. It "provides guidance for income statement presentation, classification, and disclosures related to collaborative arrangements." ASC 808-10-05-1.  A collaborative arrangement is a contractual arrangement under which two or more parties actively

participate in a joint operating activity and are exposed to significant risks and rewards that depend on the activity's commercial success.  ASC 808-10-20.

85.     ASC 808-10-50-1 requires companies to make the following disclosures related to collaborative agreements, including separate disclosures for each significant collaborative agreement, in the period in which they were entered into (which may be an interim period) and all annual periods thereafter:

    a.   Information about the nature and purpose of its collaborative arrangements.

    b.   Its rights and obligations under the collaborative arrangements.

    c.   The accounting policy for collaborative arrangements.

    d.   The income statement classification and amounts attributable to transactions arising from the collaborative arrangement between participants for each period an income statement is presented.

86.     Notably, Topic 808 *does not* provide comprehensive recognition or measurement guidance for collaborative arrangements. Recognition and measurements for those arrangements is based on whether transactions fall within the scope of other authoritative accounting literature or an analogy thereto or, if there is no appropriate analogy, reasonable, rational, and consistently applied accounting policy election. ASC 808-10-45-3 and -4.  Here, as set forth in BDO's guidance, collaborative arrangements are also governed by Topic 606 to the extent a vendor-customer relationship exists.

87.     The same month as the Company's outside auditor issued revenue recognition guidance with respect to life sciences contracts, 3DSC announced a multi-year agreement with United Therapeutics, and its subsidiary, Lung Biotechnologies, a public benefit company (the "United Therapeutics contract"). Specifically, on April 26, 2017, the companies issued a joint press release, stating, in relevant part:

3D Systems (NYSE: DDD) and United Therapeutics Corporation (NASDAQ: UTHR) today announced plans to develop solid-organ scaffolds for human transplants. The multi-year collaboration and development agreement combines the 3D printing and precision healthcare expertise of 3D Systems with the regenerative medicine and organ manufacturing capabilities of United Therapeutics.

3D Systems will collaborate with United Therapeutics and its organ manufacturing and transplantation-focused subsidiary, Lung Biotechnology PBC. The agreement focuses on development of 3D printing systems for solid-organ scaffolds, beginning with lung scaffolds.

The printing system will target collagen and other building block proteins as scaffold raw materials. Lung Biotechnology PBC will cellularize the scaffolds with patient-specific biological material, including re-differentiated stem cells.

"Our partnership with 3D Systems is a major step forward in creating an unlimited supply of tolerable transplanted organs," said Martine Rothblatt, Ph.D., Chairman and Chief Executive Officer of United Therapeutics. "By cellularizing scaffolds created with 3D Systems printers with a patient's own cells, there will no longer be a need for immunosuppression and a vastly greater number of patients can extend their enjoyment of life through organ transplantation."

"*As a global leader in healthcare solutions, we are part of many developments and applications for 3D printing coming together including bioprinting*," said Vyomesh Joshi, Chief Executive Officer of 3D Systems. "We believe bioprinting is a powerful opportunity and *we are uniquely positioned with the broadest portfolio of technologies to partner with companies of the caliber of United Therapeutics to provide healthcare solutions of the future*."

"Combining the resources of United Therapeutics and 3D Systems transforms our capability to tackle this difficult challenge," said Chuck Hull, Executive Vice President, Chief Technology Officer, 3D Systems. *"This project will be based out of our new bioprinting lab in San Diego, CA, and will rely on expertise across many technical disciplines within 3D Systems* as well as the domain knowledge of our technical partners at Lung Biotechnology PBC."

*The collaboration and joint development will add another technology alternative to United Therapeutics' pursuit of an unlimited supply of organs for human transplantation.* (Emphasis supplied.)

Whereas Topic 808 does not address revenue recognition for a "collaboration agreement," 3DSC should have "thoroughly evaluated" the elements of the arrangement for compliance with Topic 606, as indicated by BDO's guidance. It did not.

88.      From the "re-casting" of payments made in 2018 and 2019 under this contract, in the 2020 Form 10-K, it appears that from January 1, 2018, through and including Q3 2020, the

34

Company improperly failed to account for the monies received as revenues (offset by associated costs), but recorded it as funded R&D which allowed the Company to reduce its own reported R&D costs during a period of time its management was focused on cutting operating costs. In fact, during the Q4 and FY 2019 earnings call, CFO Booth attributed a Q4 reduction in R&D expenses to "customer-funded research and development." Under the guidance provided by its own auditors, as R&D was an ordinary activity of 3DSC's and, although not ordinarily sold separately, the monies paid to 3DSC under the United Therapeutics contract should have been recognized in accordance with Topic 606 starting in 2018.

89.     Even if 3DSC could contend that it was not aware of the applicability of Topic 606 to the United Therapeutics contract until the adoption of ASU 2018-18 (discussed below) its pre-Class Period public filings also failed to comply with GAAP: there was no mention of the United Therapeutics contract in the Form 10-K for FY 2018 and the Form 10-K for FY 2019 stated "[d]uring 2019, we continued to make progress in our bio-printing collaboration with United Therapeutics on the development of 3D printing systems for solid-organ scaffolds," without any quantitative disclosures. This is hardly the fulsome disclosure required by ASC 808-10-50-1, as set forth in ¶85(a)-(d) above and violates those GAAP.

90.     In November 2018, the FASB issued ASU 2018-18, "*Clarifying the Interaction Between Topic 808 and Topic 606*". Although 3DSC had not made proper disclosures under Topic 808, it later claimed that only in December 2020 did it learn that due to the adoption of ASU 2018-18, revenues and costs associated with the United Therapeutics contract were subject to both Topic 606 and Topic 808. ASU 2018-18 added "unit-of-account" guidance to clarify when certain transactions between collaborative arrangement principals fall within the scope of the new revenue-recognition standard due to the existence of a vendor-customer relationship. ASC 808-

10-15–15B and ASC 808-10-45-3. Pursuant to the former subsection, a unit-of-account is "identified as a promised good or service (or bundle of goods or services) that is distinct within the collaborative arrangement."

91.     As required by SEC Staff Accounting Bulletin ("SAB") 74, in its quarterly and annual reports, a company must disclose newly issued GAAP that, once effective, could have an impact on future reporting periods. Thus, the adoption of ASU 2014-9 was disclosed in 3DSC's Form 10-Ks filed for FY 2014, and in each year's Form 10-K thereafter. By contrast, ASU 2018-18, effective as of January 1, 2020, did not appear in either the 2018 Form 10-K nor the 2019 Form 10-K. Moreover, the 2018 Form 10-K, after disclosing six recently issued standards, stated: "No other new accounting pronouncements, issued or effective during 2018, have had or are expected to have a significant impact on the Company's consolidated financial statements."

92.     In its Class Period quarterly filings for the first three quarters of 2020, the Company not only failed to provide the required disclosures concerning the United Therapeutics contract pursuant to ASC 808-10-50-1, but it failed to timely adopt and apply ASU 2018-18. During the March 2, 2021, earnings call, CFO Narula explained that the Company first recognized in December 2020 that it needed to "reevaluate our accounting methodology" and to "recast" results for prior periods with respect to payments made pursuant to the United Therapeutics contract. The Form 10-K, filed on March 5, 2021, went even further, and acknowledged that ASU 2018-18 "should have been adopted by January 1, 2020." In addition to voluntarily recasting annual revenues, costs of goods sold, and R&D figures for 2018 and 2019, 3DSC summarily reported revised revenue and gross profit figures for the first three quarters of 2020. These figures reflect lower gross profit margins. Not surprisingly, as set forth below, the market reacted negatively to the news after both disclosures.

**Accounting Errors Disclosed After the Class Period**

93.     As the Company began to remediate its internal control problems by rebuilding its eviscerated accounting department, it found yet another reporting error that occurred in each quarter of 2020. In a company's income statement, revenues from products and services are reported separately, as are the costs associated with each. In its Form 10-Q for Q1 2021, the Company disclosed a "presentation error" which misallocated costs as between products and services. Specifically, in each quarter, costs initially allocated to products were allocated to services instead.

94.     The Company did not provide granular detail about product gross profit margins and services gross profits margins in its earnings releases or conference calls for Q1 2020 and Q2 2020. However, in Q3 2020, 3DSC reported a year-over-year sequential improvement in its services gross profit margin; once the corrections were made, there was actually a decline.

**Class Period Statements and Events**

95.     On May 6, 2020, after markets closed, 3D Systems filed a 10-Q quarterly report for the quarterly period ended March 31, 2020 ("Q1 2020 10-Q"). Revenues of $134.7 million were not only lower than any quarter since 2013, but the reported decline, as compared to Q4 2019, was approximately $30 million. Even considering seasonality, Q1 sales traditionally being lower than Q4 sales, the YOY decline was more than $17 million. Gross margins declined to 42.4%.

96.     Not surprisingly, the Company attributed its across-the-board declines to the global health crisis:  "The COVID-19 pandemic had a negative impact on these results. Printer revenue decreased by 35.5 percent. Materials revenue decreased 0.1 percent, healthcare solutions revenue decreased 7.3 percent, on demand services revenue decreased 12.8 percent and software revenue decreased 7.7 percent."  The steep drop attributed to COVID-19, the impact of which spread

around the world as the quarter progressed, is consistent with CW1's statement that there was a

rush to close sales in the last month of each quarter.

97.     During the Company's earnings call, that afternoon, CEO Joshi explained how the

pandemic had already begun to affect the Company during the first three months of 2020:

> . . . COVID-19 has been a negative impact on our overall business, with significant impact on printers and on-demand manufacturing for a few reasons.
>
> The first is end user demand – overall capex spend is down across the industries we serve, including aerospace, automotive and healthcare, where elective surgeries have been canceled or delayed. This has affected demand for new hardware and associated software licenses. Second is the overall dental market where demand has slowed as material consumption has slowed. With the majority of dental and orthodontic procedures considered elective, consumers aren't going to the dentist or starting new treatments.
>
> Next within our own facilities there has been a supply chain disruption as we are a global company. Facilities in China couldn't operate for a period of time and in Europe some capacity was limited. Finally, we couldn't extend service technicians for installations because of our customer sites being closed. This provide[s] some context to the first quarter results. Total revenue in the first quarter was $134.7 million reflecting a decrease of 11.4% over 2019.
>
> GAAP gross profit margin was 42.4% and non-GAAP gross profit margin was 43.1%, while overall margins were slightly down comparatively, material margins have held at 69%. We reported GAAP loss of 17 cents per share and non-GAAP loss of four cents per share. Our overall operating expenses were down 13% year-over-year and we shut down our on-demand operations in Brazil. We continue to work on optimizing our cost structure and taking costs out and as we start seeing COVID impact, we focused even more on cost structure.
>
> Amid the pandemic, our executives and board members to get 10% pay cut and the majority of the employees are taking limited furloughs. We pushed out some R&D programs and have reduced hiring significantly. We believe these actions strike the right balance between near-term cost savings and also being prepared when the market comes back. Our overall capex is down, and we are focused on generating revenue, reducing operating expenses and preserving cash.

98.     After explaining that a $3.2 million tax benefit provided by the passage of the

CARES Act helped soften the blow to the bottom line, CFO Booth provided quantitative detail:

. . . [Printer] revenue decreased 35.5% to $93.3million. Material revenue decreased 0.1% to $41.4 million. Healthcare revenue decreased 7.3% to $46.3 million, on-demand manufacturing revenue decreased 12.8% to $19.7million. Software revenue decreased 7.7% to $21.2 million. In the second quarter of 2020, we still expect significant impact on COVID-19 and will focus on continuing to take cost out and maintaining cash.

We reported GAAP gross profit margin of 42.4% in the first quarter of 2020 …

We ended the quarter with a $112.8 million of cash and cash equivalents. During the quarter, we used $2.3 million of cash from operations, generated $1.2 million of cash from financing activities and paid $4.4 million for capital expenditures. In addition, we used $10 million of cash for acquiring the remaining 30% of the capital and voting rights of our joint venture in Brazil and used $2.5 million of cash for the second or yearly instalments to acquire the remaining controlling interest of our previous joint venture in China. I also want to comment that as of today, we have not drawn on our revolver and we are focused on preserving cash along with reducing costs and working capital.

