UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
IN RE:                        :
                              :        21-CV-1920 (NGG)(TAM)
3D SYSTEMS                     :
                              :        May 2, 2023
SECURITIES LITIGATION         :
                              :        Brooklyn, New York
                              :
                              :
                              :
                              :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR FAIRNESS HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          ERICA STONE, ESQ.
                            ROBIN HOWALD, ESQ.
                            The Rosen Law Firm, P.A.
                            275 Madison Avenue 40th Fl.
                            New York, NY 10016

For the Defendant:          ELIZABETH CLARK, ESQ.
                            TIMOTHY FITZMAURICE, ESQ.
                            Alston & Bird LLP
                            1201 West Peachtree Street
                            Suite 4900
                            Atlanta, GA 30309-3424


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            274 Hovey Road
                            Milo, ME 04463
                            Aria@leinen.net


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

THE CLERK: This is civil cause for fairness hearing, docket 21-CV-1920, In Re: 3D Systems Securities Litigation. Before asking the parties to state their appearance, I would like to note the following: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and re-broadcasting of court proceedings. Violations of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court.

Will the parties please state their appearances for the record, starting with the plaintiff.

MS. STONE: Good afternoon, your Honor. Erica Stone and Robin Howald from The Rosen Law Firm for plaintiffs.

THE COURT: Good afternoon.

MS. CLARK: Good afternoon, your Honor. Elizabeth Clark and Timothy Fitzmaurice for the defendants.

THE COURT: Good afternoon to you as well.

As you all know, we're here today for a preliminary fairness hearing as to the proposed class

action settlement in this case, which as you of course know was referred to me by Judge Garaufis.  So the procedural history in this case is known to all.  I'm sure you recall that this case was first consolidated with a memorandum and order that I issued on referral from Judge Garaufis back on July 13th, 2021.

Following that, plaintiffs filed their amended complaint on September 13th, 2021, and defendants subsequently moved to dismiss.  However, in August of last year, August 18th, 2022, prior to Judge Garaufis' ruling on the motion, the parties had requested a stay in order to attempt resolution through mediation.  Judge Garaufis granted that request and the parties later notified the Court in October, 2022 that they had reached a settlement at mediation.

So I see from the paperwork that the mediation took place on October 12th, 2022 before Jed Melnick (ph) at JAMS.  Is that correct, Ms. Stone?

MS. STONE:  Yes, your Honor, that is correct.

THE COURT:  Could you just tell me a little bit about Mediator Melnick and how the parties arrived at that determination?

MS. STONE:  Sure, absolutely.  Mr. Melnick is very experienced in securities class action

lawsuits.  The parties wanted to retain a mediator that could bring benefit to the discussion, understood the complexities of similar cases.  I believe both firms had been in front of him before and were impressed by his ability to bring the parties together on other cases, and we thought that he could do so here and lead productive discussions, which fortunately he did.

Prior to the mediation, the parties submitted statements to each other and to Mr. Melnick so he could be clearly advised of the procedural history, the merits, and each party's position.  And after a hard-fought day with very frank discussions with Mr. Melnick, with each other, the parties reached the resolution of this settlement.

THE COURT:  Thank you for that background.

Is there anything else you'd like to add, Ms. Clark, about why defendants agreed to Mr. Melnick and how you believe the mediation went?

MS. CLARK:  Your Honor, I believe that Ms. Stone fairly characterized how we arrived at Jed Melnick and the proceedings in October.

THE COURT:  Okay, thank you.

Following that mediation, plaintiffs filed the motion for preliminary settlement approval along with the proposed settlement agreement, proposed notice

forms, et cetera. And on December 22nd, 2022, Judge Garaufis referred the motion to me for a preliminary fairness hearing and ultimately a report and recommendation, and we are here today. So thank you all for being here. The motion papers are very informative and they address nearly all of the questions that I had. There are a few more areas, though, that I'd like to ask the parties about. I just want to develop a little bit of a record regarding the negotiation process which we just discussed as to how the parties arrived at Mr. Melnick and his qualifications and how the negotiation went that day.

I have a quick question and then I'd like to turn the floor over to Ms. Stone to give an overview of why you think it's a fair and reasonable settlement, and then I'll follow up with questions. Firstly, I'm just curious, what happened to plaintiff Kumar? Do you know, Ms. Stone? I didn't see him in the amended complaint.

