UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

IN RE 3D SYSTEMS SECURITIES
LITIGATION

**REPORT AND
RECOMMENDATION**
21-CV-1920 (NGG) (TAM)

-----------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

On November 21, 2023, the Honorable Nicholas G. Garaufis held a fairness
hearing (referred to herein as the "Fairness Hearing") regarding a proposed settlement
of two consolidated class actions seeking relief on behalf of purchasers of 3D Systems'
publicly traded securities. (Nov. 21, 2023 Minute Entry; *see generally* Order, ECF No. 41;
Tr. of Fairness Hearing.) For the reasons set forth below, the Court finds the parties'
settlement agreement and the related relief Plaintiffs seek to be fair, adequate, and
reasonable, and respectfully recommends that Plaintiffs' motions related to final
settlement approval be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

3D Systems is a 3D printing and digital manufacturing company that "sold 3D
printers, materials used for 3D printing, printer software, and on-demand printing
services" during the relevant time, i.e., from May 6, 2020 to March 5, 2021 (referred to
herein as the "Class Period"). (Amend. Compl., ECF No. 43, ¶¶ 1–2.) 3D Systems
securities were traded during the Class Period on the New York Stock Exchange under
the ticker symbol "DDD." (*Id.* ¶ 25.) Vyomesh Joshi served as Chief Executive Officer of
the company from April 4, 2016, to May 25, 2020, and was succeeded by Jeffrey Graves,

who served as CEO for the remainder of the Class Period. (*Id.* ¶¶ 26, 28.) Todd Booth served as Chief Financial Officer from September 3, 2019, until May 14, 2020, and was succeeded by Wayne Pensky, who served until September 13, 2020. (*Id.* ¶¶ 27, 29.) Pensky, in turn, was succeeded by Jagtar Narula, who served as CFO for the remainder of the Class Period. (*Id.* ¶¶ 29–30.)

Plaintiffs allege that Defendants made false or misleading statements and material omissions in several of the company's public filings issued during the Class Period, which ultimately led to the fall of 3D Systems' stock price and investor losses. (*See generally id.*) Specifically, Plaintiffs point to quarterly reports filed with the SEC on May 6, 2020, August 5, 2020, and November 5, 2020, each attesting to the effectiveness of the company's internal controls over financial reporting. (*Id.* ¶¶ 95, 119, 154.) 3D Systems subsequently issued press releases on February 23, 2021, and March 1, 2021, each indicating that the company's annual report for the 2020 fiscal year would be delayed on account of "certain internal control deficiencies." (*Id.* ¶¶ 182, 185.) On March 2, 2021, following the filing of a Form NT 10-K, indicating that 3D Systems could not file its annual report, and an earnings call, 3D Systems' stock price began to fall, dropping 19.6% by market close and another 11.8% the following day. (*Id.* ¶¶ 14–15; 190–91.)

3D Systems ultimately filed its annual report on March 5, 2021, the last day of the Class Period. (*Id.* ¶ 192.) For the first time, 3D Systems disclosed an accounting error that had resulted in an inflated profit margin over the first three quarters of the 2020 fiscal year. (*Id.*) The market responded accordingly. (*See id.* ¶¶ 194–95.)

Plaintiffs filed suit in April 2021, alleging causes of action under Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and Section 20(a) of the Exchange Act against Joshi, Booth, Graves, Pensky, and Narula. (*See id.* at ¶¶ 206–21; *see also* Apr. 9, 2021 Compl., ECF No. 1; Apr. 29, 2021 Compl., Case No. 21-CV-2383 (NGG)

2

(TAM), ECF No. 1.) Specifically, investors filed two separate actions, which the Court consolidated on July 13, 2021, appointing Darrell Cline as lead plaintiff and The Rosen Law Firm as Lead Counsel.[1] (*See generally* Mem. and Order, ECF No. 41.)

Thereafter, Defendants moved to dismiss the action on May 16, 2022. (*See* Letter Mot. for Pre-Mot. Conf., ECF No. 46; Jan. 7, 2022 ECF Minute Entry; Mot. to Dismiss, ECF No. 50.) Defendants argued that Plaintiffs had failed to state a claim to relief and that certain putative class members' claims were barred under the Private Securities Litigation Reform Act (PSLRA). (*See* Mem. in Supp. of Mot. to Dismiss, ECF No. 50-1, at 1–3.)

After fully briefing the motion, the parties requested a stay in order to attempt resolution through mediation. (*See* Letter Mot. to Stay, ECF No. 51; *see also* Opp'n Mem., ECF No. 50-9; Reply in Supp. of Mot. to Dismiss, ECF No. 50-16.) Judge Garaufis granted the stay, and the parties later filed a status report on October 28, 2022, indicating that they had reached a settlement in principle. (Aug. 22, 2022 ECF Order; Oct. 28, 2022 Status Report, ECF No. 53.)

Plaintiffs filed a copy of their proposed settlement agreement on December 19, 2022, along with a motion for preliminary settlement approval and a proposed order. (*See* Proposed Settlement Agreement ("Settl. Agr."), ECF No. 55; Mot. for Prelim. Settlement Approval, ECF No. 56; Proposed Order ("Preliminary Approval Order"), ECF No. 56-1; Mem. in Supp. of Mot. for Prelim. Settlement Approval ("Supp. Mem."),

---

[1] The later-filed action, No. 21-CV-2383, was initiated by Ramesh Kumar, whom the Court notes was not named as a plaintiff in the Amended Complaint filed after case consolidation. (*See* Amend. Compl., ECF No. 43.) During the preliminary fairness hearing held on May 2, 2023, Plaintiffs' counsel represented that Mr. Kumar still qualifies as a class member for purposes of settlement. (*See* Tr. of Preliminary Fairness Hearing, ECF No. 62, at 5:20–6:8.)

ECF No. 57.) Per these submissions, the parties "agreed to settle this putative class action for $4,000,000 by the terms stated in the" proposed settlement agreement. (Supp. Mem., ECF No. 57, at 1.) Plaintiffs represented that the agreement "was achieved after substantial arm's-length negotiations with the aid of Jed Melnick, Esq., an experienced JAMS[2] mediator," whom the parties retained. (*Id.*; *see also* Letter Mot. to Stay, ECF No. 51; Settl. Agr., ECF No. 55, § I.B (stating that the parties "participated in an in-person, all-day mediation" on October 12, 2022).) On December 22, 2022, Judge Garaufis referred Plaintiffs' motion for preliminary settlement approval to the undersigned magistrate judge "to hold a fairness hearing under Federal Rule of Civil Procedure 23(e) and for a Report and Recommendation." (Dec. 22, 2022 ECF Referral Order.)