99.     Looking ahead, CEO Joshi was sanguine about 3DSC's business prospects:

COVID-19 will have long-term impact that we cannot yet quantify. Our business is sound, and our products are relevant, but our near-term results will continue to be impacted by COVID-19.

***We shipped factory metals in April as planned, but unfortunately the timing means that the demand is low right now.*** Medical device manufacturing continues to grow. In healthcare, while consumers are canceling unnecessary surgeries, our simulator business is doing well.

***Capital constraints will continue to put pressure on new hardware and software sales***. In our ODM business, R&D projects are continuing, but demand-driven tooling purchases have been slowed. In this uncertain environment, we remain focused on cash generation and optimizing cost. (Emphasis supplied.)

100.     During the question-and-answer period with industry analysts, CEO Joshi and CFO Booth fielded questions about the Q1 2020 results, how Q2 2020 is coming along, and what the long-term effects of the pandemic might be on 3DSC's business in the second half of the year.

101.     Discussing the Q1 results, CEO Joshi specified the areas that were hit the hardest by COVID-19:

[With respect to the 35% decline in printer sales] I think it's mainly SLA, MJP and dental printers on the printer side. Then, when you go to the software, the new software licenses, so if you think about the manufacturing software because the

manufacturing activity has really impacted negatively, so the Cimatron software especially with automotive market in a very different place right now, when they had already tough 2019 and in addition with all this COVID stuff. The other software, all the Geomagic Software especially the inspection software, also had a negative impact because of the COVID. So, new hardware and new software licenses are the core thing. You saw the materials, we did okay, but I think you would start seeing that impact in second quarter because clearly material consumption on the dental in orthodontic procedures and our enterprise customer also talked about that. We also, as I said jewelry material and SLA material because of the automotive segment that we really address. ***So I think in Q1 we did okay, but I think as the COVID spread, now happening in Europe and in Americas, there will be some impact of that in Q2.*** With respect to healthcare, all the elective surgeries, the surgical planning services, you're going to see the impact, but the medical device manufacturing I think we are still very healthy. (Emphasis supplied.)

102.   Regarding the then-current quarter, Q2 2020, CEO Joshi provided a sober assessment in response to several questions:

So, clearly Q2 will have, and I think Todd talked about significant impact especially in the new printing hardware and new software licenses. I think you're going to see that, and some materials also impact in Q2 . . . ***I can tell you that Q2 will have more impact than Q1, whether the Q2 is a bottom or not it's very hard to say*** and I think in April, we are seeing consistent with what I am telling you with respect to what we saw, especially in March and pulling it out in April. (Emphasis supplied.)

***

So let me start here, on April clearly, I think I talked about it. We are seeing the new printing hardware and new software licenses are really slow and the impact is also on-demand services because the manufacturing companies are not really ordering tooling, there are some R&D projects, but they have slowed down, ***so those 3 businesses definitely we are seeing the impact globally, in all the regions***, because even though China may come back, but they are not really changing the order. So I would say the April is very much what I talked about. Our medical devices that business is doing well, and it continued to grow in April and the elective surgeries are down, so our dental business and our Aligner business and our surgical planning business is impacted. (Emphasis supplied.)

103.   When asked if a good deal of the lost business was small and medium sized customers, CEO Joshi explained that the impact was more widespread:

Well, yeah, but I think ***it's not about a small and medium business, even the enterprise customers are seeing, so like auto industry, aerospace industry, there is a major impact going on*** at least from our customer base point of view. Yeah,

small and medium businesses from jewelry segment that you could say there is a big impact, the dental segment for the dental labs is a big impact, but it's not just limited to small and medium businesses . . . . (Emphasis supplied.)

104.    CEO Joshi made clear that 3DSC's problems did not stem from supply chain disruptions: "[T]he question now is more on the demand side, than supply chain disruption . . . . so I think it's really now, can we get the demand  . . . so I think that's where we are."

105.    The Q1 2020 Form 10-Q's Statement of Operations reported the following results:

Revenue:
| | | |
|---|---|---|
| | Products | $ 78,809,000 |
| | Services | $ 55,896,000 |
| | Total revenue: | $134,705,000 |
| Cost of sales | | |
| | Products | $ 48,896,000 |
| | Services | $ 28,677,000 |
| | Total cost of sales | $ 77,573,000 |
| Gross Profit | | $ 57,132,000 |
| [Gross Margin | | 42.4%] |
| | R&D | $ 19,244,000 |

106.    These results, which, *inter alia*, enabled 3DSC to report a gross profit margin of 42.4%, were materially false and misleading for the following reasons:

a.    As admitted by the Company in its 2020 Form 10-K, and as explained more fully at ¶¶ 81-92, above, the Company failed to apply the correct GAAP standards to the revenue it recognized under the United Therapeutics contract, making the financial reporting presumptively misleading and inaccurate. When later revised, consolidated revenues increased to $135,635,000 while gross profit remained at $57,132,000. Following this revision of results, the Company's reported gross profit margin declined from the 42.4% initially reported to 42.1%.

b.    As explained at ¶¶ 47-49 above, by early 2019, the Company stopped shipping its DMP Factory 350 and DMP Factory 500 printers because of a quality control issue

with the powder management units uncovered during initial use of the DMP Factory 350 units in late 2018 or early 2019. By the end of Q1 2020, the Company had engineered a solution to the problem which now performed powder management in two independent modules. In late 2019, without explaining the precise nature of the solution, CEO Joshi had indicated that this solution was being "completely qualified" for shipments in April 2020; shipments in fact restarted in 2020. Therefore, pursuant to applicable GAAP, to wit, ASC 330-10-35-1B, by no later than Q1 2020, when the new technology that enabled 3DSC to ensure powder management quality control was installed in its DMP Factory 350 and DMP Factory 500 metal printers, the Company should have written down its inventory of powder management units and the problematic DMP Factory 500 unit for which the powder management unit was being replaced, as they were defective and/or obsolete. However, 3DSC did not write-off these units until more than a year later, as explained by CFO Narula in the Company's Q2 2021 earnings call:

> One was a powder management unit for one of our metals printers that was developed back in 2019, or 2018, I believe it was. We've [since introduced] a new, better unit. We had some issues with the older one. So we had a number of these in inventory that were largely ***unsellable***. So we wrote that off. We also had one of our early Factory 500s. ***It was the first one that we produced. Some issues with it because it was the first one. And as a result, we had a write-off associated with that piece of equipment***. So that's why I called them both nonrecurring. These are both older pieces of equipment, stemming back to, I think, 2018. And so combined, as I mentioned, it's about 140 basis points impact to the margin. (Emphasis supplied.)

The Company's August 9, 2021, earnings release filed on Form 8-K indicated that a 140-point basis point drop in gross margins from the prior quarter was attributable to this charge. Although such a margin decline

42

would appear to be associated with an even greater charge, the Form 10-Q indicates the inventory obsolescence charge was only $1,100,000. Had this charge been properly taken in Q1 2020, 3DSC's gross profit margin would have further eroded, another 0.8%, to 41.3%.  Additionally, as set forth in the table in ¶11, above, by not taking the write-down in Q1 2020, 3DSC's inventory was overstated by 1%, its loss from operations was understated by 6%, and the amount of its net loss for the quarter was understated by 5.3%.

107.    With respect to the misrepresented United Therapeutics contract, the Company, CEO Joshi, and CFO Booth knew or recklessly disregarded that the financial results reported in the Form 8-K earnings release, Form 10-Q, and during the earnings conference call were materially false and misleading because:

a.    Although the reason later given (in the 2020 Form 10-K) for failure to apply proper accounting principles is that the contract at issue was "non-standard" and/or contained "non-standard" contract terms, as set forth in ¶¶ 81-82, since January 1, 2018, 3DSC has routinely dealt with the application of Topic 606 to contracts with multiple obligations. Thus, even if 3DSC did not usually sell R&D or product prototypes as a service, because R&D is an ordinary part of 3DSC's business, the Company represented that it had a method for determining its value.

b.    By the end of Q1 2020, collaborative biotechnology arrangements were hardly "non-standard" contracts for 3DSC:

i.    In an October 23, 2019, joint press release, the Company announced a collaboration with Antleron, pursuant to which the Company's

43

printers and materials would be utilized in Antleron's Belgium R&D facility to create a process that "engineer[s] living therapies" for personalized treatment. Akin to the goal of the United Therapeutics contract, Antleron's mission is to "eventually make organ manufacturing a reality." The joint press stated, in relevant part:

Bringing together two industry pioneers – 3D Systems for 3D printing technologies and healthcare expertise, and Antleron for leadership and innovation in the development of regenerative products and personalized patient care – the companies will collaborate to support Antleron's development of bioprinting solutions utilizing 3D Systems' printing technologies.

***

According to Antleron CEO, Jan Schrooten, "The vision of Antleron is to sustainably bring living therapies into the clinic. 3D printing is key to this endeavor, and we are eager to collaborate with 3D Systems and its experts. I look forward to the pioneering solutions we'll be able to achieve to elevate the efficacy of bioprinting and extend its biomedical application reach."

"3D Systems is excited about working with Antleron as they explore bioprinting, and especially their capability to develop end-to-end solutions utilizing the 3D Systems' state of the art printing platforms and materials," said Chuck Hull, co-founder and chief technology officer, 3D Systems. ***"As we look to the future, bioprinting and regenerative medicine are large opportunities for 3D printing, and we look forward to expanding the role 3D Systems will play in these exciting fields."*** (Emphasis supplied.)

ii. On January 13, 2020, 3DSC and CollPlant Biotechnologies issued a press release wherein they announced:

"[A] joint development agreement intended to play a pivotal role in advancing and accelerating breakthroughs in the biomedical industry. The collaboration brings together two industry pioneers-- 3D Systems, renowned for its 3D printing technologies and healthcare expertise; and CollPlant, the developer of proprietary recombinant human collagen (rhCollagen) BioInk technology currently used for 3D bioprinting of tissues and organs. The two companies plan to jointly develop tissue and scaffold bioprinting processes for third party collaborators.

The companies intend to create integrated 3D bioprinting solutions comprised of state-of-the-art 3D bioprinters and BioInks to produce tissues and scaffolds. In accordance with the collaboration agreement, both companies may use a combination of 3D Systems' printers, CollPlant's BioInks, and new formulations of rhCollagen-based BioInks jointly developed by the companies, for their own products, as well as for deployments with third parties.

"3D Systems is excited to work with CollPlant to develop groundbreaking bioprinted tissue and scaffold technologies," said Chuck Hull, co-founder and chief technology officer, 3D Systems. ***"We believe 3D printing to be a key technology for regenerative medicine, and this collaboration is one of many we are entering to play an integral role in this exciting field …"*** (Emphasis supplied.)

With the Company looking to partner with as many biotechnology companies as possible on a variety of arrangements, while negotiating and drafting these contracts (which were announced prior to the Class Period), it was incumbent on management to review the financial impact of the parties' respective obligations under these arrangements from an accounting perspective.

108.    The Company's Q1 2020 overstatement of gross profits due to the failure to write-off the legacy DMP Factory 500 unit and the powder management units that were unsellable, was made with scienter because 3DSC, CEO Joshi, and CFO Booth knew and/or recklessly disregarded the true facts, to wit, the inventory units would not be repaired for re-use but would in fact be replaced with new and improved units – and therefore should be written off:

a.    At the Q3 2019, earnings call, with CFO Booth present, CEO Joshi explained:

"[O]nce we get our factory metal systems completely qualified and start shipping in end of the Q1, our customers are just waiting for our solutions. I do believe that also will help us for growth in 2020.

\*\*\*

"[W]e wanted to make sure that a part of management unit that we are planning to ship with over 350, we look at the reliability and make sure that we don't have any issues. And that's why we paused, and we are making

45

incredible progress. We know the root cause. And it's a tough problem because when you are moving that metal powder, the electrostatic forces and lot of things that we need to really pay attention to, so it doesn't plump up. And I think we are finding a very good solution to that. We are testing it thoroughly and I would rather wait than ship a product, having a quality issue."

b.   A June 1, 2020, interview with Mark Cook, VP of Metal Products at 3DSC, published by the Society of Manufacturing Engineers, featured the DMP Factory 500 printer.  The article contained the following exchange:

**ME:** An important part of the DMP Factory is powder management, but I understand there were some issues with the powder management module (PMM). What happened, and are these modules now functioning for all metals?