MS. STONE: I believe he filed a second action. The initial complaint was filed by Troy Kehoe, who is now a named plaintiff on the amended complaint, and I believe Mr. Kumar was a client of another firm. And once the consolidation and lead plaintiff appointment occurred, he was no longer involved with

the case.  Now the lead plaintiff and the four named plaintiffs are The Rosen Law Firm's clients who had contacted us specifically and wanted to participate. Mr. Kumar will still be a class member or settlement class member if the settlement is approved, so he can file a claim and get his portion of any recovery, but he is no longer, as you noted, a named party of the consolidated action.

            THE COURT:  So he didn't come over to you as a potential client.

            MS. STONE:  No, that's correct.

            THE COURT:  Okay.  At the preliminary approval stage, of course the parties are well aware that the Court is tasked with making an initial evaluation of fairness prior to notifying the class. The grant of preliminary approval will of course be guided by the likelihood standard, in other words whether the parties have shown that the Court will be able to grant final approval and certify the class.

            As you guys both know, this is certainly not a toothless standard, and the judicial role in reviewing a proposed settlement is demanding.  So I wanted to go over carefully with you why you believe ultimately that we should grant this preliminary approval, and I will be asking you various questions

and making my findings.

But before we get there, Ms. Stone, would you like to be heard on the motion?

MS. STONE:  Sure, yes, your Honor.  Would it be helpful to go through the different factors for you or just an overview of why we believe -- a summary of our brief?

THE COURT:  Whatever you'd like to do.  You know, I certainly have specific -- some specific questions and if you don't hit those, I'll follow up. But it's your motion so I'd like to give you the chance to be heard on it.

MS. STONE:  All right, thank you, your Honor.  We think the settlement is fair, reasonable, and adequate.  With any securities class action, it's favorable to find a joint resolution and compromise. Although we believe our case has strong merit and would proceed ahead, there's always risk, especially in these securities class actions.

The way that we reached the settlement, as we've already touched upon, was we believe it's procedurally fair with Mr. Melnick's involvement. Again, he has substantial experience in similar cases of similar size.  The parties had very hard-fought, very respectful, hard-fought negotiations that took

place before him.

We also believe that it's substantively fair, and as your Honor is aware, the Court should look at the Rule 23 factors as well as the Grenell (ph) factors in the Second Circuit. The Rule 23 factors do not displace Grenell but do supplement the Grenell factors. To go over those, I won't name them individually but I will hit the highlights.

The first aspect that the Court should look at is the adequacy of plaintiffs and counsel and how they represented the class. Our clients were very active in this case. They communicated regularly with both myself and Ms. Howald on the line, as well as other attorneys at the firm. They were inquisitive, they asked good questions, and they were very involved with the approval of the settlement.

Our firm as well has done a substantial amount of work to reach the settlement. We initiated the first filed complaint. We drafted an amended complaint, we retained investigators, accounting experts, as well as damages experts. We responded to defendants' pre-motion to dismiss letter, we opposed the motion to dismiss, and we worked on a mediation statement and participated in those negotiations. So we believe that both plaintiffs and counsel have

adequately represented the class.

THE COURT:  Actually, before you --

MS. STONE:  Yes, please.

THE COURT:  -- leave the adequate representation point --

MS. STONE:  Yes.

THE COURT:  Can you tell me a little bit about the parties' discovery efforts prior to settlement?

MS. STONE:  Sure.  Since there was no ruling on the motion to dismiss, the PSLRA, the Private Securities Litigation Reform Act discovery stay was still in place, so there was no formal discovery conducted.  We would have to survive the motion to dismiss.  However, and this will touch I guess on the Grenell factors, we believe that plaintiffs were fully -- had enough information to make an informed decision to enter into the settlement.

We engaged accounting experts to help us delve into the technical issues that we have alleged in the case.  We thoroughly investigated the company's SEC filings, analyst reports, news, anything readily available, and we also had a damages expert help us

craft what we think the realistic outcome of the case would be.  So with all of that together in cumulation, we believe that we had enough information to enter into this settlement.

THE COURT:  Is that in part because of the public nature of the allegations?