The Court subsequently held a preliminary fairness hearing on May 2, 2023. (*See* May 2, 2023 ECF Minute Entry and Order; Tr. of Preliminary Fairness Hearing, ECF No. 62.) Lead Counsel represented Plaintiffs at the hearing; counsel for Defendants were also present. (*See* May 2, 2023 ECF Minute Entry and Order; Tr. of Preliminary Fairness Hearing, ECF No. 62, at 1.) The parties discussed Plaintiffs' pending motion, including the likelihood of final settlement approval and class certification, as well as the parties' proposed notice procedures, which included, among other things, a long form notice

---

[2] JAMS, previously known as Judicial Arbitration and Mediation Services, Inc., represents itself to be "the world's largest private alternative dispute resolution (ADR) provider." *About Us*, JAMS, https://www.jamsadr.com/about/ (last visited Nov. 16, 2023). Mr. Melnick represents that he "has resolved over one thousand disputes," *Jed D. Melnick, Esq.*, JAMS, https://www.jamsadr.com/melnick/ (last visited Nov. 16, 2023), and courts in this circuit have observed that Mr. Melnick is "a highly qualified mediator," *Gordon v. Vanda Pharms. Inc.*, No. 19-CV-1108 (FB) (LB), 2022 WL 4296092, at *4 (E.D.N.Y. Sept. 15, 2022) (quotation marks omitted); *see also Fulton Cnty. Emps.' Ret. Sys. ex rel. Goldman Sachs Grp. Inc. v. Blankfein*, No. 19-CV-1562 (VSB), 2022 WL 4292894, at *3 (S.D.N.Y. Sept. 16, 2022). (*See also* Tr. of Preliminary Fairness Hearing, ECF No. 62, at 3:24–4:7 ("The parties wanted to retain a mediator that could bring benefit to the discussion[] [and] understood the complexities of similar cases.").)

("Long Notice"), a short form notice ("Summary Notice"), a postcard notice ("Postcard Notice"), a claim form ("Claim Form"), creation of a website, and notice by publication. (*See generally id.*) In light of Plaintiffs' representation in their motion papers that, in addition to the proposed settlement agreement, the parties had entered into a "supplemental agreement," the Court directed the parties to submit the supplemental agreement for review under seal. (Supp. Mem., ECF No. 57, at 16; *see* Tr. of Preliminary Fairness Hearing, ECF No. 62, at 25:25–26:8.) The Court also raised a concern regarding the parties' proposed notices — specifically, that certain of the notices did not clearly indicate that class members could appear through their own attorney if desired, as required by Federal Rule of Civil Procedure 23(c)(2)(B)(iv). (*See id.*, at 17:1–6, 20:18–22:1.) Accordingly, the Court directed the parties to submit revised notices and took the motion for preliminary settlement approval under advisement. (*See* May 2, 2023 ECF Minute Entry and Order.)

Plaintiffs filed the parties' supplemental agreement under seal on May 3, 2023. (*See* Stipulation, ECF No. 60.) Plaintiffs also filed a supplemental letter and revised proposed notices. (*See* May 3, 2023 Letter, ECF No. 61; Revised Summary Notice, ECF No. 61-1; Revised Postcard Notice, ECF No. 61-3.)

On June 5, 2023, the Court issued a Report and Recommendation, recommending that Judge Garaufis (1) grant Plaintiffs' Motion for Preliminary Settlement Approval; (2) enter the proposed order preliminarily approving the class action settlement; (3) direct the parties to issue notice as proposed, consistent with the revised submissions; (4) appoint The Rosen Law Firm as class counsel for purposes of settlement; and (5) schedule a final settlement hearing for a specific date, time, and place, to be held approximately 120 days after entry of the Preliminary Approval Order. On July 19, 2023, Judge Garaufis adopted the Report and Recommendation,

preliminarily approved the proposed class action settlement, directed the parties to issue notice as outlined in the Report and Recommendation, appointed The Rosen Law Firm as class counsel for the purposes of settlement, and scheduled a final settlement hearing for November 21, 2023. (*See* Mem. and Order, ECF No. 65.)

On October 17, 2023, Plaintiffs filed a motion for final approval of the class action settlement and a motion for attorneys' fees and award to Plaintiffs. (*See* Mot. for Final Approval, ECF No. 66; Mot. for Attorneys' Fees and Expenses, and Award to Plaintiffs ("Mot. for Fees and Award"), ECF No. 68; *see also* Mem. in Supp. of Mot. for Final Approval ("Final Approval Mem."), ECF No. 67; Mem. in Supp. of Mot. for Fees and Award ("Fees Mem."), ECF No. 69.) On October 20, 2023, Judge Garaufis referred Plaintiffs' motions to the undersigned magistrate judge for a report and recommendation. On November 21, 2023, Judge Garaufis held the final settlement hearing. (*See* Nov. 21, 2023 Minute Entry; Tr. of Fairness Hearing.)

For the reasons set forth below, the Court respectfully recommends granting (1) the motion for final settlement approval and (2) the motion for attorneys' fees and award to Plaintiffs.

## DISCUSSION

### I.  Settlement Agreement, Fund Allocation, and Notification to Class

The proposed settlement agreement defined the settlement class as:

> [A]ll Persons who purchased the publicly-traded common stock of [3D Systems] during the Class Period. Excluded from the class are:
> (1) Defendants; (2) the officers and directors of [3D Systems] at all relevant times; (3) members of immediate families and their legal representatives, heirs, successors or assigns of any excluded Persons; and (4) any entity in which Defendants or any excluded Persons have or had a controlling interest. Also excluded from the Settlement Class are those Persons who submit a valid and timely request for exclusion in accordance with the Preliminary Approval Order.

(Settl. Agr., ECF No. 55, ¶¶ 1.4, 1.31.)

6

Members of the settlement class will be entitled to a *pro rata* share of the settlement fund of $4,000,000 (the "Settlement Fund"), less: (1) attorneys' fees with interest and reasonable expenses to Lead Counsel; (2) any award to Plaintiffs; (3) taxes due on interest earned by the Settlement Fund; and (4) the costs of the claims administration (the "Net Settlement Fund"). (Long Notice, ECF No. 55-2, at 6.)[3]

In exchange for their share of the Net Settlement Fund, members of the settlement class release:

> [A]ny and all claims, rights, demands, suits, liabilities, or causes of action, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description whatsoever, under federal, state, local, foreign law, or any other law, rule, or regulation, both known and Unknown Claims,[4] alleged or which could

---

[3] Each class member's share will be determined based on the relative size of their "recognized loss" as compared to the total recognized claims of all accepted claimants. (Long Notice, ECF No. 55-2, at 6 ("The Recognized Loss formula is the basis upon which the Net Settlement Fund will be proportionally allocated to the Authorized Claimants. To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's Recognized Loss and subject to the provisions in the preceding paragraph. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total Recognized Loss of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total Recognized Losses of all Authorized Claimants and subject to the provisions in the preceding paragraph (*i.e.*, 'pro rata' share'). No distribution will be made on a claim where the potential distribution amount is less than ten dollars ($10.00) in cash.").)

[4] "Unknown Claims" are defined as:

> (i) any and all Settlement Class Claims that Plaintiffs or any Settlement Class Member do not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties which, if known by him, her or it, might have affected his, her or its decision(s) with respect to the Settlement, or might have affected his, her or its decision not to object to this Settlement or seek exclusion from the Class; and (ii) any and all Defendant Claims that any Defendant or Released Party does not know or suspect to exist in his, her, or its favor, which if known by him, her, or it might have affected his, her, or its decision(s) with respect to the Settlement.

(Settl. Agr., ECF No. 55, ¶ 1.39.) This also includes waiver of the provisions, rights, and benefits of Cal. Civ. Code § 1542 and any other similar provisions of state or federal law. (*Id.*)

have been alleged by Plaintiffs or any Settlement Class Member in the Action against Defendants or against any other of the Released Parties in any court of competent jurisdiction or any other adjudicatory tribunal that arise out of, are based upon, in any way related to, or are in consequence of any of the facts, allegations, transactions, matters, events, disclosures, non-disclosures, occurrences, representations, statements, acts, claims, omissions, or failures to act that were: (i) involved, set forth, or referred to in any of the complaints filed in the Action, or that otherwise would have been barred by *res judicata* had the Action been fully litigated to a final judgment; and (ii) relate to the purchase or sale of [3D Systems] common stock during the Class Period.