**Cook**: The most important aspect of powder management is to maintain powder quality throughout the workflow such that nearly all powder can be consumed in the process of making parts. This includes reconditioning unused powder that has repeatedly gone through the workflow. In our initial testing, we were confident that our powder management solution would meet the powder quality requirement. After extensive testing, however, it was determined that we needed to further improve the ability to repeatedly recycle powder and maintain the highest quality standard. To address this specific issue, we decoupled the depowdering function from the recycling function and now perform powder management in two independent modules, the depowdering module (DPM) and the powder recycle module (PRM).

109.   With respect to both misstatements, each of which improperly inflated 3DSC's important gross profit margin metric, as explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and inefficient manual processes; (b) the ongoing friction among various factions in the accounting staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an already understaffed accounting department in 2020; and (f) the outsourcing of various accounting functions to at least two third parties, 3DSC, CEO Joshi and CEO Booth knew or recklessly disregarded that the Company's financial results could be materially misstated.

110.     Attached to the Q1 2020 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by CEO Joshi and CFO Booth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. In relevant part, the 1Q 2020 10-Q stated:

> **Item 4. Controls and Procedures.**
> *Evaluation of disclosure controls and procedures*
>       ***As of March 31, 2020, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) pursuant to Rules 13a-15 and 15d-15 under the Exchange Act. These controls and procedures were designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, in a manner to allow timely decisions regarding required disclosures. ***Based on this evaluation, management has concluded that our disclosure controls and procedures were effective as of March 31, 2020.***
>
> **Changes in Internal Controls over Financial Reporting**
>       There were ***no material changes in our internal controls over financial reporting*** during the period covered by this Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis supplied).

111.     This statement was false and materially misleading at the time it was made because the Company later admitted:

> "During the preparation and audit of our financial statements for the period ended December 31, 2020, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting related to a lack of certain controls, or improper execution of designed control procedures, (1) for certain non-standard contracts and non-standard contract terms and (2) over the review of internally prepared reports and analyses utilized in the financial closing process. These control deficiencies were partially related to employee turnover, resulting in a temporary shortage of personnel with appropriate knowledge or skills to perform an effective review during our financial statement

close process. In addition, certain control deficiencies related to the completeness
and review of transactions that were infrequent in nature."

112.    As explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and
inefficient manual processes; (b) the ongoing friction among various factions in the accounting
staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and
accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an
already understaffed accounting department in 2020; and (f) the outsourcing of various accounting
functions to at least two third parties, 3DSC, CEO Joshi and CEO Booth knew or recklessly
disregarded that that the Company's internal controls over its financial reporting were not effective
during Q1 2020.

113.    Because the Company had burned through $21.5 million in cash during Q1 2020,
both CEO Joshi and CFO Booth had a stated goal of preserving cash going forward. Nevertheless,
following the earnings call, at least one analyst questioned whether, based upon the bleak
predictions for Q2 2020 performance – and beyond, 3DSC would face a liquidity crisis that could
cause a violation of debt covenants. A May 7, 2020, report by Brian Drab of William Blair warned:

> **Balance Sheet and Cash Flow.** At the end of the fourth quarter, 3D Systems had
> $113 million in cash and equivalents and debt totaled $47 million. Cash from
> operations was negative $2 million and (including $4 million in capital
> expenditures) free cash flow was negative $6 million. We forecast negative free
> cash flow of $20 million to $30 million for full year 2020. We currently forecast a
> similar use of cash for 2021. ***The company's current credit agreement requires
> 3D Systems to maintain a leverage ratio of less than 3.5 times debt to total
> EBITDA and an interest coverage ratio of greater than 3.5 times. We forecast the
> company to breach both of these covenants when the test occurs at the end of
> third quarter 2020. The debt-to-total-EBITDA test could result in a breach at the
> end of the second quarter.*** The company could, of course, pay down the debt and
> be left with about $65 million in cash, a precarious position, in our view, given our
> cash flow (use) forecast. We acknowledge that leniency by the lenders and cost
> cutting could improve the company's financial security. We also acknowledge that
> we currently have little confidence in our forecast for any company. Regardless, we
> believe 3D Systems faces material liquidity risk in the near term, which could put
> further pressure on the stock. (Emphasis supplied.)

A violation of its loan covenants would mean that all the Company's long-term debt, $44.62 million, would become immediately due and payable. It is likely for this reason that 3DCS asked its outside auditor, BDO, to review its debt situation in 2020, as explained by CW2.

114.    This same analyst noted that the Company's adjusted gross margin performance of 43.1% came in below the consensus estimate of 44.3%, as well as 60 basis points below the previous quarter.  (The Company's Form 8-K, filed May 6, 2020, at Ex. 99.1, reported the non-GAAP adjusted gross margin by increasing the reported GAAP metric of 42.4% to 43.1% due to $900,000 in adjustments to the cost of goods sold.) Including this upward adjustment, had 3DSC properly accounted for the United Therapeutics contract payments and timely written off the defective and obsolete DMP Factory inventory, the Company's adjusted gross margin would have been a shade under 42%, more than 2.3% below consensus estimates.

115.    Before the release of the Company's financial results and the earnings call, 3DSC closed on May 6, 2020, at $8.72 on a volume of just under 2.6 million shares. As the market reacted to the information released as well as to reports by a handful of analysts, 3DSC's stock price declined $1.26, to $7.46, on a heavy trading volume just below 7 million shares. Even with the Company's overstatement of gross profit margins, its share price dropped 14.4%.

116.    Although he had just assumed his executive positions at 3DSC in September 2019, CFO Todd Booth stepped down shortly after the issuance of 3DSC's Q1 2020 financial results. In a May 20, 2020, filing on Form 8-K, the Company announced: "On May 14, 2020, Todd A. Booth notified 3D Systems Corporation (the "Company") of his intention to resign as Executive Vice President and Chief Financial Officer of the Company to pursue other career opportunities. Mr. Booth's resignation as Executive Vice President and Chief Financial Officer of the Company was effective immediately …" The same filing announced the appointment of Wayne Pensky – former

CFO of Hexcel Corporation, where CEO Graves serves as a board member – as interim CFO as of May 19, 2020.

117.    CFO Booth's departure after just eight months of service is atypical among large corporations. An August 1, 2016, article in the *Wall Street Journal*, entitled "A Quick CFO Exit Can Spell Trouble," noted: Among the 1,000 large companies that [recruiting firm] Korn/Ferry [International] tracks, only 4% of the finance chiefs who departed over the past six years left within their first 12 months. That is fewer than 40 people." Ironically, the article featured the market jitters occasioned by the departure of Charles Hull as CFO of 3DSC in May 2015 after just six months of service.  In light of the internal accounting department turmoil chronicled by CW1, CW2, and CW3, the departure of CFO Booth – a leader who was finally beginning to put an end to the departmental culture clash – did not bode well for the Company.   The negative impact would be exacerbated by COVID: Furloughs of a majority of company employees, averaging two weeks, would further tax the understaffed accounting department. Further, as CW2 noted, once employees began working from home, the Zoom environment tended to silo employees and limit interaction with other departments and functions.

118.    CEO Graves, who took control of the Company on May 26, 2020, immediately began to disassemble the executive team that CEO Joshi had put in place.  On July 17, 2020, in a filing on Form 8-K, 3DSC announced that on July 15, 2020, it had notified Philip C. Schultz, Executive Vice President, Operations, and Herbert Koeck, Executive Vice President, Global Go-To-Market, that their employment with the Company will cease effective August 15, 2020, and September 15, 2020, respectfully, as part of a realignment of the Company's organizational structure." (A month later, Mr. Koeck's employment was extended to December 31, 2020.)

119.     On August 5, 2020, after the markets closed, the Company made three big announcements. In addition to filing its Form 10-Q quarterly report for the quarter ended June 30, 2020 ("Q2 2020 10-Q"), 3DSC announced a radical restructuring of the entire business and an at-the-market ("ATM") stock offering to shore up its cash situation.

120.     The Company reported a dismal $112.1 million in revenues, a decline of $22.6 million from Q1 2020, and a whopping $45.2 million as compared to Q2 2019. In a press release filed on Form 8-K, the Company stated: "The lower demand was across all products and services due primarily to the COVID-19 pandemic, as many customers were shut down or on a significantly reduced level of activity."  3DSC's gross profit margin sunk to 31.4%.  Reporting a non-GAAP margin of 41.3%, the Company attributed the difference to "a charge of $10.9 million to cost of sales primarily attributed to inventory, accessories and inventory commitments for product lines that reached their end-of-life," adding that "[t]he company has ceased production for these items."

121.     During the earnings call with analysts, new CEO Graves did not dwell on the dismal results. As did former CEO Joshi, CEO Graves discussed the result of his extensive listening sessions after taking control of the Company:

> Over the last two months since joining 3D Systems as CEO, I've talked extensively with our employees, our customers, and our business partners as well as several of our analysts and long-term shareholders. In short, through these discussions you've reaffirmed for me why I joined 3D Systems. Namely that we have a tremendous and somewhat unique opportunity as a leader in this industry. And I'm tremendously excited by the passion of our employees and the breadth of our technology and capabilities within our company.
>
> We have incredible strengths upon which to build our future. I've also learned that there is a wide consensus that we need to change if we're going to be successful. To be blunt, while we've made significant progress in key technology areas and -- today can boast of one of the strongest portfolios of 3D printing hardware, software, and materials in the industry. In recent years, we've not translated these elements into consistent growth and profitability. My singular goal is to make this happen.

51

122.    Reorganizing the Company around the purpose statement "We are the leaders in enabling additive manufacturing solutions for applications in growing markets that demand high reliability products," CEO Graves announced the segmentation of the Company's business into two vertical markets – healthcare and industrial – further explaining that "[m]oving forward, we will no longer emphasize the individual software, hardware or materials elements of additive manufacturing separately, rather the combination of these elements into specific application solutions within our targeted markets."

123.    In addition to reorganizing the structure of 3DSC's operations, CEO Graves announced a drastic reduction in the Company's overall size:

> In connection with the organizational realignment announced today, we have an opportunity to maximize efficiencies and align our operating costs with current revenue levels. Through this restructuring effort, we expect to reduce the annualized cost by approximately $100 million by the end of next year. This should enable the company to be profitable at current revenue levels and be well positioned to leverage our sales growth, as its realized. Through this restructuring, we'll reduce our workforce by nearly 20% with the majority being completed by year-end. This reduction [of course] is a difficult but essential step in our ongoing strategic actions designed to better position the company for sustainable and profitable growth.

> I'd like to express my appreciation to each of the employees impacted by this decision for their dedicated service. Other cost reduction efforts will include reducing the number of facilities and examining every aspect of the company's manufacturing and operating expenses, the reduction in our footprint is primarily an office space in part enabled by our learning's from the COVID actions which have accelerated our efforts to work remotely. Reduction in our physical site is a real cost opportunity for us, given the volume of acquisitions the company completed several years ago.

According to the 2019 Form 10-K, as of December 31, 2019, the Company employed 2,472 people. Vastly accelerating the staff reductions first started in 2018, and which became a particular focus of senior management in 2019 and early 2020, CEO Graves reduced the number of employees at 3DSC to 1,995 by year-end. An astonishing 477 employees exited the Company in one year.

124.    Discussing the cause for the decline in gross profit margin, CFO Pensky noted the inventory write-down to cost of sales and attributed the remainder to lower absorption of overhead costs due to decreased production. Referencing a chart (attached as Exhibit 99.4 to the Form 8-K), which showed the last six quarters of gross profit margin (starting with Q1 2019), CFO Pensky stated: "Many of the restructuring actions we are taking will help get our gross profit margin back to the levels seen at the beginning of this chart." The chart, in turn, stated: "Expect restructuring actions to take us back to prior year levels as we try to offset the impact of lower volume." In 2019, the annual gross profit margin was 44.2%, with quarterly results of  43.2% (Q1), 46.6% (Q2), 43.3% (Q3) and 43.6% (Q4).