MS. STONE:  Yes, a lot of it is.  However, we also had an investigator who contacted former employees of 3D Systems, and they were able to give us insight of what was going on at the company at certain points in the class period and helped us understand the inner workings of the company.  So that was not publicly known and that was done through our investigation.  But you are right, your Honor, there was a lot of public information that we had to decipher, distill, and put together to craft what was going on that's alleged in the complaint.

THE COURT:  Okay.  Thank you for that.  You had started to turn to arms'-length negotiation, which was next on my list as well, so go ahead.

MS. STONE:  Okay.  So as we've discussed, we believe that the arms'-length negotiations here support the finding of the fairness of the settlement.  Mr. Melnick was the mediator.  The parties submitted robust mediation statements and had a full-day mediation going

back and forth and really having in-depth discussions and being pushed by the mediator when needed, and eventually reached the settlement.  So the arms'-length nature supports the settlement.

And then the next factor is that the settlement is a highly favorable result in light of the risks of continuing litigation.  What's very important in a settlement of a securities case like this is the immediate and guaranteed recovery to the investors. It's possible as this case proceeds further along that different theories of the case may be struck from the case, different allegations will be removed.  The defendants may assert compelling arguments to the Court and later potentially to a jury.  So the guaranteed nature in an area that -- securities cases are notoriously complex and uncertain.

There are heightened pleading standards that the plaintiffs would have to achieve even before getting the discovery that would help bolster the case. Defendants raised issues for each element of the claim here, falsity, materiality, scienter, loss causation, and damages.  And although we believe that we would survive a motion to dismiss, we don't know what Judge Garaufis would decide and we don't know what would happen on summary judgment after discovery.  It's

possible there are documents that don't support our allegations, but we don't know the risks that the continued litigation would have.

There are also some potential issue of loss causation.  Defendants have indicated in their briefing on the motion to dismiss that they would raise later or continue to raise, that they would try to cut the class period down to two months, which would significantly reduce the number of people able to participate in the settlement and the damages that we've alleged.  They've previewed that there are market efficiency issues that could potentially come up on a class certification motion.  So there aren't guarantees in this case, so having this immediate guaranteed benefit to the shareholders was very important and we believe a highly favorable result.

THE COURT:  I just wanted to be clear.  You represented I believe in the briefs and the supplemental memorandum or the memorandum in support of ECF 57 that the total settlement here, four million dollars, would equate to approximately 1% of the total maximum potential damages calculated by your expert.  In light of everything you've just described, that obviously is a fairly small percentage.  Can you please discuss how that is reasonable given all of these risks

and concerns you've just highlighted?

MS. STONE: Sure, your Honor. We understand that there are settlements that are larger but here, I want to just highlight that the damages figure that our expert gave us is if we got -- if everything went our way. It would be that all that the statements were found to be false and misleading, there was scienter, that the jury took our damages expert analysis more than the defendants', so it is our ideal if everything went our way. We are pragmatic that in these types of cases, it's very hard to have everything go your way, so that number could be significantly reduced if the litigation were to continue.

There are also other cases similarly situated in the Second Circuit. We've cited a few but there was even a recent one. Although not approved by the district judge, there's a case called Shaddick Labs (ph). Magistrate Levy recently recommended that a settlement of 1.4% of damages be approved. There's another case in the Southern District of New York called Jumia (ph) Technologies. There were two settlements, one in the federal court, one in the state court, but the federal court was .77% of damages and collectively, with the two actions, it's about 2.71% of damages.

So we believe given the significant preview of additional arguments that defendants are going to raise as this case moves forward, having a settlement now at this amount is better than the risk of not getting anything later.  We talked this over significantly with our clients.  They all gave us approval.  There are five of them.  So we all understood, especially with our firm's experience in these types of cases, what could potentially happen down the road, so we think that this is a reasonable and fair recovery.

THE COURT:  The case you just cited from Judge Levy, do you have the citation for that handy?

MS. STONE:  Sure.  It's 22-CV-560.

THE COURT:  Okay.  And you said the district judge did not approve it.

MS. STONE:  Not yet.

THE COURT:  Is it just not approved yet or has the district judge rejected it?

MS. STONE:  No, it's still on the -- there hasn't been any adoption or rejection of the report and recommendation.

THE COURT:  Okay.  I just wanted to clarify that.