("Settlement Class Claims")[5] (Settl. Agr., ECF No. 55, ¶¶ 1.26, 1.32.) Defendants also release any claims they may have against Plaintiffs, Plaintiffs' counsel, and any member of the settlement class, except for "claims to enforce the Settlement." (*Id.* ¶ 1.7.)

According to the claims administrator, Strategic Claims Services ("SCS"), the Postcard Notices were mailed to 83,070[6] potential Settlement Class Members; links to the Long Notice, Claim Form, and Summary Notice were emailed to 126,052[7] individuals; and the Summary Notice was published electronically once on *GlobeNewswire* and in print once in the *Investor's Business Daily*. (Ex. 1 ("SCS Decl."), ECF No. 70-1, at 4–5, ¶¶ 6–9; *see* Final Approval Mem., ECF No. 67, at 20–21.) Potential

---

[5] However, excluded from Settlement Class Claims are: "(i) any derivative claims asserted on behalf of [3D Systems]; (ii) any claims relating to the enforcement of the Settlement; and (iii) any claims by persons or entities who or which submit a request for exclusion that is accepted by the Court." (Settl. Agr., ECF No. 55, ¶ 1.32.)

[6] While the Postcard Notices were initially mailed to 85,285 individuals, 4,799 of those mailings were returned as undeliverable. Of those 4,799 undeliverable mailings, SCS mailed another Postcard Notice to 301 forwarding addresses obtained by the United States Postal Service and 2,283 updated addresses obtained by "skip-trac[ing]." (SCS Decl., ECF No. 70-1, at 5, ¶ 8.)

[7] Specifically, "SCS emailed links to the Long Notice, Claim Form, and the Summary Notice to 11 individuals provided by two nominees, and SCS was notified by two other nominees that they collectively emailed 126,041 of their customers links to the Long Notice and Claim Form and Summary Notice on the settlement webpage." (SCS Decl., ECF No. 70-1, at 5, ¶ 7.)

Settlement Class Members also had access to a toll-free phone line to obtain further information about the Settlement and a website accessible at all times that contained the "current status; the case deadlines; the online claim filing link; and . . . the Long Notice and Claim Form, the Postcard Notice, the Summary Notice, the Preliminary Approval Order, and the Settlement Stipulation with exhibits." (SCS Decl., ECF No. 70-1, at 5–6, ¶¶ 10–11.) The deadline for Settlement Class Members to "object to the Settlement, Plan of Allocation, requested attorneys' fees and expenses, or requested Awards to Plaintiffs, or to opt out of the Settlement Class, was October 24, 2023." (Reply in Supp., ECF No. 71, at 2.) As of November 14, 2023, SCS had received 14,563 claims, and as of November 21, 2023, had not received any objections. (Suppl. SCS Decl., ECF No. 71-1, at ¶ 9; Tr. of Fairness Hearing, at 2:23–3:4.)[8]

In addition to the payments to the settlement class, the settlement agreement also provides for an award to Plaintiffs' counsel for fees in the amount of $1,333,333 (one-third of the settlement fund) plus $43,860.32 in expenses, as well as a total award of $21,500 divided between lead plaintiff Darrell E. Cline and named plaintiffs Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez, and Diane Van Alstyne, in connection with their representation of the settlement class. (Fees Mem., ECF No. 69, at 1; *see* R. & R., ECF No. 63, at 16.)

---

[8] Although SCS received eight requests for exclusion, "only one [was] valid." (Reply in Supp., ECF No. 71, at 2; *see* Tr. of Fairness Hearing, at 3:5–3:8.) Five of the eight requests were deemed to be invalid because they "failed to follow the directions for requesting exclusion from the Settlement and did not provide any information to confirm the individuals are Settlement Class Members." (SCS Decl., ECF No. 70-1, at 6, ¶ 12; Suppl. SCS Decl., ECF No. 71-1, at 2–3, ¶ 7.) Although SCS "explained to each of those individuals how to file a valid exclusion," four of the individuals did not respond, and the fifth individual ultimately filed a claim. (Suppl. SCS Decl., ECF No. 71-1, at 2–3, ¶ 7.) The other three requests for exclusion were from two individuals who do not qualify as Settlement Class Members "because they have no recognized losses," and one from an individual "who would have recognized losses." (*Id.*) The latter individual's request is the sole exclusion request that was deemed to be valid.

## II. Legal Standard

The Second Circuit has expressed a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005) (noting that "[t]he compromise of complex litigation is encouraged by the courts and favored by public policy"). Under Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of . . . a class proposed to be certified for purposes of settlement [] may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e); *see also In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 328–30 (E.D.N.Y. 2010). To approve a class settlement under Rule 23(e), "the district court must determine that it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Loc. 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York*, 392 F. Supp. 3d 361, 374 (S.D.N.Y. 2019) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). In conducting this inquiry, courts consider the substantive and procedural fairness of a proposed settlement to determine "whether 'the terms of the settlement and the negotiation process leading up to it' are fair." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018) (quoting *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008)), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (summary order); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").

For an evaluation of substantive fairness, it is well settled in this circuit that courts must consider the nine *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability;

> (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009). In determining procedural fairness, there is a "presumption of fairness, adequacy, and reasonableness" that attaches when a class settlement is reached following "arm's length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc.*, 396 F.3d at 116; *see also Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 320 (S.D.N.Y. 2019*); Dover v. Brit. Airways, PLC (UK)*, 323 F. Supp. 3d 338, 349 (E.D.N.Y. 2018). Although settlement approval is subject to a district court's discretion, *see, e.g., McReynolds*, 588 F.3d at 800; *Denney v. Deutsche Bank AG*, 443 F.3d 253, 273 (2d Cir. 2006), courts "must eschew any rubber stamp approval in favor of an independent evaluation." *Grinnell*, 495 F.2d at 462. However, "at the same time, [a court] must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.*

## III. Analysis

### A. Class Certification

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in Rule 23(a) and (b) have been satisfied." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012); *see also Johnson*, 333 F.R.D. at 318. As noted above, on July 19, 2023, Judge Garaufis preliminarily certified the class for the purposes of settlement under Federal Rule of

Civil Procedure 23(a) and (b)(3). (July 19, 2023 Order, ECF No. 65, at 2.) The Court now respectfully recommends final certification for settlement purposes be granted as well.

    1.  *Rule 23(a)*

Rule 23(a) sets forth four threshold requirements for class certification: (1) numerosity ("joinder of all members is impracticable"); (2) commonality ("[common] questions of law or fact"); (3) typicality ("claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy ("representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). As the Court has previously found, Plaintiffs have satisfied Rule 23(a)'s requirements. (*See generally* R. & R., ECF No. 63; July 19, 2023 Order, ECF No. 65.) As discussed below, and given that "nothing has transpired since preliminary approval was granted that would alter the Court's [prior] findings," the Court reiterates its previous finding that Plaintiffs have satisfied Rule 23(a)'s requirements. (Final Approval Mem., ECF No. 67, at 19.)

    a.  <u>Numerosity</u>

When a class consists of forty or more members, numerosity is presumed. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also Scott v. Quay*, 338 F.R.D. 178, 187 (E.D.N.Y. 2021). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 304 (S.D.N.Y. 2010). As described *supra*, Plaintiffs ultimately distributed notice of the proposed settlement to 209,122 individual Settlement Class Members. (Final Approval Mem., ECF No. 67, at 20.) Accordingly, Plaintiffs have demonstrated that the settlement class consists of well

over forty people, and numerosity is satisfied. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021).