125.    Echoing CEO Graves's plan to reduce operating costs by examining "every aspect of the Company's manufacturing and operating expenses," CFO Pensky specifically noted: "In the first half of 2020, our selling, general and administrative expenses were nearly 44% of revenue. That is simply too high and many restructuring actions we will be taking are focused on reducing those costs." Notably, CFO Pensky's comment covered Q2 2020, a quarter in which  SG&A was reduced by 27.4% YOY after the Company's executive officers took a voluntary 10% pay cut (as did non-employee board members), the Company announced (during the Q1 2020 earnings call) that the majority of 3DSC's workers would be furloughed for an average of two weeks, and travel expenses were significantly lower.

126.    During the Q&A portion of the call, analysts asked for more detailed information about the $100 million annualized cost reduction.  CFO Pensky and CEO Graves both indicated that $60 million would be achieved by year end, with CEO Graves specifying that the savings would roughly be split 40% cost of sales, 40% SG&A and 20% R&D. Both CFO Pensky and CEO Graves indicated that the measure of success would be whether the Company could be profitable

53

at the end of the year, as measured by net income. One area where spending was to be increased was, not surprisingly, operational infrastructure, where "efficiency investments in IT" would yield "very short-term benefits that are essential."

127.   The Q2 2020 Form 10-Q's Statement of Operations reported the following results:

Revenue:

| | | |
|---|---|---|
| | Products | $ 61,496,000 |
| | Services | $ 50,564,000 |
| | Total revenue: | $112,060,000 |
| Cost of sales | | |
| | Products | $ 52,489,000 |
| | Services | $ 24,404,000 |
| | Total cost of sales | $ 75,893,000 |
| Gross Profit | | $ 35,167,000 |
| [Gross Margin | | 31.4%] |
| | R&D | $ 16,997.000 |

128.   These results, which, *inter alia*, enabled 3DSC to report a gross profit margin of 31.4%, were materially false and misleading because, as admitted by the Company in its 2020 Form 10-K, and as explained more fully at ¶¶ 81-92, above, the Company failed to apply the correct GAAP standards to the revenue it recognized under the United Therapeutics contract, making the financial reporting presumptively misleading and inaccurate. When later revised, consolidated revenues increased to $112,777,000, while gross profit remained at $35,167,000. Following this revision of results, the Company's GAAP reported gross profit margin declined from the 31.4% initially reported to 31.2%.  The Company's six-month results for these line items were also materially false and misleading because each quarter's figures did not comply with GAAP.

129.   With respect to the misrepresented United Therapeutics contract, the Company, CEO Graves, and CFO Pensky knew or recklessly disregarded that the financial results reported

in the Form 8-K earnings release, Form 10-Q, and during the earnings conference call were materially false and misleading for the reasons set forth in ¶¶ 107 and 109, above.

130.    As set forth in ¶¶ 106(b) and 108, the Company began to ship DMP Factory printers in Q2 2020 that contained the new powder management system designed to prevent the quality control problems that occurred when the original powder management systems had been installed. Therefore, the Q2 2020 financial results were false and materially misleading, and made with scienter because 3DSC, CEO Graves and CFO Pensky knew or recklessly disregarded that the reported three-month and six-month results failed to include an inventory write-down for defective and obsolete DMP Factory products in violation of GAAP.  Failure to take the write-down in Q2 2020 caused 3DSC's inventory to be overstated by 0.9%. Additionally, as set forth in the table in ¶ 11, above, had the write-down been taken in Q2 2020, the gross profit margin would have decreased another 1.0%, to 30.2%.

131.    With respect to both misstatements, each of which improperly inflated 3DSC's important gross profit margin metric, as explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and inefficient manual processes; (b) the ongoing friction among various factions in the accounting staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an already understaffed accounting department in 2020; and (f) the outsourcing of various accounting functions to at least two third parties, 3DSC, CEO Graves and CEO Pensky knew or recklessly disregarded that the Company's financial results could be materially misstated.

132.    The Q2 2020 Form 10-Q was also false and materially misleading because the Company affirmatively represented that no "triggering event" was present to cause it to conduct a

goodwill impairment analysis. Indeed, even though the Company found that conditions warranted

such analyses in both Q1 2020 and Q3 2020, for Q2 2020, the Company did not do so stating:

> As of March 31, 2020, we experienced a triggering event due to our operating performance, which had been negatively impacted by macroeconomic factors, the decrease and mix of sales, and the effect of the COVID-19 pandemic, and performed a quantitative analysis for potential impairment of our goodwill or long-lived asset balances. We also took action to counter these factors, including reducing our cost structure by focusing on cost of sales and operating expenses to drive future profitability. Based on available information and analysis as of March 31, 2020, we continued to believe the fair value of our reporting units exceeded their carrying values and the carrying value of our long-lived assets were recoverable.
>
> As expected, our operating performance through June 30, 2020, continued to be negatively impacted by the effect of the COVID-19 pandemic. While we believe our actions implemented at March 31, 2020, have had a positive impact, further action is required as we just announced a new strategic reorganization and a major restructuring program targeted to take $100 million of costs out of our cost base. Refer to discussion of the COVID-19 pandemic in this Management's Discussion and Analysis. ***As of June 30, 2020, we considered the potential for a triggering event and concluded none was present. Based on currently available information and analysis as of June 30, 2020, we continue to believe the fair value of our reporting units exceeds their carrying values and the carrying value of our long-lived assets is recoverable.*** In the event that these matters are not satisfactorily resolved, we could experience another triggering event or impairment of our goodwill or long-lived asset balances in future periods.  (Emphasis supplied.)

133.    As correctly predicted by former CEO Joshi, who led 3DSC for four years, the

global turmoil caused by the pandemic had an even greater negative impact on 3DSC's financial

results in Q2 2020 than was felt in Q1 2020. Remarkably, brand new CEO Graves and interim

CFO Pensky reviewed the Company's circumstances against GAAP's list of potential triggering

events and determined that *no triggering event was present*. ASC 350-20-35-3C(a)-(g) contains

the following non-exclusive list of events and circumstances which could trigger an interim

goodwill impairment test.

134.    For the reasons set forth in ¶¶ 135-140, below, setting forth each of the enumerated

potential triggering events followed by pertinent information relating to those events as of June

30, 2020, the statement "no triggering event was present" was false and materially misleading when made. As set forth in the chart in ¶ 11 above, because the goodwill charge was not taken in Q2 2020, 3DSC's goodwill was overstated by 27.9%. Additionally, because 3DSC delayed both the goodwill write-down and the defective and obsolete inventory write-down, the Company's loss from operations was understated by 145.8% ($49.4 million) and its net loss was understated by 130.3% ($49.44 million).

135.   "ASC 350-20-35-3C(a):   Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets":

a.   On May 19, 2020, an article in *Forbes*, entitled "Over $200 Billion in Impairments to Hit Corporate Earnings," predicted a tidal wave of impairment testing in Q2 2020. The author compared the severity of the world economic crisis caused by COVID-19 to that of the Great Recession of 2008:

> According to yearly impairment studies conducted by Duff & Phelps, during the Great Recession in 2008, there were 502 goodwill impairment events recorded by public companies, resulting in $188 billion in lowered earnings. The impact of COVID-19 is expected to be more severe than 2008. ***The International Monetary Fund projected global economic activity to fall 3% this year***. For comparison, the 2008 crisis resulted in only a 0.1% drop in global GDP. As a result, there is a potential for even greater impairments this year versus in 2008. (Emphasis supplied.)

b.   In June 2020, the International Monetary Fund issued a stark, more negative update to its World Economic Outlook, entitled "A Crisis Like No Other, an Uncertain Recovery," which concluded:

> "***Global growth is projected at –4.9 percent in 2020, 1.9 percentage points below the April 2020 World Economic Outlook (WEO) forecast***. The COVID-19 pandemic has had a more negative impact on activity in the first half of 2020 than anticipated, and the recovery is projected to be more gradual than previously forecast."

136.   "ASC 350-20-35-3C(b): Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development":

a.   In its Q1 2021 Form 10-Q, the Company described the impact of COVID-19:

> While the COVID-19 pandemic has impacted the Company's reported results for the first quarter, we are unable to predict the longer-term impact that the pandemic may have on our business, results of operations, financial position, or cash flows. ***The extent to which our operations may be impacted by the dynamic nature of the COVID-19 pandemic will depend largely on future developments, which are highly uncertain and cannot be accurately predicted***, including new information which may emerge concerning the severity of the outbreak and actions by government authorities to contain the outbreak or treat its impact. Furthermore, the impacts of a potential worsening of global economic conditions and the continued disruptions to, and volatility in the financial markets remain unknown.

> During Q2 2020, revenues, in fact, cratered as "many customers were shut down or on a significantly reduced level of activity." When asked if conditions had stabilized, CEO Graves could not "accurately predict" "future developments":

> ***"[T]here is a tremendous amount of noise***. I would tell you there is a few things that encourage me number one in most of the world and to different degrees, you see sites reopening. So from a service standpoint and getting production running again you can start seeing people operating machines which demand should follow that. So you see factories reopening and machine starting to run again. So that's a good thing, areas that were viewed as non-essential like dental treatments and orthopedic surgeries, things like that are now allowed again to at least some extent. So those fundamental demand drivers to be a very good thing for us. Now what we, what we, ***what is not clear because there's just so much noise still out there is pace of improvement***.

b.   The Q1 2020 Form 10-Q discussed triggering events as follows:

> Our operating performance through March 31, 2020, has been negatively impacted by macroeconomic factors, the decrease and mix of sales and the

effect of the COVID-19 pandemic. As a result of these matters, the Company experienced a triggering event in the current quarter and performed a quantitative analysis for potential impairment of its goodwill or long-lived asset balances. Based on currently available information and analysis as of March 31, 2020, the Company continues to believe the fair value of the reporting units exceeds their carrying values and the carrying value of our long-lived assets is recoverable. The Company is taking actions to counter these factors, including reducing our cost structure by focusing on cost of sales and operating expenses to drive future profitability. ***In the event that these matters are not satisfactorily resolved, we could experience another triggering event or impairment of goodwill or long-lived asset balances in future periods***. (Emphasis supplied.)

In Q2 2020, despite reductions in both cost of sales – nearly 26% QOQ (excluding a $10.9 million inventory write-off), and operating expenses – 8.4% QOQ, the Company apparently concluded "these matters [were] not satisfactorily resolved":

As expected, our operating performance through June 30, 2020, continued to be negatively impacted by the effect of the COVID-19 pandemic. While we believe our actions implemented at March 31, 2020, have had a positive impact, ***further action is required*** as we just announced a new strategic reorganization and a major restructuring program targeted ***to take $100 million of costs out of our cost base.*** (Emphasis supplied.)

c.  At the Needham Virtual Growth Conference on January 13, 2021, CEO Graves, looking back to Q2 2020, stated: "because ***we didn't know where the bottom was*** at quite frankly, we launched an aftermarket equity offering at that time to make sure we could meet all of our cash needs . . ." (Emphasis supplied.)

Under its own Q1 2020 framework, 3DSC's dire circumstances in Q2 2020 constituted a triggering event under this factor.

137.  "ASC 350-20-35-3C(c): Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows": In Q2 2020 3DSC took an obsolete inventory write-off of $10.9 million and increased its inventory reserve by more than

$11.4 million over the previous quarter. The negative impact of the inventory charge on cash flows constituted a triggering event under this factor.

138. "ASC 350-20-35-3C(d): Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods": Not only were quarterly revenues of $112 million the lowest in eight years, but the Company missed analysts' already-reduced estimates ($118 million consensus according to August 6, 2020, William Blair report) and also fell short $0.03 on adjusted loss per share, at $(0.13). The Company's cash position declined nearly $70 million in the first half of 2020. Further, as the William Blair report noted, "cash from operations was negative $19 million and (including $3 million in capital expenditures) free cash flow was negative $22 million." The Company's abysmal performance, which failed to meet reduced expectations, constituted a triggering event under this factor.