MS. STONE:  It's a recent -- it's February,

2023, so it's a recent, similar size recovery.

THE COURT:  Okay, thank you.

MS. STONE:  So I just wanted to -- because that happened since our papers went in.

THE COURT:  Thank you for that.

MS. STONE:  So I just wanted to kind of raise that.  I don't know if the Court has any further questions on this point.  I'm happy to elaborate further.

THE COURT:  No, I think on the costs, the risks, and delays questions, you've covered it pretty well and also discussed your position as to why you believe that the settlement amount is reasonable.  So if you'd like to go ahead and discuss additional factors including the effectiveness of the method that you plan to use with regard to claims processing and notice, the fees, the next factors, feel free to move on.

MS. STONE:  Okay, thank you.  We're on the same page.  So our proposed method of notice we believe is effective.  It's a standard notice program and I can discuss it now or discuss it later, separately, if you have a preference.  It comprises having the claims administrator either email links -- sorry, email the summary notice with a link to the long notice claim

form to settlement class members that we're able to get email addresses for.  For those that we can't get an email address, they would send a postcard notice which would direct the settlement class members to the website of the claims administrator, where they could download the long notice and the claim forms.  You can also submit electronically a claim form.  So there are two ways, however the investor prefers to participate.

As well, there would be a summary notice disseminated over Globe News Wire, which is an online resource, as well as in print in Investor Business Daily.  We would maintain a settlement-dedicated website for the settlement, post the pertinent information, the stipulation of settlement.  If there's a preliminary approval order, the notices.  If there's any -- the timing of the final approval hearing, the deadlines for claims to be filed, objections if they want to be lodged, or requests for exclusion.  So this is something that is routinely done and we believe provides -- satisfies Rule 23 due process and the PSLRA.

THE COURT:  Okay.  That all makes sense to me and I certainly reviewed the proposed notices.  One quick note on the notice, though.

MS. STONE:  Sure.

THE COURT:  I wanted to understand one very specific detail.  Rule 23(c) specifically states that notices must notify class members that they may enter an appearance through an attorney if they so desire, and I'm not sure that I'm seeing that in your forms.  Can you direct me to where that is?

MS. STONE:  I know that we have a provision for those who want to object to the settlement.  They can do so with an attorney.  Let me just pull this up so I can point you to the right place.  It says --

THE COURT:  Which document are you looking at?

MS. STONE:  I'm sorry, I'm on Exhibit A-1 to the stipulation at 55-2.

THE COURT:  Give me one second.

MS. STONE:  It says on page 13 of the actual file -- it's number 13 of the notice -- "Do I have a lawyer in the case?"  It says, "The Court appointed The Rosen Law Firm as lead counsel to represent you and the other settlement class members.  If you want to be represented by your own lawyer, you may hire one at your own expense."  And then the contact information for The Rosen Law Firm is provided below.  So that's one place and then for number 15, if you don't like the settlement or object to the settlement, it does say

that you could -- you or your counsel can lodge an objection and how to do so and make an appearance.

THE COURT:  The only place it appears is in the long-form notice, is that correct?

MS. STONE:  Yeah.  That's the more robust notice, that's correct.  I'm just pulling out the summary notice just to double-check but I believe it would just be the long-form notice.  I don't believe the postcard notice has that information but the postcard and the summary notice do point the investors to the long-form notice.

THE COURT:  Yeah.  I think that my concern about it being only in the long-form notice is the notion that, you know, when your average investor gets this type of a document in the mail, it sort of seems like a fait accomplis, like it's done.  Do you know what I mean?  It may well be that they're fine with that but I do think that it's important to give people full notice of their options, and I'm not sure that the postcard notice and the short-form notice really do that.  Do you have authority for the proposition that inclusion in the long-form notice only is sufficient under Rule 23 for this particular point?

MS. STONE:  I could tell you just offhand that this type of notice program and the format of the

postcard and the summary notice is regularly approved. Judge Garaufis did something very similar. We had a case in front of him a few years ago, Blue Apron Holdings. It included an emailed summary notice, a postcard, and disseminating the summary notice in a very similar template. We also -- our notice follows -- there's a Federal Judicial Center template so we followed that.