> b.  Commonality & Typicality

A class may only be certified if "there are questions of law or fact common to the class," and "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(2), (3). Analysis of the requirements of commonality and typicality "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997); *Scott*, 338 F.R.D. at 188.

"The 'commonality requirement is met' where 'the plaintiffs' claims arise from the same alleged course of conduct and are based on legal theories similar to those of all the class members.'" *Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 211–12 (quoting *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002)). Similarly, typicality is met "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376.

In this case, there are common questions of law and fact related to whether Defendants misrepresented or omitted material facts in several of 3D Systems' public filings issued during the Class Period, and whether that caused members of the settlement class to suffer compensable losses. (*See generally* Amend. Compl., ECF No. 43.) Moreover, each class member's claim arises out of the same course of events and requires the same legal arguments as to Defendants' liability. (*See generally* R. & R., ECF

No. 63.) Accordingly, Rule 23(a)'s requirements of commonality and typicality are satisfied. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 212; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52–53 (E.D.N.Y. 2019); *see also In re Grana y Montero S.A.A. Sec. Litig.*, No. 17-CV-1105 (LDH) (ST), 2021 WL 4173684, at *9 (E.D.N.Y. Aug. 13, 2021), *report and recommendation adopted*, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).

c.  <u>Adequacy of Representation</u>

To satisfy Rule 23(a)(4)'s requirement "that all members of the class are adequately represented, district courts must make sure that the members of the class possess the same interests, and that no fundamental conflicts exist among the members." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In addition, courts must ensure "that 'class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Marisol A.*, 126 F.3d at 378 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

In this case, the named Plaintiffs' interests align with those of the settlement class because each named Plaintiff "purchased [3D Systems common] stock during the Settlement Class Period and suffered significant losses as a result of Defendants' alleged misconduct, [and] 'all shared the common goal of maximizing recovery.'" (Final Approval Mem., ECF No. 67, at 12 (citing *In re Payment Card*, 330 F.R.D. at 32).) Plaintiffs have also demonstrated a commitment to the litigation by retaining qualified and experienced lead counsel. (*See* R. & R., ECF No. 63, at 9–10; Rosen Law Biography, ECF No. 26-4.) Plaintiffs' counsel have substantial experience in securities class actions, and have litigated on behalf of the putative class for over two years. Therefore, Plaintiffs have sufficiently shown that they are able to "fairly and adequately protect the interests

14

of the class." Fed. R. Civ. P. 23(a)(4); *see also Lea v. Tal Education Grp.*, No. 18-CV-5480 (KHP), 2021 WL 5578665, at \*6 (S.D.N.Y. Nov. 30, 2021); Fed. R. Civ. P. 23(e)(2)(A).

    2.   *Rule 23(b)(3)*

"In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b)." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at \*10 (quotation marks omitted); *see also Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 5847420, at \*2 (S.D.N.Y. Dec. 9, 2021). Rule 23(b)(3) permits a class action to be maintained if the court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 441 (E.D.N.Y. 2021) (quoting *Amchem*, 521 U.S. at 623). Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)). To establish the superiority prong of this inquiry, "the moving party must show that 'the class action presents economies of time, effort and expense, and promote[s] uniformity of decision.'" *Lea*, 2021 WL 5578665, at \*6 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (quotation marks omitted)).

In this case, as discussed above, Plaintiffs and the settlement class members suffered the same basic harm due to the same alleged misconduct by Defendants. Therefore, the Court finds that the proposed class is "'sufficiently cohesive to warrant

adjudication by representation.'" *Wang*, 338 F.R.D. at 441 (quoting *Amchem*, 521 U.S. at 623); *see also Amchem*, 521 U.S. at 625 (explaining that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws").

In addition, in light of the numerosity of class members and the uniformity of their claims, there is a strong basis for a finding of superiority. *See Public Emps.' Ret. Sys. v. Merrill Lynch & Co.*, Inc., 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (finding superiority where "there is no overwhelming interest by class members to proceed individually" and noting that in most securities actions, "[m]ultiple actions by multiple plaintiffs could also significantly reduce the prospects for recovery as it would decrease plaintiffs' bargaining power").

## B. Settlement Approval

As discussed above, a district court's approval of a class action settlement is contingent on a finding that the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), which is determined by an evaluation of a settlement's procedural and substantive fairness. *See McReynolds*, 588 F.3d at 803–04; *D'Amato*, 236 F.3d at 85; *see also Lea*, 2021 WL 5578665, at *7; *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *11.[9]

---

[9] The Court notes that "Rule 23 also requires the court to consider several criteria — some of which overlap with the *Grinnell* factors — that inform whether the settlement is fair, reasonable, and adequate." *In re Parking Heaters, Antitrust Litig.*, No. 15-MC-940 (DLI) (JO), 2019 WL 8137325, at *4 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, Sept. 30, 2019 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(A)–(D). These factors do not displace the *Grinnell* factors, but rather "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," given that "[t]he central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Accordingly, in light of the significant overlap between the relevant Second Circuit case law and the Rule 23(e)(2) factors, the Court incorporates the Rule 23 factors into its analysis throughout.

1. *Procedural Fairness*

Plaintiffs represent that the $4,000,000 global settlement was reached after extensive and arm's-length negotiations between experienced counsel and included an all-day mediation with mediator Jed D. Melnick, Esq., of JAMS. (Final Approval Mem., ECF No. 67; *see* Melnick Decl., ECF No. 70-1.) In addition, as detailed in the pleadings, motion papers, and at the preliminary fairness hearing, Plaintiffs' counsel spent extensive time investigating the facts of this case and evaluating the strengths and weaknesses of the claims. (Tr. of Preliminary Fairness Hearing, ECF No. 62, at 8:17-9:1 (explaining that Lead Counsel "retained investigators, accounting experts, as well as damages experts" in preparing the amended complaint, and responded to Defendants' pre-motion conference letter and subsequent motion to dismiss); *see* R. & R., ECF No. 63, at 10; *see generally* Amend. Compl., ECF No. 43.)

These facts support the conclusion that the settlement process was procedurally fair. *See Wal-Mart Stores, Inc.*, 396 F.3d at 116 (noting the "presumption of fairness, adequacy, and reasonableness" that attaches when a class settlement is reached following "arm's-length negotiations between experienced, capable counsel after meaningful discovery"); *see also Lea*, 2021 WL 5578665, at *8; *D'Amato v. Deutsche Bank*, 236 F.3d at 85 (holding that the settlement was procedurally fair because the court "expressly considered whether the negotiations were a result of arm's length negotiations and whether plaintiffs' counsel possessed the experience and ability to represent effectively the class's interests" (quotation marks omitted)).

Accordingly, the Court concludes "that the parties gained sufficient information about the claims through mediation and settlement discussions to allow them to make a reasoned evaluation of the chances of success," and therefore, "finds that there was procedural fairness in reaching the proposed settlement." *Burns v. FalconStor Software,*

*Inc.*, No. 10-CV-4572 (ERK) (CPL), 2014 WL 12917621, at *4 (E.D.N.Y. Apr. 11, 2014), *report and recommendation adopted*, May 8, 2014 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(B).