139. "ASC 350-20-35-3C(e): Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation":

a. In May 2020, a new CEO *and* a new (interim) CFO joined the Company;

b. As announced on the same day as Q2 2020 earnings, new management decided on a radical restructuring of the business into two segments – healthcare and industrial;

c. The Company announced that it would terminate 20% of the 3DSC's employees;

d. The Company planned to jettison business (and customers) not associated with additive technologies in the healthcare and industrial sectors.[1]

---

[1] Additive technology adds layer upon layer of material to produce the desired product while subtractive technology removes layer after layer from a solid block, akin to sculpting a stone.

Each of these occurrences separately, and certainly all taken together, constituted a triggering event under this factor.

140.    "ASC 350-20-35-3C(f): Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit":  Due to its plans to completely restructure the business, in the midst of its worst quarter in years, the Company recorded a $10.9 million inventory charge, explaining:

> In June 2020, as part of our assessment of prospective sales and evaluation of inventory, we determined the end-of-life for certain product lines. The end-of-life determination for these products reflects management's plans to focus our resources that are better aligned with our new strategic focus, as further discussed in Note 15. As a result, for the quarter ended June 30, 2020, we recorded a charge of $10,894 to products costs of sales, primarily attributable to inventory, accessories, and inventory commitments for these products. We have ceased production for these items.

A major restructuring of the Company's business into two units so thorough as to plan the sale of assets not consistent with 3DSC's new stated purpose – enabling additive manufacturing solutions for applications in growing markets that demand high reliability products – and which resulted in an end-of-life determination for product lines the Company will no longer produce, constituted a triggering event under this factor.  In fact, when the Company decided to formally report results in these two segments, in its Q1 2021 Form 10-Q, the Company determined that decision to be a triggering event.  ("As a result of this re-segmentation, the Company performed a quantitative analysis for potential impairment of our goodwill immediately following the re-segmentation.")

141.    "ASC 350-20-35-3C(g): If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers)": Not coincidentally, 3DSC claimed a share price

decline triggered an impairment analysis in *Q3 2020* – an analysis that determined that there was an eyepopping $48.3 million impairment of goodwill in assets held in its EMEA region. Specifically, 3DSC stated, when reporting its Q3 2020 results: "The interim test was necessitated by our identification of certain impairment triggering events associated with the decline of the company's share price ultimately due to the impact on the business environment from the COVID-19 pandemic." In essence, the Company admitted the existence of triggering events due to the pandemic's effect on the business environment – all of which were present in Q2 2020 – but decided to ignore them until the market sized up the situation and 3DSC's share price drifted lower, from approximately $6.99 per share on June 30, 2020, to $4.92 on September 29, 2020.

142.    The misrepresentation that "no triggering event was present" was made with scienter because it was made knowingly and/or with reckless disregard of its falsity by 3DSC, CEO Graves, and CFO Pensky for the following reasons:

   a.    As explained by CW2, outside auditor BDO was reviewing the Company's debt situation during 2020. Following the May 6, 2020, earnings report, at least one analyst suggested that 3DSC could breach one of its debt covenants – leverage ratio of less than 3.5 times debt to total EBITDA – at the end of the second quarter. *See* 2018 Form 10-K, Ex. 10.10 at Sec. 8.2.14. Based solely upon public information as of June 30, 2020, had the Company not repaid more than $26 million of its long-term debt during Q2 2020, its leverage ratio would have been 3.44, avoiding a covenant breach by a mere $834,500. A company whose management asks its outside auditors to monitor its debt situation should perform an impairment analysis because financial performance so poor as to risk violating a debt covenant is stark

proof that the company is not operating as well as expected, a triggering event under ASC 350-20-35-3C(d);

b.  If the Company's management was so closely watching the debt situation so as to pay down just the amount of debt necessary to avoid breaching a loan covenant, 3DSC, CEO Graves, and CFO Pensky must have been concerned about the impact of a potential breach on the cost and availability of capital, a triggering event per ASC 350-20-35-3C(a), which would have required 3DSC to use a higher discount rate in its discounted cash flows analysis – part of its stated impairment test to determine fair value of the EMEA reporting unit (*see* Q3 2020 Form 10-Q at 9) – leading to a finding of impairment in Q2 2020;

c.   On August 5, 2020, the Company indicated that it would focus only on additive technologies in the future and step away from other businesses. Less than three months later, the Company sold the majority of its Cimatron and GibbsCAM software business (the subtractive technologies), located in the EMEA region, in a $65 million deal. To complete the deal, the Company needed to amend its long-term secured credit agreement because the agreement contained a $50 million annual cap on asset sales. *See* Form 8-K, filed October 14, 2020, Ex. 10.1 at 7 (amending Sec. 8.2.7(h)) A $48.3 million goodwill impairment charge would likely have prevented 3DSC from obtaining its secured lender's consent to sell off these high-margin software subsidiaries;

d.  Having just used precious cash to pay down more than $26 million in long-term debt, the Company sought to raise necessary capital for its restructuring by means of stock sales in the "at the market program". This program was announced on

August 5, 2020. Had the Company taken a large impairment charge in its financial filings that same day, this would have negatively impacted the Company's ability to raise cash in the equity markets. During the single quarter the ATM program was in operation, the Company raised approximately $25 million, nearly the same amount it had paid down its secured debt in Q2 2020;

e.  The impairment charge for the Q3 2020 quarter was announced on November 5, 2020. The deal to sell the Cimatron and GibbsCAM businesses was announced on November 3, 2020. Had the $48.3 million EMEA goodwill impairment charge been taken in Q2 2020, as a result of a quantitative analysis following one or more triggering events, it would have had a detrimental effect on the negotiations with the buyer;

f.  By the time 3DSC announced its Q3 2020 financial results, as set forth below, its entire executive management team was in place, global economic conditions had improved, the Company's revenues increased by $23 million – more than a 20% QOQ increase in both the healthcare and industrial segments, the restructuring efforts were on-track to reduce operating costs by $60 million by the end of the year, and closing the Cimatron and GibbsCAM sale would provide sufficient cash to end the at-the-market sales of stock. The Company looked past these positive indicators – known to management but not the market throughout the course of Q3 2020, during which time the Company issued its terrible Q2 2020 earnings report – to belatedly focus on the impact of the earlier-existing triggering events on its share price from July - September 2020.

143.     Attached to the Q2 2020 10-Q were SOX certifications signed by Defendants Graves and Pensky attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Q2 2020 10-Q stated, in pertinent part:

> **Item 4. Controls and Procedures.**
> *Evaluation of disclosure controls and procedures*
> ***As of June 30, 2020, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and interim Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) pursuant to Rules 13a-15 and 15d-15 under the Exchange Act. These controls and procedures were designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and interim Chief Financial Officer, in a manner to allow timely decisions regarding required disclosures. ***Based on this evaluation, management has concluded that our disclosure controls and procedures were effective as of June 30, 2020.***
>
> **Changes in Internal Controls over Financial Reporting**
> There were ***no material changes in our internal controls over financial reporting*** during the period covered by this Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. (Emphasis added.)

144.     This statement was false and materially misleading at the time it was made because the Company later admitted:

> "During the preparation and audit of our financial statements for the period ended December 31, 2020, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting related to a lack of certain controls, or improper execution of designed control procedures, (1) for certain non-standard contracts and non-standard contract terms and (2) over the review of internally prepared reports and analyses utilized in the financial closing process. These control deficiencies were partially related to employee turnover, resulting in a temporary shortage of personnel with appropriate knowledge or skills to perform an effective review during our financial statement

close process. In addition, certain control deficiencies related to the completeness and review of transactions that were infrequent in nature."

145.    As explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and inefficient manual processes; (b) the ongoing friction among various factions in the accounting staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an already understaffed accounting department in 2020; and (f) the outsourcing of various accounting functions to at least two third parties, 3DSC, CEO Graves and CEO Pensky knew or recklessly disregarded that the Company's internal controls over its financial reporting were not effective during Q2 2020.

146.    Following the revenue, gross margins, and earnings misses, 3DSC's share price declined from its close of $7.06 on August 5, 2020, to $6.27 the following day – at $0.79, the largest price drop of the quarter – on heavy trading of nearly 8.8 million shares.

147.    On August 26, 2020, the Company announced that Jagtar Narula would become an Executive Vice President and assume the position of CFO as of September 14, 2020. Reporting to CEO Graves, CFO Narula would become the leader of 3DSC's Finance organization, including all finance operations and investor relations.  Upon assuming his role, CFO Narula would become 3DSC's third new CFO brought to the Company in a just a year's time.

148.    On September 21, 2020, the Company revised its annual incentive compensation plan for its key executives, initially adopted by the Compensation Committee in February 2020. As reported in the Proxy Statement filed on Form DEF-14A, at 29, the original metrics to be utilized to calculate executives' bonuses were revenue and non-GAAP operating profit. Substituting adjusted EBITDA for the second half of 2020, the Company explained:

> The Committee considered the impact of the COVID-19 pandemic on the Company's business operations, the Company's new strategic focus on accelerating the adoption of additive manufacturing solutions for applications in growing markets, and the reorganization of the Company's leadership team under new President and Chief Executive Officer, Dr. Jeffrey Graves, and determined that it was in the best interests of the Company and stockholders to replace the performance criteria in the Prior Bonus Plan because those criteria no longer appropriately motivated its key executives to achieve the Company's goals and objectives. ***The Revised Bonus Plan focuses on incentivizing employees, including its named executive officers, to execute on resizing and cost-reduction objectives*** established to support the Company's restructuring efforts to position the Company to achieve its profitability and growth objectives in 2021 and beyond. (Emphasis supplied.)

The revised bonus targets, which incentivized shrinking the Company's headcount as part of the overall goal of achieving $60 million cost reductions by the end of 2020 became an incentive for top management to cut far too many jobs in the accounting department, thus directly contributing to 3DSC's internal control problems, especially those attributed to "employee turnover." For 2020, CEO Graves received a total compensation package of more than $5.9 million and CFO Narula received $2 million.  *See* Form DEF 14-A, filed April 8, 2021, and Form 8-K, filed May 20, 2021.

149.    On October 6, 2020, the Company announced the selection of the leaders of its two vertical solutions business units. Executive Vice President Menno Ellis, who joined the Company four years earlier, was selected to lead the Healthcare Solutions Group. Executive Vice President Reji Puthenveetil, new to the Company, was selected to lead the Industrial Solutions Group. CEO Graves stated, *inter alia* "With this announcement of our two business unit leaders, our executive reorganization is complete, and we are moving well along our path to restructure the business, with a strong focus on value creation in this exciting market for additive manufacturing."

150.    Also on October 6, 2020, an article on the StreetInsider.com reported analyst Craig-Hallum reiterated its "Buy" rating of 3DSC with a share price target of $11, issued following the Q2 2020 earnings call, because the Company was close to selling one of its major non-core assets.

The Company's share price rose from $4.99 to $5.37, with more shares trading hands that day, 5.565 million, than in the last three sessions combined.

151.     October 7, 2020, *Yahoo! Finance* published press release about the issuance of a report by ResearchandMarkets.com predicting the 3D printing plastics market would grow to $2.83 billion by 2027, with a compound annual growth rate of 23.7%. Also that day, with the Company focused on automotive customers seeking factory production of high-reliability products, an article in the *Motley Fool*, suggested that the Company's shares were "on fire," on news about Tesla's "rapidly growing Additive Manufacturing operations." Spurred by the positive news, the Company's share price climbed nearly a dollar, from $5.37 to $6.36, on extraordinary trading volume of 24.26 million shares.

152.     Two weeks later, on October 20, 2020, analyst Berenberg Capital Markets, reported that the major asset sale was likely to occur soon, citing the Form 8-K filed on October 14, 2020, removing the $50 million annual asset sale cap from its long-term secured credit agreement.  The report speculated that the Company would divest its Cimatron subtractive software business.

153.     On November 3, 2020, the Company announced that it would sell its the Cimatron and GibbsCAM businesses to Battery Ventures for $65 million as part of its focus on additive manufacturing solutions. In anticipation of receipt of the proceeds of sale, the Company also announced that it would not be selling shares during Q4 2020 in its at-the-market program.