But it's been pretty routine in the past few years to just have the summary notice and the postcard notice point to the long-form notice, and that's been -- we haven't had issues with it over the past few years, so I think that that is something that could be approved. I should mention that our summary notice does point to -- tells investors who to contact at our firm if they do have questions, so our firm's information and specific people that they can reach out to are there in the summary notice. So they can give us a call, email us, write us a letter, however they want.

I think the notice here specifically mentions Ms. Howald, my colleague, who has been working on this case, so that does provide the investors the ability to reach out to us in the summary notice if they just that press release and they know who to

contact, and we can point them to what they need to do and help them.  If they need -- point them to the claims administrator if they have questions about how to submit the claims or anything like that.  So this is something routine that we haven't had issues with.  We haven't found that people are complaining of the lack of receiving notice or the lack of understanding what their rights are, so that's what I would -- how I would respond to that inquiry.

THE COURT:  Ms. Chan, did we just lose somebody or did somebody join?

THE CLERK:  Somebody dropped off but it might have just been a member of the public.

THE COURT:  Okay.

THE CLERK:  We do have the necessary attorneys on.

THE COURT:  All right, thank you.

I'm not so much concerned about whether or not you've had issues or whether it is your perception that people have not seemed to be confused about what their rights may be so much as I have questions about whether or not this is really technically in full compliance with the spirit of Rule 23 because as I noted before, when these arrive in the mail -- I've received them, I'm sure you have, too.  Everybody has.

You know, you get the notice that -- you get two cents for your foreign transactions on your credit card, things like that.  It really doesn't seem to present most folks with information that they have options.

I'm just looking for example at the postcard and it says, you may but do not have to attend the hearing and ask to be heard by the Court, but nowhere on that form does it indicate that they could enter an appearance through their own lawyer, which is part of Rule 23, and that's my issue.  It's not so much a question of whether or not, in your firm's experience, people seem confused or don't have options of how to contact you.  It's the issue of whether or not they feel that they have the independent right to get counsel or appear through counsel, as opposed to the onus being on them.

That's the spirit of Rule 23 that I'm concerned about here because it seems not only as if the settlement is a fait accomplis but that they have you as your lawyer.  And unless it's a really sophisticated party who digs deep into the record, they're not going to see that they have an option to get a different attorney.  And I'm not actually of the view that there will be a lot of people who seek to do that, but I do think that Rule 23 requires people to be

given notice of that fact.

MS. STONE:  Okay.

THE COURT:  So my question to you is, regardless of prior procedures, does the plaintiff have any objection to including one more sentence in the short-form notice on this postcard on this issue?

MS. STONE:  No, we would be happy to put that in for both the summary notice and the postcard notice.

THE COURT:  Okay, all right.  Well, that's certainly something that we would recommend to Judge Garaufis if we are ultimately in a position to recommend approval of the preliminary notice.  But anyway, we've gotten pretty far afield on that point, on the effectiveness of the method of distributing the information, so what is next?  You talked about the notice program and I'd also like to hear about your thoughts on distribution of the fund and claims processing.

MS. STONE:  Sure.  So for distribution of the funds, for those who submit claims, there is a plan of allocation that is in the long-form notice.  It's docket 55-2 starting at page 6 or 7 of the file, I should say.  The plan of allocation was crafted with our damages expert.  We believe it's a fair and

rational basis on how the claims should be -- sorry, the money should be distributed to authorized claimants.  For those who do file a claim, the claims administrator does a very thorough job.  We've worked with them in the past.  I should mention we seek the appointment of Strategic Claims Services as the claims administrator here.

What they will do is, they will do a quality control check and if they are any deficiencies in someone's claim, they will notify the claimant what the deficiencies are, given them an opportunity to cure the deficiencies.  If they reject the claim, the investor has the right to contest that objection.  There are times that we will talk to the investor and clarify any questions.

The distribution, once there is an order permitting us to distribute the funds, Strategic Claims will give everyone who is an authorized claimant their portion pro rata of the settlement fund.  Then if there are any leftover -- people that were inadvertently omitted from the distribution, they will go through again and give a check to the people that did not receive a check.  If after that, there are additional funds in the settlement fund remaining, they will do another distribution for people that would receive at

least ten dollars for a check, just to make it cost effective to do that distribution, a second distribution if necessary. So that's how the claims process will work and the distribution of the settlement funds. I don't know if your Honor has any questions that I haven't addressed on that.