2. *Substantive Fairness*

For consideration of whether "the relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C), the Court now turns to the *Grinnell* factors to evaluate the proposed settlement's substantive fairness.

a. <u>Complexity, Expense, & Likely Duration of Litigation</u>

Although difficult to predict, the complexity, expense, and likely duration of the litigation favor the proposed settlement. Securities class actions are "inherently complex." *Burns*, 2014 WL 12917621, at *4 (citing *Velez v. Novartis Pharms. Corp.*, No. 04-CV-9194 (CM), 2010 WL 4877852, at *12 (S.D.N.Y. Nov. 30, 2010)); *see also Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349 (NGG) (RER), 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021) ("Class action suits have a well-deserved reputation as being most complex[.]" (quotation marks omitted)); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-MD-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015) ("As a general rule, securities class actions are notably difficult and notoriously uncertain to litigate." (quotation marks omitted)), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (summary order).

This case has already been pending for more than two years. (*See* Compl., ECF No. 1.) Even assuming Plaintiffs can withstand Defendants' motion to dismiss, the parties would need to conduct extensive fact and expert discovery, litigate motions for class certification and summary judgment, and potentially carry out a trial and subsequent appeals, all before any class members might recover an award. (*See* Final Approval Mem., ECF No. 67, at 8–9.) Litigating this action is also made significantly

more complex, expensive, and risky because (1) "the pending motion to dismiss argued that every alleged misstatement was defective on one or more grounds, to wit, standing, falsity, materiality, scienter, and loss causation"; (2) in litigating motions for class certification, Defendants "would have challenged market efficiency, a requisite for proof of class-wide reliance"; (3) determinations on the accounting claims could require *Daubert* motions and would pit experts against each other "in a case where [3D Systems] did not state its interim financial results for 2020"; (4) due to turnover of executive officers, "proof of scienter would require demonstration of the mental state of five defendants"; and (5) "proving the amount of price decline due solely to revelation of the alleged misconduct" would "require Plaintiffs to prevail in a battle of experts on the issue of damages." (*Id*. at 8.) In short, the record amply establishes that litigating this case will be complex, expensive, and very time consuming. Accordingly, this *Grinnell* factor, in addition to Federal Rule of Civil Procedure 23(e)(2)(C)(i), favors settlement.

      b.  <u>Reaction of the Class to the Settlement</u>

      The reaction of the class also favors the proposed settlement. As the Second Circuit has noted, "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart*, 396 F.3d at 118; *see also In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 311 (E.D.N.Y. 2006). To date, as mentioned *supra*, 83,070[10] copies of the Postcard Notice were mailed to potential settlement class members, links to the Long Notice, Claim Form, and Summary Notice were emailed to 126,052 individuals, and the Summary Notice was published on

_____

[10] As set forth *supra* note 6, the Postcard Notices were initially mailed to 85,285 individuals, with 4,799 of those mailings returned as undeliverable. Of those 4,799 undeliverable mailings, SCS mailed another Postcard Notice to 301 forwarding addresses and 2,283 updated addresses. (SCS Decl., ECF No. 70-1, at 5, ¶ 8.)

*GlobeNewswire* and in the *Investor's Business Daily*. (SCS Decl., ECF No. 70-1, at 4–5, ¶¶ 6–9; *see* Final Approval Mem., ECF No. 67, at 20–21.) In addition, a website and toll-free number were created for this specific class settlement. (*See* SCS Decl., ECF No. 70-1, at 5–6, ¶¶ 10–11.) Class members had until October 24, 2023, to object to the settlement or request exclusion from the settlement class, and as of the November 21, 2023 Fairness Hearing, there had not been a single valid objection, and only one valid request for exclusion. (*Id.* at 6, ¶¶ 12–13; Suppl. SCS Decl., ECF No. 71-1, at 2–3, ¶ 7; Reply in Supp., ECF No. 71, at 2, 4–6; Tr. of Fairness Hearing, at 2:23–3:8.)

       c.  <u>Stage of the Proceedings & the Amount of Discovery Completed</u>

For this factor to favor settlement, the court must ensure that the parties have conducted a factual investigation sufficient for the court to evaluate the proposed settlement and confirm that pretrial negotiations were adequately adversarial. *See Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982); *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d at 85–86. Although the parties have not engaged in formal discovery, the record demonstrates that Plaintiffs' counsel have thoroughly investigated the strengths and weaknesses of the claims and conducted extensive legal research in responding to the motion to dismiss. (R. & R., ECF No. 63, at 10; *see* Tr. of Preliminary Fairness Hearing, ECF No. 62, at 9:15–9:16; Pls.' Mem. in Opp'n to Mot. to Dismiss, ECF No. 50-9.)

Therefore, because the Court finds that counsel had sufficient information "to appreciate the merits of the case," settlement is favored. *Burns*, 2014 WL 12917621, at *5, *see also Lea*, 2021 WL 5578665, at *9.

       d.  <u>Risks of Establishing Liability</u>

"In considering this factor, the Court need not adjudicate the disputed issues or decide unsettled questions; rather, 'the Court need only assess the risks of litigation

against the uncertainty of recovery under the proposed settlement.'" *In re Grana y Montera S.A.A. Sec. Litig.*, 2021 WL 4173684, at *13 (quoting *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)). Here, Plaintiffs "face substantial risks in establishing liability." *Id*. Defendants' motion to dismiss (ECF No. 50-1) was stayed pending resolution of this matter through mediation. (*See* Nov. 21, 2022 ECF Order.) Plaintiffs concede the possibility that the motion to dismiss could be granted, particularly considering the challenges involved in proving scienter. (*See* Final Approval Mem., ECF No. 67, at 15–16.) Indeed, "[t]he facts that [3D Systems] received unqualified audit opinions, [3D Systems] never restated financial results, and there was [sic] no unusual stock sales by the individual defendants could weigh against" a finding of scienter. (*Id*. at 16 (quotation marks omitted).) Moreover, "if Plaintiffs cannot demonstrate that Defendants knew investors scrutinized the misstated line items . . . Defendants could prevail even if scienter could be proved." (*Id*. (explaining that Defendants will argue that "the lack of a restatement provides evidence that the accounting errors — most of which resulted in misstatements well below 5% — were not material").) In addition, Plaintiffs' counsel noted that there is also a risk that Plaintiffs would not be able to certify a class, because although Defendants agreed to class certification, it was for settlement purposes only, and Defendants "preview[ed] a likely attack on market efficiency for some or all of the class period in the introductory paragraph of the motion to dismiss . . . [and] sought to exclude from the class all purchasers prior to January 7, 202[1]." (*Id*. at 18; *see* Mem. in Supp. of Mot. to Dismiss, ECF No. 50-1, at 29.)

For all of these reasons, the Court finds that the $4,000,000 proposed settlement eliminates a substantial risk of establishing Defendants' liability and favors the motion for final settlement approval. *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp.

2d at 177; *see also Massiah v. MetroPlus Health Plan, Inc.*, No. 11-CV-5669 (BMC), 2021 WL 5874655, at *4 (E.D.N.Y. Nov. 20, 2012) (explaining that "[o]ne purpose of a settlement is to avoid the uncertainty of a trial on the merits"); Fed. R. Civ. P. 23(e)(2)(C)(i).

      e.  Risks of Establishing Damages

Establishing loss causation in securities cases "is a complicated concept, both factually and legally," and "typically involve[s] conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 (quotation marks omitted); *see also Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) ("The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions."). In addition, moving forward to a trial naturally introduces an element of risk because a jury may only award a fraction of Plaintiffs' established damages. *See In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04-CV-8144 (CM), 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain when a [securities] case like this one is taken to trial, it is what the jury will come up with as a number for damages.").