154.     On November 5, 2020, after markets closed, 3D Systems filed a 10-Q quarterly report for the quarterly period ended September 30, 2020 ("Q3 2020 10-Q"). The next morning, the Company filed its earnings release on Form 8-K. In it CEO Graves commented:

> "While the challenges of the pandemic persist, ***we were pleased to deliver strong sequential quarterly growth in both our Healthcare and Industrial businesses of approximately 20%, as markets incrementally opened around the world***. While volatility continues, we anticipate these trends continuing as we move forward

through our fourth quarter. With our restructuring efforts on track to deliver our targeted $60 million in savings on a run-rate basis by year end, we are pleased with our progress in the quarter and believe we will exit the year a much more efficient, highly focused additive manufacturing company that is well positioned as a market leader in this exciting industry." (Emphasis supplied.)

155.    The Company reported revenues of $135.1 million, up $23 million from the previous quarter and a gross profit margin of 43.4%, an improvement on the 43.3% achieved in Q3 2019.

156.    Amid all the good news, the Company announced:

Included in operating expenses is a $48.3 million pre-tax non-cash goodwill impairment charge. The goodwill impairment was identified in connection with an interim goodwill impairment test. The interim test was necessitated by our identification of certain impairment triggering events associated with the decline of the company's share price ultimately due to the impact on the business environment from the COVID-19 pandemic. The impairment charge will not result in any cash expenditures and will not affect the company's cash position, liquidity, availability or covenant test under our senior secured term loan facility and our senior secured revolving credit facility.

157.    During that morning's earnings call with analysts, CEO Graves and CFO Narula repeatedly stated that 3DSC saw across-the-board improvement in Q3 2020:

a.  CEO Graves positively noted that "[a]s businesses become more efficient and dealing with the effects of the COVID-19 pandemic and as the economies around the world begin to open, we're pleased to see rising demand across the markets we serve."

b.  CFO Narula added the Company enjoyed a revenue "increase of 21% compared to the second quarter of this year, as we saw a rebound in customer activity from the worst of the pandemic related shutdown."

c.  Later, when asked about which product lines saw improvement, CFO Narula replied: "So within our product line, we saw in materials, we saw it in printers, and

69

we saw in software. So it was across the board. Within our printer category, we saw in both plastics and metals. So it was a -- it was a pretty broad-based recovery on the revenue side."

158.    When discussing the $48.3 million goodwill impairment charge, CFO Narula's prepared remarks were terse and virtually identical to the statement in the earnings release; he provided no additional details.

159.    CFO Narula provided more detail with respect to gross margins:

We reported gross profit margin of 43.4% in the third quarter of 2020 compared to 43.3% in third quarter of 2019. Our gross margins were impacted due to lower absorption of overhead caused by the lower volume in Q3 2020 versus the third quarter of 2019, offset by our initial cost reduction activities. Many of the [restructuring] actions we are taking will further help strengthen our gross profit margins over the coming quarters.

This last comment reiterated CEO Graves's assessment, in his prepared remarks, that the restructuring would enhance "growth and margin expansion in the future."

160.    During the Q&A session, CEO Graves expanded on his gross margins commentary:

Jagtar told you about the kind of short-term comparisons and the puts and takes quarter-by-quarter on gross margin, I was actually pleased that we can hold the gross margin relatively flat in a condition where we're still facing lower demand versus last year in the industrial space. We were able to get enough cost out of the business to hold gross margins at a good level. But moving forward over the future years, I love the businesses that we're in around because they generally carry a higher gross margin associated with them and as we have a built-out service team, and this is becoming more sophisticated every day as we look at leveraging that team that tends to bring higher gross margins as well. So I said, it's a nice environment to be in, we're focused where the value is, and I would hope that trend is one you'll see in future quarters.

161.    Although CFO Narula revised CEO Graves's statement a quarter earlier that 40% of the run rate reduction would come from cost of sales, both confirmed that the $100 million reduction would occur by 2021:

CEO Graves: "Our expectation is that we will deliver $100 million of cost savings on a run rate basis by the end of 2021. We also stated that $60 million of the savings would be achieved by the end of 2020. I'm pleased to tell you that we're on track to deliver to our plan."

CFO Narula: "What we've said is, right, $60 million of run rate cost savings exiting this year, $100 million in total by the end of next year, right? So if you think about 30% of that roughly is on the cost of goods line. That probably gives you some perspective on where we expect gross margins to end up."

162.    CFO Narula fielded several questions about the fact that Cimatron and GibbsCAM were extremely high-margin businesses, acknowledging that the divestiture of its $35 - $40 million in revenues would create a headwind with respect to achieving gross margin growth in 2021:

Q (Brian Drab of William Blair): Cimatron, the software business that was running over 80% gross margin before it was acquired by 3D, is that the kind of level of gross margin that that business was running at? Narula, can you talk about that?

A: Yes. Of the $20 million to $25 million of cost that I mentioned associated with that business, I'd say about 10% of that-- 10% to 15% hit the cost of goods sold line

***

Q (Greg Palm of Craig-Hallum): Okay. But even with the divestiture of Cimatron that would certainly put some upward pressure on gross margins despite that math, right?

A: Yes. That's fair. I mean that is a high margin business.

163.    The Q3 2020 Form 10-Q's Statement of Operations reported the following results:

Revenue:

|  |  |  |
|---|---|---|
| Products | $ 77,267,000 |  |
| Services | $ 57,880,000 |  |
| Total revenue: | $135,147,000 |  |

Cost of sales

|  |  |  |
|---|---|---|
| Products | $ 49,010,000 |  |
| Services | $ 27,510,000 |  |
| Total cost of sales | $ 76,520,000 |  |
| Gross Profit | $ 58,627,000 |  |
| [Gross Margin | 43.4%] |  |
| R&D | $ 18,886,000 |  |

164.     These results, which, *inter alia*, enabled 3DSC to report a gross profit margin of 43.4%, were materially false and misleading because, as admitted by the Company in its 2020 Form 10-K, and as explained more fully at ¶¶ 81-92, above, the Company failed to apply the correct GAAP standards to the revenue it recognized under the United Therapeutics contract, making the financial reporting presumptively false and misleading. When revised, consolidated revenues were adjusted upward to $136,176,000, while gross profit remained at $58,627,000. Following this revision of results, the Company's GAAP reported gross profit margin declined from the 43.4% initially reported to 43.1%.  The Company's nine-month results for these line items were also materially false and misleading because each quarter's figures did not comply with GAAP.

165.     With respect to the misrepresented United Therapeutics contract, the Company, CEO Graves, and CFO Narula knew or recklessly disregarded that the financial results reported in the Form 8-K earnings release, Form 10-Q, and during the earnings conference call were materially false and misleading for the reasons set forth in ¶¶ 107 and 109, above.

166.     As set forth in ¶ 106(b), above, the Company began to ship DMP Factory printers in Q2 2020 that contained the new powder management system designed to prevent the quality control problems that occurred when the original powder management systems had been installed. Therefore, the Q3 2020 financial results were false and materially misleading for failure to take a $1.1 million write-down on the defective and obsolete units. As set forth in the table in ¶ 11, above, had the $1.1 million write-down been taken in Q3 2020, 3DSC's gross profit margin would have been reduced by another 0.8%, to 42.4%. For the reasons set forth in ¶ 108, above, these misstatements were made with scienter because 3DSC, CEO Graves and CFO Narula knew or

recklessly disregarded that the reported three and nine-month results failed to include an inventory write-down for defective and obsolete DMP Factory products in these periods.

167.    With respect to both misstatements, each of which improperly inflated 3DSC's important gross profit margin metric, as explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and inefficient manual processes; (b) the ongoing friction among various factions in the accounting staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an already understaffed accounting department in 2020; and (f) the outsourcing of various accounting functions to at least two third parties, 3DSC, CEO Graves and CEO Narula knew or recklessly disregarded that the Company's financial results could be materially misstated.

168.    For the reasons set forth in ¶¶ 135-140, above, had 3DSC management determined a triggering event had occurred in Q2 2020, the ensuing impairment analysis could have demonstrated that all or most of the $48.3 million goodwill impairment charge needed to be taken in Q2 2020. To the extent that the impairment charge should have been taken in Q2 2020, ASC 250-10-45-22 to -24 required a correction of the earlier financial statement, and thus the Q3 2020 Form 10-Q is materially false and misleading, and the misstatements were made with scienter for the reasons set forth in ¶141, above.

169.    Attached to the Q3 2020 10-Q were SOX certifications signed by Defendants Graves and Narula attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. In pertinent part, he 3Q 2020 10-Q stated:

>   **Item 4. Controls and Procedures.**
>   *Evaluation of disclosure controls and procedures*
>   **As of September 30, 2020, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief**

***Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) pursuant to Rules 13a-15 and 15d-15 under the Exchange Act. These controls and procedures were designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, in a manner to allow timely decisions regarding required disclosures. ***Based on this evaluation, management has concluded that our disclosure controls and procedures were effective as of September 30, 2020.***

### Changes in Internal Controls over Financial Reporting

There were ***no material changes in our internal controls over financial reporting*** during the period covered by this Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. (Emphasis added.)

170.    This statement was false and materially misleading at the time it was made because

the Company later admitted:

"During the preparation and audit of our financial statements for the period ended December 31, 2020, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting related to a lack of certain controls, or improper execution of designed control procedures, (1) for certain non-standard contracts and non-standard contract terms and (2) over the review of internally prepared reports and analyses utilized in the financial closing process. These control deficiencies were partially related to employee turnover, resulting in a temporary shortage of personnel with appropriate knowledge or skills to perform an effective review during our financial statement close process. In addition, certain control deficiencies related to the completeness and review of transactions that were infrequent in nature."

171.    As explained in ¶¶ 51-66, above, because of: (a) the continued use of complex and

inefficient manual processes; (b) the ongoing friction among various factions in the accounting

staff; (c) placement of unqualified persons in leadership roles; (d) the exodus of senior finance and

accounting personnel, staring in the fall of 2019; (e) the "wholesale" elimination of positions in an

already understaffed accounting department in 2020; and (f) the outsourcing of various accounting

functions to at least two third parties, 3DSC, CEO Graves and CEO Narula knew or recklessly

disregarded that the Company's internal controls over its financial reporting were not effective during Q3 2020. Additionally, CEO Graves and CFO Narula were motivated to make too many cuts to the accounting department to achieve their performance bonuses predicated on "resizing" the Company and achieving $60 million in cost reductions by the end of 2020.

172.    As earnings were being reported just days after the Cimatron and GibbsCAM sale announcement, and in anticipation of the report, 3DSC's share price rose from $5.91 on November 4, 2020, to $6.54 on November 5, 2020. However, despite the improved results achieved in Q3 2020, following the earnings call, 3DSC's share price declined to $6.24.

173.    On the morning of January 7, 2021, 3DSC issued a press release, filed on Form 8-K, announcing its preliminary financial results for Q4 2020 and FY 2020, confirming the sale of the Cimatron and GibbsCAM subtractive assets closed on January 1, 2021, for approximately $64.2 million, that part of the cash proceeds were used to pay off the remaining outstanding long-term debt of approximately $21 million, and that the Company terminated the sale of shares in at-the-market equity program.

174.    The press release stated, in relevant part:

. . . [T]he company is providing preliminary financial data for the quarter ended December 31, 2020. The company expects revenue for the fourth quarter of 2020 will be in the range of $170 million to $176 million and fourth quarter non-GAAP operating income in the range of $11 million to $19 million. The GAAP operating (loss) income for the fourth quarter is expected to be in the range of $(8.6) million to $0.5 million. This non-GAAP operating income range compares favorably to the non-GAAP operating income of $5.6M reported in Q4 2019 and $0.0M reported in Q3 2020. The GAAP operating loss for Q4 2019 was $(4.7) million and for Q3 2020 was $(67.6) million.

***

Dr. Jeffrey Graves, President and CEO of 3D Systems, said, "In the summer of 2020, we laid out a four-stage plan to deliver increased value to our customers and shareholders. This plan included: reorganization into two business units, Healthcare, and Industrial Solutions; restructuring of our operations to gain efficiencies; divesting of non-core assets; and investing for accelerated, profitable

75

organic growth. We are pleased to now see significant progress from these efforts, as reflected in accelerated top-line growth and rapidly strengthening operating margins. ***Our Team's ability to deliver over 20% consecutive-quarter revenue growth in both business units, while executing large scale restructuring, was particularly gratifying to see. This was even more impressive when viewed with a backdrop of continuing headwinds from the COVID virus, which impacted our operations and those of our customers.*** Having surpassed our prior year, pre-COVID revenue performance in Q4, and with continued strong focus on operational execution, we are excited about the trajectory we are on as we enter the new year."