THE COURT: No, I do not, and I also think your briefing was extremely thorough on that, so I think that that point is well-settled in the record. But I appreciate the further explication about the rounds and just hearing it in your own words today, so thank you for that.

MS. STONE: Sure thing.

THE COURT: I think --

MS. STONE: And then -- please, go ahead.

THE COURT: Next on my list at least was attorneys' fees, so would you like to go over what the anticipate attorneys' fees -- I note of course in the briefing that you made clear that it's the sort of typical one-third settlement amount and litigation expenses in an amount not to exceed $50,000. Of course, a one-third attorney fee is fairly routine in these matters. Is there anything you'd like to add?

MS. STONE: Not too much, your Honor. That's what we anticipate asking. We've worked very

hard on this case. We will continue to put a lot of resources and time to make sure the settlement gets completed and the money gets distributed into the hands of the investors. I don't have any other particular points to add at this point on that.

THE COURT: Based on your firm's experience, do you have a sense of how the one-third settlement of this settlement amount would compare to your lodestar?

MS. STONE: We haven't done a lodestar analysis yet or taken -- I don't have an accurate number to give you today. I anticipate it would be below 2, if not closer to 1.5 as a multiplier. But today, I can't give you a very accurate answer on that so I don't want to speculate too much, but it's not going to be a multiplier of 3, 4, something like that. I think it's something that would fall pretty in line with what's routinely approved in the Second Circuit.

THE COURT: Okay. And you will of course be prepared to submit your billables and your lodestar calculation at that point?

MS. STONE: Yes.

THE COURT: When the time comes for final approval?

MS. STONE: Absolutely, yes.

THE COURT: Okay. I note also that there's

another agreement, specifically that the parties have a separate agreement that if the shares of the opt-out claimants surpass a certain number, that 3D Systems can terminate the settlement agreement.  That agreement was offered for my consideration under seal.  I would like to review it just in the interest of completing the record.  When could the parties submit that for my review?

MS. STONE:  We could get that probably today or tomorrow.  Maybe we'll do Wednesday or Thursday.  I just want to talk to defense counsel to make sure.  By the end of the week maybe we could say, as soon as possible?

THE COURT:  I think that would be fine with me.

Any objection to that or any concern about that timing from the defense?

MS. CLARK:  No, your Honor.

THE COURT:  Okay.  So if you could submit that supplemental agreement to me by May 5th, I would appreciate it.

MS. STONE:  Sure thing.

THE COURT:  All right.  Is there anything else you'd like to address with regard to the Grenell factors?

MS. STONE:  I think we've touched upon -- I think we've touched upon it in our discussions.  So at this time, I think we're good.  I think we touched everything else, unless there's anything I can elaborate on for you, your Honor.

THE COURT:  Thank you.  Just hitting on a couple more of them, the sort of stage of the proceedings and the amount of discovery, we already discussed that at length and it was also addressed in the papers.  I'd also like to note that the factor of equitable treatment was also well covered in the briefing, and the parties' explanation of the pro rata share of settlement based on ownership of the company stock and respective losses was clearly explicated.

I did want to discuss briefly the ability to withstand a great judgment because in the motion for preliminary settlement approval, plaintiffs represent that 3D Systems' most recent securities filings show cash and short-term investments of approximately 610 million and shareholder equity of 734 million.  So I'm curious to hear from you, Ms. Stone, what your position is on whether or not the defendants could withstand a greater judgment and that factor given their assets and holdings.

MS. STONE:  Sure, absolutely.  With this

factor, what we have to -- what we keep in mind is, the reasonableness of the settlement is not just to expect the company to empty its coffers and what they have the ability to pay.  It's just, is this in the range of reasonableness?  And we believe that it is.

You note that at the time that we filed the settlement papers, they had 610 million of cash and short-term investments.  That was even down from the end of 2021, when they had 734 million.  As of their 10K that they filed on March 16 of 2023, so the most recent filing, it shows that the financial situation hasn't improved and that the company is burning through cash.  At the end of December of '22, 3D has cash and cash equivalents and short-term investments of 568.7 million.  So it's been decreasing, so there are concerns that there are still some operational issues at the company and we don't think that -- we don't know what the future holds with the company and what the operations are going to continue to be like.