Plaintiffs in this case recognize that "proof of damages in a securities fraud case is always difficult and invariably requires expert testimony" such that it is nearly impossible to predict how the jury will find regarding causation. (Final Approval Mem., ECF No. 67, at 17 (quotation marks omitted).) Plaintiffs further note that although they have cogently pled causation, "Defendants could argue other reasons, *e.g.* failure to provide revenue guidance, projection of disappointing gross margins, and a failure to file the 2020 Form 10-K until days after the earnings call . . . were responsible for some or all of the price decline between March 1 and March 8[,] 2021." (*Id.* at 17–18.)

22

In light of these risks, the Court finds this factor also favors settlement. *See Mikhlin*, 2021 WL 1259559, at *6 (noting that where "[b]oth parties would present expert testimony on the issue of damages," it is "'virtually impossible to predict' which side's testimony would be found more credible, as well as 'which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.'" (quoting *Strougo v. Bassini*, 258 F. Supp. 2d 254, 259–60 (S.D.N.Y. 2003))); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i).

      f.   <u>Risks of Maintaining a Class Action Through Trial</u>

"Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin*, 2021 WL 1259559, at *6 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 40). Here, where the parties stipulated to class certification for the purpose of settlement, and Defendants would have vigorously opposed certification otherwise (*see* Final Approval Mem., ECF No. 67, at 18), "[t]he risks attendant to certifying a class and defending any decertification motion supports approval of the settlement." *Lea*, 2021 WL 5578665, at *10 (citing *Garland v. Cohen & Krassner*, No. 08-CV-4626 (KAM) (RLM), 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011)); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 ("The risk of maintaining a class throughout this long and protracted litigation weighs in favor of settlement approval.").

      g.   <u>Ability of Defendants to Withstand a Greater Judgment</u>

"This factor stands for the proposition that if a defendant could not withstand a greater judgment than what is provided for in the settlement, then the settlement is more likely to be reasonable, fair, and adequate." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *14 (citing *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104,

129 (S.D.N.Y. 1997)). As to this factor, Plaintiffs point to the fact that "[i]n its most-recent Form 10-Q filed with the SEC, [3D Systems] reported cash and short-term investments . . . down 23% from a year earlier." (Final Approval Mem., ECF No. 67, at 24.) "Given the steady cash burn," Plaintiffs posit that it is very unlikely that Defendants "would utilize [3D Systems]'s resources to fund a securities class action settlement." (*Id.*) In other words, 3D Systems may not have cash reserves sufficient to pay a large judgment. Accordingly, although 3D Systems "may have been able to withstand a greater judgment, 'the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate . . . especially where other applicable factors weigh heavily in favor of settlement approval." (*Id.* (citing *In re Glob Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 460); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 47 ("Although the Court finds that this factor weighs against a grant of final approval, it does not necessarily preclude a finding that the settlement is fair.").) Accordingly, as the Court previously concluded, although the proposed $4,000,000 settlement amount may be less than Defendants' theoretical capacity to pay, based on Plaintiffs' representations regarding the financial outlook of 3D Systems moving forward, the Court again finds that this factor should not preclude settlement approval. (R. & R., ECF No. 63, at 18.)

       h.  <u>Range of Reasonableness of the Settlement Fund in Light of Best Possible Recovery and in Light of All Attendant Risks of Litigation</u>

These final two *Grinnell* factors "are often combined for the purposes of analysis." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 48. "In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *Id.* (quotation marks

omitted); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i). "[S]ettlements have been approved as reasonable where the settlement provides a 'meaningful benefit' to the class." *Burns*, 2014 WL 12917621, at *5 (quoting *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d at 340).

Here, the $4 million settlement represents approximately 1% of the maximum estimated aggregate damages, $414.1 million, assuming Plaintiffs can prove all their relevant causation arguments. (*See* Final Approval Mem., ECF No. 67, at 19.) However, for Plaintiffs to succeed in obtaining a judgment of $414.1 million, they would have to "prevail on the motion to dismiss, achieve class certification in the face of a market efficiency challenge (and a possible *Daubert* challenge to Plaintiffs' expert), survive summary judgment, and prove to a jury that 100% of [3D Systems'] price declines from March 1–8, 2021, were caused by the revelation of the accounting misstatements, misattribution of industrial sector revenue growth, and the nature and impact of the inadequate internal controls." (*Id.*) In other words, "Plaintiffs achieving complete victory on the issue of loss causation and damages [would be] nearly impossible." (*Id.*)

Based on the substantial litigation risks discussed above, and because the settlement here was reached with the assistance of an experienced mediator, the Court concludes that the settlement amount is within a reasonable range.[11] *See Grinnell*, 495

---

[11] The Court further notes that the approximately 1% settlement amount proposed in this case, although somewhat lower than the median settlement for cases with similar estimated losses, is not dramatically so. *See* NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, at 17, https://www.nera.com/content/dam/nera/publications/2023/PUB_2022_Full_Year_Trends.pdf (last visited Nov. 29, 2023) (estimating a 1.6% median settlement amount for similarly valued cases filed and settled from December 2011 to December 2022); *see also* Cornerstone Research, *Securities Class Action Settlements: 2022 Review and Analysis*, at 4, https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf (last visited Nov. 29, 2023).

F.2d at 455 n.2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *see also Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) ("It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) ("It is more important to assess the judgment in light of plaintiffs' claims and the other factors."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 468, 483 (S.D.N.Y. 2009) (approving $586 million settlement that represented only 2% of aggregate expected recovery).

3. *Allocation of Settlement Fund*

The method of distributing relief and processing class member claims also supports approving the settlement. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii). Like the settlement agreement itself, the plan of allocation "must also be fair and reasonable." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 316; *see also In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 158 (S.D.N.Y. 2013) ("When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis."). Furthermore, a proposed claims processing method "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 40 (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

Here, the method for processing settlement class members' claims and distributing the net settlement fund to eligible claimants includes well established, effective procedures, and was developed with the assistance of a damages expert. (*See* Phillip Kim Decl., ECF No. 70, at 5; SCS Decl., ECF No. 70-1.) SCS will process the

26

claims under Plaintiffs' counsel's guidance, allow claimants an opportunity to cure any purported deficiencies or request that the Court review their claim denial and, if approved, mail or wire authorized claimants their *pro rata* share of the net settlement fund. (SCS Decl., ECF No. 70-1, at 11; Stip. of Settl., ECF No. 55-1, at 10–11; Final Approval Mem., ECF No. 67, at 20–21.) This methodology is appropriate and consistent with many other securities class action settlements' plans of allocation, and treats class members equitably relative to each other. *See Lea*, 2201 WL 5578665, at *11; *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 317; Fed. R. Civ. P. 23(e)(2)(D).