***

Dr. Graves concluded, "With the benefits of our organizational alignment, our technology and application leadership, and our relentless focus on operational execution, we are more optimistic than ever about the exciting future we see ahead in 2021 and beyond."

The company has not yet completed its financial and operating closing procedures for the fourth quarter and full year 2020, including but not limited to, review of various estimation accounts, recording of the divestures completed late in the fourth quarter, completion and review of reconciliations, and various other year-end closing procedures. Additionally, the preliminary financial data above has not been subject to audit, review or other procedures by the company's independent registered public accounting firm. As a result, actual results may differ materially from the preliminary results shown above and will not be publicly available until the company reports its fourth quarter and full year 2020 results in late February 2021. (Emphasis supplied.)

The Company further announced that it would file its FY 2020 Form 10-K after the markets closed on February 24, 2021, and hold a its earnings call the next day.

175.     The statement that both industrial and healthcare revenues were up 20% QOQ was materially false and misleading when made.  During the March 2, 2021, earnings call, defendants admitted that the increase in industrial revenues was only 14.2%.  This misstatement was made with scienter for the reasons set forth in ¶¶ 51-66, above.

176.     Before the press release was issued, analysts' consensus was that revenues would be $140 million for Q4 2020. Combined with the news that the cash from the Cimatron and GibbsCAM sale would enable 3DSC to retire its long-term debt and end the at-the-market equity

program, JP Morgan analysts – whose revenue estimate for Q4 2020 had been $138 million – immediately issued an upgrade, from "underweight" to "neutral" and set a price target of $14. That day the stock price soared on astronomical trading volume of more than 193.5 million shares, more than doubling from $11.24 at the close on January 6, 2021, to $22.96.

177.    The next day, analysts at Craig-Hallum raised their price target from $11 to $27. Again, there was tremendous trading volume – more than 133.7 million shares – and the Company's stock price rose to $23.53.

178.    On the morning of January 27, 2021, the Company announced it would greatly expand its development efforts focused on regenerative medicine and bioprinting solutions, revealing that in 2020, 3DSC and Lung Bioprinting, PBC, made "significant progress in the development of a next generations additive manufacturing platform solution for lung scaffolds that is capable of full-sized, vascularized, rapid, micron-level printing."

179.    After CEO Graves enumerated "consolidation of real estate and facilities" as one of the means 3DSC succeeded in reducing operating costs, the market reacted positively to the announcement on the morning of February 3, 2021, that the Company intends to add 100,000 square feet to its existing headquarters campus to "consolidate its materials, manufacturing, quality and logistics operations, with new and expanded materials development laboratories to improve operational efficiencies, accelerate solution development and reduce time to market." On the news, 3DSC's stock price rose to $43.73.

180.    On February 8, 2021, AP news picks up a press release issued on Business Wire by ResearchandMarkets.com, announcing it has compiled a comprehensive report on the dental 3D printing market – the largest revenue base in 3DSC's healthcare segment – forecasting that worldwide it could reach $6.5 billion by 2025, up from $1.8 billion in 2020, with a compound

annual growth rate of 28.8%. The Company's share price closed at $52.35 that day and reached a class period high of $55.96 during trading on February 9, 2021.

181.    Over the next week's sessions, prices pulled back, closing at $41.41 on February 18, 2021. Although JP Morgan had lowered its "neutral" rating to "underweight" on January 15, 2021, its analysts reevaluated yet again, on February 19, 2021, maintaining the rating but raising the price target to $22:  "We are updating our model. We believe we previously underestimated the rate of recovery in DDD's business segments, and we are increasing the longer-term growth rate to reflect increased use of 3D prototyping and additive manufacturing in next-generation healthcare and manufacturing facilities." The Company's shares rise to close at $43.19.

182.    On the evening of February 23, 2021, the Company issued a press release, filed on Form 8-K, delaying the filing of its 2020 Form 10-K from February 24, 2021, to March 1, 2021, and the earnings call from February 25, 2021, to March 2, 2021.  The Company explained the reason for the five-day delay:

> In the course of preparing the company's financial results for the fourth quarter and full year 2020, the company discovered certain internal control deficiencies. As a result, the company may report one or more material weaknesses in internal controls in its upcoming fiscal 2020 Annual Report on Form 10-K. As of the date of this release, there have been no misstatements identified in prior year financial statements as a result of these deficiencies, and the company expects to timely file its Form 10-K on March 1, 2021. Please refer to the upcoming fiscal 2020 Annual Report on Form 10-K for more information.
>
> The company is reaffirming preliminary financial data for the quarter ended December 31, 2020, previously announced on January 7, 2021.

183.    On the strength of the Company finding no misstatements in its prior year  financial reporting and the fact that the Company reaffirmed all of its preliminary Q4 2020 and FY 2020 financial data after seven weeks of review of its 2020 financial reporting, the market did not react negatively to the news.

184.    On the morning of March 1, 2021, 3DSC's closest competitor, Stratasys, surprised the market with better-than-expected revenues and earnings, producing its highest operating cash flow in three years. With investors looking forward to the release of 3DSC's results for Q4 2020 and FY 2020, and to obtaining guidance for 2021 after CEO Graves's encouraging comments in the January 7, 2020, press release, the price of the Company's shares rose to $38.79 on March 1, 2021

**The Truth Emerges**

185.    On March 1, 2021, after the close of the markets, the Company issued a press release announcing yet another delay in the filing of its Form 10-K annual report for the fiscal year ended December 31, 2020. In pertinent part, the press release stated:

> 3D Systems Corporation (NYSE:DDD) announced today that it will ***delay filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2020.***  The company will file a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission, which extends the deadline to file the Form 10-K.  The company confirms its plans to hold a fourth quarter and full year 2020 conference call on Tuesday, March 2, 2021.
>
> ***The company noted the delay in filing is primarily related to the presentation of cash flows associated with the divestiture process for its Cimatron and GibbsCam software businesses.***  Based on preliminary analysis, the company believes that any financial impact resulting from this review is accounted for within its fourth quarter and full year 2020 results presented below.  The delayed filing has no impact on the operations of the company's business. 3D Systems CEO, Dr. Jeff Graves commented "While we were greatly disappointed that we were not able to conclude the audit in a timely fashion, we are pleased to provide our preliminary financial results for the fourth quarter and full year 2020 and look forward to discussing these results and our progress in positioning 3D Systems for sustained profitable growth on our conference call tomorrow."
>
>                                           ***
>
> In the course of preparing its financial results for the fourth quarter and full year 2020, the company discovered certain internal control deficiencies.  As a result, the company will report material weaknesses in internal controls in its fiscal 2020 Annual Report on Form 10-K. ***As of the date of this release, there have been no material misstatements identified in prior year financial statements as a result***

*of these deficiencies,* and the company expects to file its 2020 Annual Report on Form 10-K no later than March 16, 2021. Please refer to the upcoming 2020 Annual Report on Form 10-K for more information. (Emphasis supplied.)

186.    The earnings release issued that evening revealed a negative earnings surprise, non-GAAP earnings of only $0.9 for Q4 2020 when analysts expected EPS of at least $0.10.

187.    On March 2, 2021, at 7:00 a.m., 3DSC filed a NT-10-K with the SEC, stating that its Form 10-K filing would be delayed for the reasons listed in the March 1, 2021, press release. At 8:30 a.m., 3DSC held its earnings call, as scheduled, despite not having filed the 2020 Form 10-K. After CEO Graves blamed the filing delay on "auditing of the presentation of our cash flow statement [which] proved more challenging than expected, driven in part by the geographic diversity of the divested assets," in their prepared remarks during the Q4 2020 and FY 2020 earnings call, CEO Graves and CFO Narula were positive about both the announced results and the Company's prospects, stating, *inter alia*:

> CEO Graves: From a topline perspective, the results really speak for themselves. Both our Healthcare and Industrial businesses delivered exceptional double-digit revenue growth on a consecutive quarter basis with our Healthcare business even surpassing last year's pre-COVID performance by a significant margin.
>
> From a bottom-line perspective, the combination of volume growth and the increasing benefit from our restructuring efforts, improved operating margin significantly, returning the company to profitability and positive operating cash performance.
>
> *** *
>
> Adding additional exciting momentum to our Healthcare business over the long-term, meaning 2022 and beyond, will be our newest area of development, regenerative medicine. As we announced in mid-January, over the last three years, our Chief Technology Officer and the Inventor of the entire Additive Manufacturing industry, Chuck Hull and his team, have been working very closely with our partner, United Therapeutics to demonstrate the capability to actually print human organs in order to address the enormous need of transplant patients.
>
> The first application selected for development was a fully functioning biocompatible human lung. In December, we created a – we reached a critical milestone in these efforts. In short, we demonstrated the capability to reproducibly

print extremely complex, ultrathin walled structures using collagen-based and other biocompatible materials.

***

We look forward to building upon this momentum with a strong focus on growth and gross profit margin expansion in our core additive manufacturing business moving forward.

***

We're hopeful that the momentum continues to accelerate, and with that we'll be able to deliver double-digit growth rates in our core additive business in the year ahead.

CFO Narula: "[I]n the fourth quarter, we achieved the development milestone in our regenerative medicine efforts. This triggered the cash payment from one of our development partners related to this achievement. ***That payment and our growing initiative in regenerative medicine prompted us to reevaluate our accounting methodology for this contract. As a result of this analysis, in our earnings release, we have recast numbers for prior periods to reflect this accounting change, which is also reflected in my commentary on this call.*** However, it is important to note that this recasting has only a minor impact on the numbers and does not have any impact at all on our bottom-line reported results.

***

Gross profit margin on a GAAP basis for the full year 2020 was 40.1% compared to 44.1% in the prior year. Non-GAAP gross profit margin was 42.6% compared to 44.8% in the prior year. Gross profit margin decreased primarily due to the under absorption of supply chain overhead resulting from lower production and end-of-life inventory changes of $12.4 million in mix.

***

Industrial sales decreased 21.6% year-over-year to $86 million as demand has not fully rebounded to pre-pandemic levels. ***On a sequential quarter-over-quarter basis, we saw broad-based revenue improvement of approximately 14.2% in our Industrial business with no single customer or segment responsible for the improvement.***

Now we turn to gross profit margin. We expect gross profit margin of 42% in the fourth quarter of 2020 compared to 44.1% in the fourth quarter of 2019. Non-GAAP gross profit margin was 42.9% compared to 44.3% in the same period last year. Gross profit declined year-over-year, primarily as a result of timing and the reallocation of costs from OpEx to cost of goods sold.

Looking forward, and as mentioned previously, our gross profit will be impacted by the sale of our Cimatron and GibbsCAM software business, while revenue in these two businesses was -- while revenue in these two businesses were expected to decline, their divestitures expected to negatively impact gross margins going forward by about 300 basis points to 400 basis points, while our restructuring and transformation activities will benefit gross margins. Net, ***going forward in 2021,***

81

***we expect non-GAAP gross margins in a range of 40% to 44%.*** (Emphasis supplied.)

***

This quarter, we are introducing adjusted EBITDA as a metric that we find useful in measuring the health of the business. We focus on adjusted EBITDA as evidence of the results of our strategy and restructuring actions and we believe is a helpful metric used to compare to prior results. Adjusted EBITDA defined as non-GAAP operating profit plus depreciation was $28.7 million or 5.2% of revenue in 2020 compared to $31.2 million in 2019 or 4.9% of revenue. For the fourth quarter of 2020, adjusted EBITDA improved materially to $22.9 million or 13.2% of revenue compared to $12.9 million or 7.7% of revenue in the fourth quarter of 2019. The improvement is the result of the business growth in the quarter as well as the results from our restructuring efforts. We were pleased that we could grow adjusted EBITDA in Q4 despite the challenging economic environment.