If we proceeded ahead and if we did get more damages at trial, which we have already discussed that it's very difficult, any judgment could potentially decimate the company and put them out of business. It's not our goal to do that.  Our goal is to get the money, the guaranteed money back for the investors, so

that is some considerations that we had with that factor.

THE COURT:  Thank you.

I'm curious if you'd like to be heard on that factor as well, Ms. Clark?

MS. CLARK:  Thank you, your Honor.  I don't really have anything to add unless your Honor has specific questions.  Certainly Ms. Stone's assessment of what is publicly available information about the company and how that supports that factor and her concerns about future recovery should she continue the litigation -- I think the way that she stated it, you know, I don't have anything to add.  Certainly her view based on the publicly available information seems -- it's certainly appropriate for her to have her views to support the settlement from the plaintiffs' perspective on that factor.

THE COURT:  Okay, thank you.

With regard to the Grenell factors, Ms. Stone, I think we've hit the highlights and of course, you also have your briefing.  Is there anything else you'd like to add?

MS. STONE:  I think that's all, your Honor, thank you.

THE COURT:  All right.  So now I'd like to

just at least briefly talk about the likelihood of class certification.  Of course, as the parties know, it's very well-settled.  Rule 23 of course encompasses the familiar four prerequisites for class certification, including numerosity, commonality, typicality, and adequacy of representation.  In addition to the explicit requirements of Rule 23(a), the class of course also must satisfy the implied requirement of ascertainability.

Because you're seeking class certification under Rule 23(b)(3), you also must meet the predominance and superiority requirements.  These requirements are very often easily met in securities class actions due to the number of potential class members, so I really only have one question about the number of potential class members.  I note that you asserted in your papers that there are hundreds if not thousands of potential settlement class members.  I'm just trying to ascertain how you determined the size of the class and the ascertainability of the members and how you're going about that process so that we understand your methodology and how you're going to have the list prepared for notice.

MS. STONE:  Sure, absolutely.  One thing I should note is, the 10K that 3D filed in 2020, which

was -- for 2020 so it was in early 2021, at the end of the class period, it states that as of February 22 of 2021, there were 124 million shares outstanding roughly, more than 124 million shares outstanding.  So that obviously shows that it's a large company with a lot of shareholders.  We also have a damages expert and he calculated how many shares that he thought were damaged.  His estimate was 61.8 million shares.  So based on experience of that sizeable -- that number, we anticipate that there will be hundreds if not thousands of people who are potential class members.

We'll know more once the claims administrator is appointed.  They contact different brokerages and banks to get the information of the people who traded in 3D during the settlement class period.  So they will get the contact information and either contact the investor directly with the notice or the broker will contact their own clients directly and then provide confirmation to the claims administrator that they reached out to them.

So we'll get a better idea once the notice goes out, but we anticipate it's going to be definitely a numerous size, definitely more than 40 members as some case law has said is enough for a class action.  The stock traded on the New York Stock Exchange during

the class period and there are many cases that state that a nationally traded security does satisfy the numerosity standard.  And we believe with the number of shares outstanding and all that I've said, that numerosity is satisfied.

THE COURT:  Thank you.

Ms. Clark, do you have any factual quarrel with Ms. Stone's representation regarding the scope of the shares and her prediction as to the size of the class?

MS. CLARK:  No, I don't, your Honor.

THE COURT:  Okay.  Anything that the defendants would like to add about the use of the Rule 23 class mechanism here and the likelihood of class approval?  Ms. Clark, anything you'd like to add?

MS. CLARK:  Sorry about that, I went back on mute.

THE COURT:  That's okay.

MS. CLARK:  No, your Honor, nothing to add. Certainly if the case had been continued to litigate, as Ms. Stone mentioned, we certainly -- the defendants would have had arguments regarding the potential class period and things of that nature.  But in terms of Rule 23 and the things that Ms. Stone articulated, the size of the class and providing adequate notice to the

class, we don't have any concerns.

THE COURT: Okay. I note in addition to Ms. Stone's explication of the highlights of the notice procedure, your memorandum sets forth a lot of detailed steps in the notice plan. This of course has been approved in other cases. I've seen similar in other cases as well. But I just wanted to note that for the record, that the plaintiffs anticipate all of the things that Ms. Stone identified earlier in addition to a very detailed schedule for the creation of the website, emailing the links, the publication of the summary notice, the date for any paperwork to be filed, the submission deadline for claim forms. All of those steps are well laid out in the supplemental -- in the memorandum filed by plaintiffs at ECF 57.