    4.  *Identification of Other Agreements*

    Federal Rule of Civil Procedure 23(e) requires the Court to take into account "any agreement made in connection with" the proposed settlement. Fed. R. Civ. P. 23(e)(3), (e)(2)(C)(iv). The parties have entered into a supplemental agreement filed under seal establishing conditions under which Defendants may terminate the settlement if a certain threshold of opt-outs is reached (*See* Final Approval Mem., ECF No. 67, at 21; Stip. of Settl., ECF No. 55, at 20, ¶ 2.12.) As Plaintiffs have explained, the terms of the supplemental agreement were kept confidential to "prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts." (Final Approval Mem., ECF No. 67, at 21.) Given the specific function of this separate agreement, it does not appear to bear upon the overall fairness of the settlement agreement itself. *See Mikhlin*, 2021 WL 1259559, at *8 (finding that "the general contours of the supplemental agreement are not incompatible with class members' receipt of adequate relief" because "in the event that Defendants' termination right is activated, and that Defendants exercise such right, Plaintiffs would be still be in a position to pursue relief through litigation"); *see also Christine Asia Co. v. Yun Ma*, No. 15-MD-2631 (CM) (SDA), 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019) ("This type of

agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement."). Accordingly, the Court finds that the supplemental agreement does not pose an impediment to final approval of the settlement.

### C. Attorneys' Fees and Costs & Plaintiff Awards

Rule 23(e)(2)(C)(iii) also requires consideration of "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Plaintiffs' counsel seek an attorneys' fee award of 33.33% of the settlement amount, $43,860.32 in costs, and $21,500 in total as an award for the lead plaintiff and four named plaintiffs. (*See* Fees Mem., ECF No. 69, at 7.) Counsel argues that these amounts are warranted based upon the risks involved in the litigation, the quality of counsel, and the fees granted in similar securities class action litigations. (*See generally id.*) Having reviewed the documents submitted by class counsel in support of their requests, including attorney declarations, billing records, and invoice summaries for the claimed costs, the Court finds that fees totaling 33.33% of the settlement amount, $43,860.32 in costs, and a total award of $21,500 to the lead plaintiff and named plaintiffs to be reasonable, and therefore recommends approval of the requested fees, costs, and awards.[12]

---

[12] Federal Rule of Civil Procedure 23(e)(2)(C)(iii) also requires courts to consider the "timing of payment" for "any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, the parties' settlement agreement calls for "attorneys' fees, costs, and expenses" to be paid from the Settlement Fund to Plaintiffs' counsel "immediately upon entry of the Court's order awarding such fees and expenses, notwithstanding any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof." (Stip. of Settl., ECF No. 55, at 28, ¶ 7.1.) While courts in this circuit have found "quick-pay" provisions like this one to be objectionable in certain cases, *see, e.g., Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020), the Court does not find such an arrangement to be problematic here because (1) the claims administrator is tasked with distributing the fund to approved claimants, not counsel; and (2) the Court will retain jurisdiction over any disputes arising out of the administration of the settlement fund. (Stip. of Settl., ECF No. 55, at ¶¶ 6.0, 9.6.) Accordingly, while the timing of the award of attorneys' fees does not necessarily "bolster the case for . . . approval, it also does not undercut th[e] case where, as here, the majority of other factors weigh significantly in its favor." *Mikhlin*, 2021 WL 1259559, at *7.

1.  *Attorneys' Fees*

When determining appropriate counsel fees in class actions, courts generally use "the lodestar method or award[] fees based on a percentage of the settlement fund." *In re Parking Heaters, Antitrust Litig.*, No. 15-MC-940 (DLI) (JO), 2019 WL 8137325, at *6 (E.D.N.Y. Aug. 15, 2019) (citing *Goldberger*, 209 F.3d at 47), *report and recommendation adopted*, Sept. 30, 2019 ECF Order. The "lodestar method" multiplies a reasonable number of hours spent on the case by a reasonable hourly rate, whereas the "common fund method" calculates the fee amount as a percentage of the total award. *Id*. (citing *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417–22 (2d Cir. 2010)). Courts using the percentage of the fund method, which is the "trend in this Circuit," will also "cross-check the percentage fee against counsel's 'lodestar' amount of hourly rate multiplied by hours spent." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *9 (citing *Wal-Mart Stores*, 396 F.3d at 121; *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011)). Under either method, courts will also consider the following *Goldberger* factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *16 (citing *Goldberger*, 209 F.3d at 50); *see also Burns*, 2014 WL 12917621, at *8 (same).

As discussed, counsel seeks one-third of the settlement fund, or $1,333,333. (Fees Mem., ECF No. 69, at 7.) This amount constitutes approximately 174% of counsel's

aggregate lodestar amount, which is $764,660 billed for 938.2 hours worked.[13] (*See* Fees Mem., ECF No. 69, at 15–16; Billing Recs., ECF No. 72-1.) Analyzing this requested award against the *Goldberger* factors and cross-checking it against the lodestar both favor approval of the requested fees.

      a.  <u>Goldberger Factors</u>

First, the time and labor expended by class counsel in this case is reasonable considering that the litigation has been proceeding for more than two years, required litigating a motion to dismiss, and included extensive settlement negotiations with the assistance of a professional mediator. (*See* Fees Mem., ECF No. 69, at 17.) Moreover, the claimed time is supported by Plaintiffs' counsel's declaration and corresponding billing records. (*See* Phillip Kim Decl., ECF No. 70, at 8–10; Billing Recs., ECF No. 72-1.)

Second, this case involves complex questions concerning liability and damages that would have required the introduction of difficult to obtain documentary and deposition evidence, as well as significant reliance on experts. (*See* Fees Mem., ECF No. 69, at 23; Final Approval Mem., ECF No. 67, at 14.) *See also In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *7 (recognizing that "class actions like these are complex, expensive, and lengthy").

Third, the risk of litigation, which is "often cited as the first, and most important *Goldberger* factor," weighs in favor of approving the requested fee, as "[c]lass counsel undertook this litigation on a contingent basis and have received no payment for their work during the roughly [two and a half] years that the case has remained pending

---

[13] Plaintiffs' counsel's aggregate lodestar is calculated by multiplying 938.2 hours worked by the "rates for attorneys who worked on this litigation, ranging from $875 to $1,075 for partners and $550 to $800 for associates and counsel." (Fees Mem., ECF No. 69, at 15, n.5; *see* Billing Recs., ECF No. 72-1.)

. . . ." *Lea*, 2021 WL 5578665, at *12 (citing *Goldberger*, 209 F.3d at 54; *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 361). Indeed, Plaintiffs' counsel note that the case "posed significant obstacles to success at each stage of the litigation, with a vigorous defense . . . which began even before the Court appointed Lead Plaintiff and Lead Counsel." (Fees Mem., ECF No. 69, at 19 (explaining how the "response to lead plaintiff motions indicated intent to file a motion to dismiss and reserved right to challenge the not-yet-appointed lead plaintiff at class certification").)

Fourth, as noted above, lead counsel possess substantial experience litigating complex securities class action cases and have provided quality representation to Plaintiffs and the putative class by, among other things, successfully negotiating a settlement. (*See, e.g.*, Rosen Law Firm Resume, ECF No. 70-8; Fees Mem., ECF No. 69, at 23–25.)

Fifth, the requested one-third fee in relation to the settlement is unopposed and constitutes a proportion routinely approved as reasonable. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 445 ("[I]t is very common to see 33% contingency fees in cases with funds of less than $10 million . . . ."); *see also Burns*, 2014 WL 12917621, at *10.