188.   During the Q&A period, despite his upbeat presentation, CEO Graves would not provide guidance for 2021: time and again he projected long-term organic growth but would not provide specifics because of the uncertainty COVID-19 injected into near-term prospects for Q1 and Q2 2021. Examples of these questions and/or responses include:

"So I'm really bullish once the virus lifts in the summer, the question marks around Q1 and Q2, and so far, so good, we just keep our fingers crossed each day."

Q (Ananda Baruah of Loop Capital): [Y]ou had made mention about sort of double-digit revenue growth during the prepared remarks in a particular context. I'm just wondering, do you feel any differently today than you did 90 days ago about the potential to the double-digit revenue growth . . . I think just having a sense of what you guys think the potential trajectory through this year is and if that's changed over the last 90 days?

A: [T]here is just so much short-term volatility with the virus . . . It's kind of like, you know, we are going on a speedboat through choppy waters. There's still short-term issues that pop up geographically, which are frustrating, around shipments, around servicing, installing equipment, all that stuff. There will still be some short-term noise, which is why we're really reluctant to ever comment on revenue in Q1, Q2.

189.   In addition to refusing to make any specific near-term projections, statements by both CEO Graves and CFO Narula created uncertainty:

a.   The source of the remaining gross margin savings was unclear

82

During the Q2 2020 and Q3 2020 earnings calls, 3DSC management indicated that they intended to reduce the Company's run rate by $100 million, $60 million in 2020 and $40 million in 2021. However, in his prepared remarks on March 2, 2021, CEO Graves indicated:

> Looking ahead, we have detailed plans within our core additive business to deliver an additional $20 million in savings this year, with the balance of $100 million linked to our analysis of future divestitures.

CFO Narula reiterated that point, answering a question as to why gross margins guidance was low:

> Sure, Brian. Like I said in my prepared remarks, so the Cimatron divestiture was about, call it, 300 basis point to 400 basis point drag on gross margins. All right. Now on the cost savings initiatives, we said $60 million we achieved in 2020. About 30% of that, I would say, was on the COGS line. So that would give you about $18 million of flow through in 2021. Some of it -- some of which was actually recorded in Q3 and Q4 2020, right. We did achieve those numbers during the year. So the gross margin for the year that you're looking at includes a portion of that 30% of the $60 million that was saved.
>
> For 2021, as of now, we're talking about $20 million additional savings. Like I said, pending the analysis divestiture, again, I expect that split to roughly be 30% of the gross margin line that will be achieved over the course of the year.

Now that the final $20 million of run rate savings was suddenly tied to divestitures, CEO Graves was asked to comment on which assets were deemed "non-core" and likely to be sold, and the timing of the potential sales, but CEO Graves danced around the question:

> Q (Wamsi Mohan of BofA Securities): ". . . [H]ow much of your baseline $513 million of revenue does not fall into either of those categories, and have all of that is up for divestiture? And what's the sense of urgency around that you noted that the assets are good in their own right, but just not core to you, now that your balance sheet is in a much better place, is this going to be a quick process, is going to be a slow process?
>
> A: Yeah, it's -- those are really good questions. It's -- anyway I like to paint it is black and white in the core, outside of the core is as simple to think about. In reality, there are assets that are in a gray zone in between. And that -- so those are tougher calls. You'd really have to take a hard look and say how much – what's best in terms of value creation. And one of my acid tests I always use is, is the business worthy of investing in. Those are good return on investment. And if you own a business where the incremental investment does not have a good return, it doesn't make it up your priority list in returns. You have other better things to do

with your money. Those businesses generally you should feel a drive to sell and let them be owned by someone else that will treat them as their highest priority.

We have some really exciting opportunities in additive manufacturing, more than we can possibly run after every day. And so non-additive technologies, things that are even borderline on that are of lower priority to us, and when it's a lower priority, I'm definitely of a mind to get rid of it, because they're not good businesses. I want to be clear, they're really good, but they need to be owned by somebody that will love them and nurture them and treat them as their highest investment priority. So if it works its way down our list, when we rank our priorities, we tend to get rid of the ones that are lower on that list. It's better for the customers, the employees and certainly our shareholders. We will reinvest that cash into our core business where we have tremendous growth opportunities.

Q: (follow up Wamsi Mohan): So, Jeff, would you say of the $513 million, like how much it falls [outside] of Healthcare and Industrial?

A: Yeah, it's -- you know, in general, I would say, it's by definition quite little. But bear in mind Industrial is a very broad word. So how much of it -- a key question is how much of it is additive, how much of it is really in a growth additive manufacturing? And if you say it that way, we still own assets that are predominantly exposed to non-additive markets, and those are the ones we really look at and there's two options. We either convert them increasingly to additive manufacturing and we hang on to them, or we sell them and take the cash and invest in the core business for faster growth and margin expansion. So it's -- conceptually, it's that simple. You have to find a buyer that really wants the assets, because some of these are -- and this came up earlier about gross margin volatility, some of these are really nice gross margin businesses. It's just under our ownership, we're not going to invest a lot for growth. They were lower priority, and they should be owned by someone else. So I can't give you -- it's very hard to give you a percentage of what is, you know, not Industrial or Healthcare. In terms of non-additive, it's not a very – it's not an extremely high percentage, but we still have some assets that are not additive.

Without a clear understanding of which assets might be sold – or when – to make up the $20 million in additional run rate reduction, the gross margins improvement picture remained unclear. Added to the meager adjusted gross margin guidance of 40 to 44% – the midpoint of which is lower than the 42.6% adjusted gross margin for 2020 – and investors were very underwhelmed.

b.  Revenue in the Industrial Sector did not grow 20%
    QOQ as represented in the January 7, 2021, press release

In the January 7, 2021, press release announcing, *inter alia*, preliminary results for Q4 2020, CEO Graves called the second straight quarter of 20% revenue gains in both sectors while the Company was undergoing a major restructuring "particularly gratifying," and even "more impressive" because of the continuing COVID-19 headwinds. However, it simply was untrue.

> Q (Brian Drab): I'm just trying to understand if there was something divested in the fourth quarter -- revenue that was divested that was not in the fourth quarter but was in the third quarter because just trying to reconcile that I had seen in the press release, right, the pre-announcement that the industrial business was up more than 20% sequentially on an organic basis, but the slides there are showing that the Industrial business was up 14%.

> A (Narula): Regarding our pre-announcement for Industrial at 20% plus sequential growth versus the 14.2% that were in our kind of actual announcement, the difference there was frankly just the mischaracterization of some of our revenue from Healthcare to Industrial in the pre-announcement. We have some small Healthcare customers, small things [ph], small hospitals and the like, highly geographically dispersed that we mischaracterized unfortunately as part of our Industrial business, when we did our pre-announcement, but then as we were filing our numbers, we realized that those were actually Healthcare numbers and reflected that in our Healthcare totals rather than our Industrial totals. So that's what put that number.

> A (Graves): So, Brian it's a – It's a detail, but it's one that, with you following the industry, you'll understand it. So when you have an emerging customer in Healthcare, we often deal with those on a geographic basis through our channels, some indirect, some direct, but through our channels. And the customers we call on out of our Healthcare business directly or through a very dedicated Healthcare channel, those are the ones that are easy to quantify. It's the collection of geographically distributed ones that it took some refinement here at the end of the year to actually carve out and attribute those to the Healthcare business. So there were some movements in revenue between the two business units as we clarified those small customers and they are potentially very important for the future, but we call on them initially from a geographic perspective.

Just as they blamed the geographic distribution of Cimatron's and GibbsCAM assets for the delay in finalizing the Company's cash flow statement for the inability to file the Form 10-K on March 1, 2021, CEO Graves and CFO Narula try to excuse their "mischaracterization" of revenues by

suggesting that small hospitals could be mistaken for automotive and aerospace factories because they are geographically disbursed.

190.    The information revealed in the press release and the earnings call surprised and disappointed the market. Despite assuring investors more than once that its internal control problems did not affect the accuracy of prior financial reporting, 3DSC was required to "re-evaluate its accounting methodology" for regenerative medicine agreements, specifically payments on the human lung bioprinting contract with United Therapeutics. The Company also missed consensus estimates of adjusted earnings per share and admitted it had earlier misclassified Q4 2020 healthcare sector revenue as industrial sector revenue. When management provided disappointing adjusted gross margin guidance for 2021 – in the range of only 40 – 44%, most of that range *below* the 42.6% achieved in a year of pandemic lockdowns – investors (correctly) perceived that additional negative surprises lay ahead. Following the earnings call, the Company's stock price fell $7.62 per share, or more than 19.6%, from closing at $38.79 on March 1, 2021, to close at $31.17 per share on March 2, 2021.

191.    The next day, the Company came in for additional criticism for the news disclosed during the earnings call. William Blair analysts issued a report that stated, *inter alia*,

> **Lowering Estimates on Soft Margin Guidance**
> Summary: 3D Systems preannounced fourth-quarter financial results in January, but the full release included some surprises. As expected, revenue increased 3% year-over-year and 27% sequentially. However, the result was driven even more by the healthcare business than previously indicated. Healthcare revenue increased 42% sequentially and 48% year-over-year. Industrial revenue increased 14% sequentially, below the preannounced growth rate of greater than 20% (restated given a previous error in characterization of revenue) . . . Another surprise in the report was guidance for [adjusted] gross margin of 40% - 44% in 2021, below the consensus estimate of 46%.
>
>            \*\*\*
>
> **Forecast.** We are lowering our earnings estimates, primarily driven by lower gross margin expectations than previously anticipated.

JP Morgan analysts issued a similar report, noting the negative EPS and gross margin surprises. Maintaining its "underweight" rating and $22 price target, JP Morgan noted that the Company's growth prospects already appear to be priced in. By the close of trading on March 3, 2021, 3DSC's stock price fell another 11.8%, shedding $3.68 to close at $27.49.

192.    The Company's Form 10-K was filed during the last half hour of trading on Friday, March 5, 2021.  In it, the Company revealed for the first time that it had not been accounting for payments under the United Therapeutics contract correctly, and that it should have adopted ASU 2018-18 by no later than January 1, 2020. Although CFO Narula claimed during the earnings call on March 2, 2021, that the changes to the financial statements would be minor, the Form 10-K disclosed that the Company received $6,935,00 million in payments under the contract in 2020. This amount represents 1.25% of the Company's revenue for the year; the Company should have known how to correctly account for it. Also, the improper accounting for payments during the first three quarters caused 3DCS to overstate its gross profit margins.

193.    By not taking the $1.1 million inventory write-down in Q4 2020, at set forth in the chart in ¶ 11, 3DSC overstated its inventory by 1.0% and its gross profit margin by 0.6%. Most important, as operating profit was a target 3DSC, CEO Graves and CFO Narula were eager to achieve, not taking the charge in Q4 2020 allowed 3DSC to report *income* from operations of $731,000 instead of a *loss* of $369,000.

194.    By the close of the trading session, the Company's share price slipped again to $24.75.

195.    On March 8, 2021, after the close of the Class Period, the market continued to react to the information released late in the trading session the previous Friday, with the Company's share price declining further and closing at $22.87.

87

196.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

197.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded common stock of 3DSC during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the class are the individual defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or any excluded persons have or had a controlling interest.

198.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of the Company's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

199.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

201.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

202.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

89

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

203.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock is traded in efficient markets;

(d)     the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period, with greater than 2% of the outstanding shares turning over on a weekly basis;

(e)     the Company traded on the NYSE, and was covered by multiple analysts, including JP Morgan, William Blair, Craig-Hallum, Bank of America Securities, Piper Sandler, B Riley, Loop Capital, and Needham & Company;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; Plaintiffs and members of the Class purchased and/or sold the Company's common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

204. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

205. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**COUNT I**</u>
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

206. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

208. During the Class Period, the Company, and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, *i.e.,* specifying which of the Individual Defendants is identified with which misstatements, depending upon the period of each individual's service as CEO or CFO at the time the statement was made, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

210.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

211.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

212.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the

Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

213.     Had Plaintiffs and the other members of the Class been aware that the market price of the Company's common stock had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

214.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

215.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

216.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

218.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

219.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

220.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

221.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated: September 13, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com


*Lead Counsel for Lead Plaintiff Darrell E. Cline and Plaintiffs Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez and Diane Van Alstyne*