Is there anything else, Ms. Stone, that you think we should cover or anything else you'd like to add to the record in support of your argument for preliminary approval of the settlement and the settlement class?

MS. STONE: I believe we covered it all, thank you very much, your Honor.

THE COURT: How about you, Ms. Clark? Is there anything else you'd like to add?

MS. CLARK: Only, your Honor, just so the

record is clear, I think as is already clear from the papers, the defendants have denied and continued to deny the conduct alleged in the plaintiffs' amended complaint but certainly recognize and agree to the settlement here as fair and reasonable based on the elimination of the burden and expense and uncertainty of further litigation, and we thank your Honor for your time.

THE COURT:  Totally understood.  That is clear in the notices and the paperwork that have been submitted to the Court.  I'm certainly not making any findings as to liability at this juncture, just trying to determine whether or not to recommend preliminary approval of the settlement and the settlement class. Based upon the entirety of the record before me now, including the filings and today's presentation of additional information, I am prepared to recommend to Judge Garaufis that he preliminarily approve the settlement and the settlement class.

I would like, however, to see that supplemental agreement before we finalize our recommendation to Judge Garaufis.  You represented, Ms. Stone, that that could be filed by Friday, is that correct?

MS. STONE:  That is correct, your Honor.

THE COURT:  The settlement agreement?

MS. STONE:  Yes, your Honor.

THE COURT:  All right.  And is there a date by which you could provide just a very slightly revised notice that includes that additional information about the ability appear through an attorney?

MS. STONE:  We could do that by Friday as well.  Maybe we'll make both dates Friday and we'll strive to get it to you sooner.

THE COURT:  That would be fine with me.

Ms. Clark, are you going to have an opportunity to confer in the next couple of days so that Ms. Stone can meet that deadline?

MS. CLARK:  Yes, absolutely, your Honor.

THE COURT:  Okay, terrific.  So we'll look for the revised notice, and I think we're really most concerned about the postcard and the short form, simply that additional piece of that information from Rule 23.  So if you could submit a slight revision to those by Friday along with the supplemental agreement, I would appreciate it.

Just give me one more second.  I'm going to just double-check with my law clerk that we've covered everything.  Hold on one second.

MS. STONE:  Your Honor?

THE COURT:  Yes.

MS. STONE:  Can I interrupt for one second? Sorry, I just want to make sure we have exactly what you're asking for.  So you just want language in both the postcard and the summary notice, alerting investors that they have the right to obtain their own counsel, correct?

THE COURT:  Exactly, yes.  I think that it seems -- to me, it seems that it could be a very simple sentence.

MS. STONE:  Yes.

THE COURT:  For example, on the postcard, you said, you may but do not have to attend the hearing and ask to be heard by the Court.  You also have the right to appear through counsel if you choose, you know, something very simple.

MS. STONE:  Yeah, okay.

THE COURT:  It doesn't have to be overboard. It's really just a matter of making sure that parties understand that they have that additional right and that's part of the really just technical compliance with Rule 23, in my view.

MS. STONE:  Certainly, okay, thank you for that.

THE COURT:  Certainly

MS. STONE:  We'll get that done.

THE COURT:  Okay, terrific.  Just give me one second.  I just want to double-check one thing.

MS. STONE:  Yes.

(Pause in proceedings.)

THE COURT:  All right.  So my very excellent law clerk, Mr. Arroyo, has confirmed that we covered everything.  I think we were very thorough so I want to thank you for that, and I want to thank you for your thorough papers.  I look forward to those supplemental filings by Friday and we will endeavor to get our report and recommendation issued in the coming couple of weeks.  I'm very glad that you were able to reach this preliminary settlement.  Unless there's anything further, we are adjourned.

Anything final, Ms. Stone?

MS. STONE:  No, thank you very much, your Honor.

THE COURT:  Ms. Clark?

MS. CLARK:  No, thank you, your Honor.

THE COURT:  All right, terrific.  Have a great afternoon, everybody.  Stay safe.

MS. STONE:  You as well, thank you.

* * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                                    May 9, 2023