Finally, public policy considerations also favor approval of the requested fee amount. In addition to obtaining relief for investors alleging violations of securities laws, "[c]ourts in this Circuit have recognized the importance of private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *18 (citing *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515–16 (S.D.N.Y. 2009)).

31

b. Underlined Lodestar Cross-Check

The requested fees are also reasonable under the lodestar method. Lead Counsel represents that they have spent 938.2 total hours litigating this case, producing an aggregate lodestar amount of $764,660 when multiplied by counsel's hourly billing rates. (Fees Mem., ECF No. 69, at 9, n.5; *see* Billing Recs., ECF No. 72-1.) This results in a lodestar multiplier of approximately 1.74, which is "well within the range of multipliers commonly awarded in securities class actions and other complex litigation." (Fees Mem., ECF No. 69, at 15–16.) *See, e.g.*, *Wal-Mart*, 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *Burns*, 2014 WL 12917621, at *10 (holding a fee award of 33.3% as reasonable based on cross-check multiplier of 4.75); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1988) (upholding a multiplier of 3.97 as reasonable).

The Court notes, however, that Plaintiffs' counsel's billing records reflect hourly rates that exceed those normally approved in this district for similar services.[14] *See In re KeySpan Corp. Sec. Litig.*, No. 01-CV-5852 (ARR), 2005 WL 3093399, at *14 (E.D.N.Y. Sept. 30, 2005) ("The reasonable hourly rates should be based on the rates 'prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation.'") (citing *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1159 (2d Cir. 1994)); *Rosenfeld v. Lenich*, No. 18-CV-6720 (NGG) (PK), 2022 WL 2093028, at *4 (E.D.N.Y. Jan. 19, 2022) (approving hourly rates ranging from $225 to $900 in a large class action settlement); *In re Converse Tech. Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) (approving rates ranging from $125 to $880 in a

_____

[14] The Rosen Law Firm lists an hourly rate ranging from $550 for associates to $1,075 for partners. (*See* Lodestar Calculation Chart, Phillip Kim Decl., ECF No. 70, at 8–9.)

securities class action). However, even applying reduced hourly rates, a reasonable aggregate lodestar is $654,895, which would produce a lodestar multiplier of approximately 2.03 relative to the requested fee amount.[15]

Even at this reduced amount, the multiplier "is below what has been deemed reasonable for the common fund settlements in securities class action cases in this circuit." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *18 (citing *Athale v. Sinotech Energy Ltd.*, No. 11-CV-5831 (AJN), 2013 WL 11310686, at *8 (S.D.N.Y. Sept. 4, 2013); *Carlson v. Xerox Corp.*, 355 F. App'x 523, 526 (2d Cir. 2009) (summary order)). Moreover, counsel will expend additional time on this litigation following the adjudication of these motions, which will increase any lodestar calculations. (Tr. of Fairness Hearing, at 7:10–7:16.) Accordingly, the lodestar cross-check also favors approval of the uncontroverted amount of fees awarded in the settlement.

*   *   *   *   *

In light of the foregoing, the Court respectfully recommends that Plaintiffs' counsel's request for attorneys' fees in the amount of one-third of the settlement fund be approved.

2. *Attorneys' Expenses*

"The Court may award counsel reasonable out-of-pocket expenses that were necessary to successfully litigate and resolve the action." *Burns*, 2014 WL 12917621, at *11 (citing *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d at 363–64; *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. at 468). Plaintiffs' counsel request

---

[15] The Court calculated this reduced lodestar by multiplying the hours spent on the litigation by hourly rates the Court finds reasonable for this district, i.e., $900 for partners, $700 for attorneys who hold the position of counsel, and $225 for associates.

reimbursement for $43,860.32 in expenses incurred while prosecuting this action.[16] (*See* Phillip Kim Decl., ECF No. 70, at 9; Fees Mem., ECF No. 69, at 26–27; Expense Receipts, ECF No. 72-2.) Counsel state that "the expenses were incurred for professional services rendered by Plaintiffs' accounting and damages experts and investigator, costs of mediation, legal and factual research, notice to investor fees, printing, and other expenses incurred in the course of litigation . . . [which were] critical to Plaintiffs' success in achieving the proposed Settlement." (Fees Mem., ECF No. 69, at 27.)

Having reviewed counsel's expense charts, *see infra* note 16, and given that the Notice distributed to potential class members anticipated up to $50,000 in litigation expenses (*see* Long Notice, ECF No. 55-2, at 2, 13), the Court finds that the claimed costs were, on the whole, reasonably expended and should be reimbursed. Accordingly, the Court respectfully recommends approving the request for an award of attorneys' expenses in the amount of $43,860.32.

3. *Plaintiffs' Awards*

"Incentive awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325,

---

[16] The $43,860.32 in costs is comprised of: (1) $10,106 in investigator fees; (2) $8,730 in accounting expert fees; (3) $3,783 in financial expert fees; (4) $1,661.53 in online computer legal research and document retrieval fees; (5) $402 in court filing fees; (6) $13,777.69 in mediation fees; (7) $42.42 in postage and FedEx fees; (8) $4,656.93 in notice to class members and press release fees; (8) $400.75 in printing fees; and (9) $300 in travel, transportation, and meal fees. (List of Unreimbursed Expenses Chart, Phillip Kim Decl., ECF No. 70, at 9 (listing these fees and noting that, as to the travel, transportation, and meal fees, the $300 "includes anticipated expenses associated with attending the [November 21, 2023] Settlement Hearing").)

34

at *8 (quotation marks omitted); *see also Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101 (E.D.N.Y. 2015) (same).

Here, Plaintiffs seek an award of $7,500 to lead plaintiff Darrell E. Cline and $3,500 to each of the other four named plaintiffs, Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez, and Diane Van Alstyne, totaling $21,500, in connection with their representation of the settlement class. (*See* Fees Mem., ECF No. 69, at 27–28.) Each of these five Plaintiffs submitted declarations detailing their efforts in this action over the past two years. (*See generally* Cline Decl., ECF No. 70-3; Kehoe Decl., ECF No. 70-4; Woods Decl., ECF No. 70-5; Herrera Martinez Decl., ECF No. 70-6; Van Alstyne Decl., ECF No. 70-7.) The incentive awards requested in this case are in line with or are more modest than others that have been awarded in the Second Circuit. *See, e.g., Lea*, 2021 WL 5578665, at *13 (awarding $7,500 to two lead plaintiffs); *Kindle v. Dejana*, 308 F. Supp. 3d 698, 718 (E.D.N.Y. 2018) (approving award of $10,000 to a named Plaintiff). Accordingly, the Court respectfully recommends approving the application for an incentive award of $7,500 to lead plaintiff Darrell E. Cline and $3,500 to named plaintiffs Troy Kehoe, Alfonzo Woods, Osiel Herrera Martinez, and Diane Van Alstyne.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends granting Plaintiffs' motions for final settlement approval (ECF No. 66) and for attorneys' fees, reimbursement of litigation expenses, and award to Plaintiffs (ECF No. 68).

*    *    *    *    *

Objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Nicholas G. Garaufis, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate

courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a)

(providing the method for computing time). Failure to file objections within the

specified time waives the right to appeal the District Court's order. *See, e.g., Caidor v.*

*Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object

timely to a . . . report [and recommendation] operates as a waiver of any further judicial

review of the magistrate [judge's] decision" (quotation marks omitted)).

     **SO ORDERED.**

Dated:  Brooklyn, New York
      December 5, 2023

*Taryn A. Merkl*
_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE